**2022-2248**

In The
# United States Court of Appeals
For The Federal Circuit

## UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES,

*Plaintiff – Appellant*,

v.

## UNITED STATES,

*Defendant – Appellee.*

**APPEAL FROM THE
UNITED STATES COURT OF FEDERAL CLAIMS
IN NO. 1:15-cv-01549-PEC, JUDGE PATRICIA E. CAMPBELL-SMITH.**

## NON-CONFIDENTIAL BRIEF OF APPELLANT

**Steven B. Kelber**
**THE KELBER LAW GROUP**
**6701 Democracy Boulevard, Suite 300**
**Bethesda, Maryland 20817**
**(240) 506-6702**
**steve@kelberlawgroup.com**

***Counsel for Appellant***

**Jerry Stouck**
**THE LAW OFFICES OF JERRY STOUCK**
**10863 Symphony Park Drive**
**North Bethesda, Maryland 20852**
**(301) 807-5100**
**jerrystouck@verizon.net**

***Counsel for Appellant***

THE LEX GROUP[DC] ♦ 1050 Connecticut Avenue, N.W. ♦ Suite 500, #5190 ♦ Washington, D.C. 20036
(202) 955-0001 ♦ (800) 856-4419 ♦ www.thelexgroup.com

# CLAIMS AT ISSUE

1. A transgenic mouse with enhanced Alzheimer's Disease related amyloid accumulation in its brain produced by:

producing an $F_1$ generation mouse by crossing a first transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter with a second transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the first transgenic mouse expresses the DNA sequence encoding the mutant presenilin and wherein the second transgenic mouse expresses the DNA sequence encoding the APP; and

selecting from the offspring of the cross, those transgenic mice whose genome comprises at least one DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, and identifying an $F_1$ mouse which express both transgenes such that the $F_1$ mouse develops accelerated deposition of Aβ in its brain as compared to non-transgenic mice or either parental mouse.

2. The mouse as set forth in claim 1, wherein the first transgenic mouse is homozygous for the mutant presenilin transgene.

3. A transgenic mouse with accelerated Alzheimer's Disease related pathology whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that the mouse develops accelerated deposition of Aβ in their brains as compared to non-transgenic mice or transgenic mice expressing either transgene.

4. The mouse as set forth in claim 3, wherein the first transgenic mouse is homozygous for the mutant presenilin transgene.

5. A transgenic mouse with accelerated Alzheimer's Disease related pathology whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that the mouse develops accelerated deposition of Aβ in its brain within six months of birth as compared to non-transgenic mice or transgenic mice expressing either transgene.

6. The mouse as set forth in claim 5, wherein the first transgenic mouse is homozygous for the mutant presenilin transgene.

7. A transgenic mouse with accelerated Alzheimer's Disease related pathology whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that the accelerated pathology develop accelerated deposition of Aβ in its brain as compared to non-transgenic mice or mice expressing either transgene.

8. A transgenic mouse with elevated levels of amyloidogenic Aβ (Aβ42(43)) as a pathology for Alzheimer's Disease whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that the mouse develops accelerated deposition of Aβ (Aβ42(43)) in its brain as compared to non-transgenic mice or transgenic mice expressing either transgene.

9. A transgenic mouse with elevated levels of amyloidogenic Aβ (Aβ42(43)) as a pathology for Alzheimer's Disease whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that an elevated level of Aβ (Aβ42(43)) protein deposits in it's brain as compared to non-transgenic mice or transgenic mice expressing either transgene.

10. A method of screening for two expressible transgenes, the method comprising:

producing an $F_1$ generation mouse by crossing a first transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding mutant presenilin operably linked to a promoter with a second transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the first transgenic mouse expresses the DNA sequence encoding the mutant presenilin and wherein the second transgenic mouse expresses the DNA sequence encoding the APP; and

selecting from the offspring of the cross, those transgenic mice whose genome comprises at least one DNA sequence encoding mutant presenilin operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, and identifying an $F_1$ mouse which express both transgenes such that the $F_1$ mouse develops accelerated deposition of Aβ in its brain as compared to non-transgenic mice or either parental mouse.

11. A method for preparing a transgenic mouse with elevated levels of amyloidogenic Aβ (Aβ42(43)) as a pathology for Alzheimer's Disease the method comprising:

producing an $F_1$ generation mouse by crossing a first transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding mutant presenilin operably linked to a promoter with a second transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the first transgenic mouse expresses the DNA sequence encoding the mutant presenilin and wherein the second transgenic mouse expresses the DNA sequence encoding the APP; and

selecting from the offspring of the cross, those transgenic mice whose genome comprises at least one DNA sequence encoding mutant presenilin operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, and identifying an $F_1$ mouse which express both transgenes such that the $F_1$ mouse develops accelerated deposition of Aβ (Aβ42(43)) in their brains as compared to non-transgenic mice or either parental mouse.

12. The method as set forth in claim 11, wherein the mutant presenilin is M146L.

13. A method of preparing a transgenic mouse with enhanced Alzheimer's Disease related amyloid pathology, the method comprising:

producing an $F_1$ generation mouse by crossing a first transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter with a second transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the first transgenic mouse expresses the DNA sequence encoding the mutant presenilin and wherein the second transgenic mouse expresses the DNA sequence encoding the APP; and

selecting from the offspring of the cross, those transgenic mice whose genome comprises at least one DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, and identifying an $F_1$ mouse which express both transgenes such that the $F_1$ mouse develops accelerated deposition of AD in its brain as compared to non-transgenic mice or either parental mouse.

14. The method as set forth in claim 13, wherein the first transgenic mouse is homozygous for the mutant presenilin transgene.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-2248

**Short Case Caption** University of South Florida Board of Trustees v. United States

**Filing Party/Entity** University of South Florida Board of Trustees

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/27/2022

Signature: /s/ Steven Kelber

Name: Steven Kelber

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| University of South Florida Board of Trustees | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| The Kelber Laws Group, LLC | Steven Kelber | |
| Greenberg & Traurig | Jerry Stouck | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... iii

I. STATEMENT OF RELATED CASES ..... 1

II. JURISDICTIONAL STATEMENT ..... 1

III. STATEMENT OF THE ISSUES ..... 2

IV. STATEMENT OF THE CASE ..... 3

V. SUMMARY OF THE ARGUMENT ..... 12

VI. ARGUMENT ..... 14

I. Standard of Review ..... 18

II. The Court Misstated the Testimony It Relied Upon ..... 18

A. Marcia Gordon Did Not Receive Funds Under the Federal Grant Before November, 1997 ..... 18

B. There Is NO Testimony that Mayo Grant Money Went to USF to Pay for the Mice of the '094 Patent ..... 20

III. The Court Found an Implied-in-Fact Agreement to Exist Only by Ignoring the Requirements for Such an Agreement, The Prior Existence of an Express Contract for the Same Work and Extended a License to the Government for Entirely Separate Work That Would Not Provide a License Under the '094 Patent ..... 22

A. The Court Erred in Failing to Apply the Proper Standard ..... 22

No Mutuality of Intent to Contract ..... 23

No Consideration ..... 24

No Offer and Acceptance........................................................26

No Government Authority ......................................................27

B. The Court Erred in Granting an Implied-in-Fact License Where an Express Contract for the Same Work Was Established ..........................................................................29

C. The Subcontract Between Mayo and USF was for Project V Not the '094 Patent ...............................................................30

IV. It Was Error to Find an Implied-In-Fact Agreement on this Record Could Satisfy the Requirements of a 'Funding Agreement' Under the Bayh-Dole Act ..............................................32

A. There Are Good Reasons the CFC's Imagined Implied-in-Fact Agreement Does Not Satisfy the Bayh-Dole act Requirements ..........................................................................35

VII. CONCLUSION.............................................................................38

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

**<u>CONFIDENTIAL MATERIAL OMITTED</u>**

This Brief on Appeal was prepared subject to Limited Protective Order. No information was included in this Brief whose redaction would have been required by the Protective Order. See footnote 1 of Appx0005.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Atlas Corp. v. United States*,
899 F.2d 745 (Fed. Cir. 1990) ....................30

*Bank of Guam v. United States*,
578 F.3d 1318 (Fed. Cir. 2009) ....................30

*Ciba-Geigy Corp. v. Alza Corp*.,
804 F. Supp. 614 (DNJ 1992) ....................32

*City of El Centro v. United States*,
922 F.2d 816 (Fed. Cir. 1990) ....................23

*Federal Crop Ins. Corp. v. Merrill*,
332 U.S. 380 (1947) ....................23, 28

*Fincke v. United States*,
675 F.2d 289 (Ct. Cl. 1982) ....................23

*Hanlin v. United States*,
316 F.3d 1325 (Fed. Cir. 2003) ....................24

*Hanson v. United States*,
1988 WL 98384 (Fed. Cir. 1988) ....................28

*ITT Federal Support Services v. United States*,
531 F.2d 522 (Ct. Cl. 1976) ....................25

*Jossi v. Derwinski*,
1993 WL 173704 (9th Cir. 1993) ....................25

*Juda v. United States*,
6 Cl. Ct. 441 (1984) ....................23, 28

*Kam–Almaz v. United States*,
682 F.3d 1364 (Fed. Cir. 2012) ....................................................................27

*Lewis v. United States*,
570 F.3d 597 (Fed. Cir. 1999) ......................................................................24

*Madey v. Duke University*,
413 F. Supp. 2d 601 (MD NC 2006), *aff'd in relevant part*,
307 F.3d 1351 (Fed. Cir. 2002) ............................................................... 32-33

*Network Signatures, Inc. v. Citibank, N.A.*,
2008 WL 5216032 (C.D. Cal. 2008) ............................................................35

*Pacific Gas & Elec. Co. v. United States*,
3 Cl. Ct. 329 (1983), *aff'd*,
738 F.2d 452 (Fed. Cir. 1984) ......................................................................28

*Pierce v. Underwood*,
487 U.S. 552 (1988).........................................................................................18

*Prudential Ins. Co. of America v. United States*,
801 F.2d 1295 (Fed. Cir. 1986), *cert. denied*,
107 S. Ct. 1289 (1987).....................................................................................28

*Russell Corp. v. United States*,
537 F.2d 474 (Ct. Cl. 1976), *cert. denied*,
429 U.S. 1073 (1977).......................................................................................23

*Schism v. United States*,
316 F.3d 1259 (Fed. Cir. 2002) ....................................................................30

*Stanford University v. Roche Molecular Systems, Inc.*,
563 U.S. 776 (2011).........................................................................................17

*Taylor v. United States*,
597 Fed. Appx. 644 (Mem) (Fed. Cir. 2015) ................................................26

*Turping v. United States*,
913 F.3d 1060 (Fed. Cir. 2019) ....................................................................24

**STATUTES**

28 U.S.C. §1295(3) ....... 2

28 U.S.C. §1491(a) ....... 38

28 U.S.C. §1498(a) ....... 1, 7, 29

35 U.S.C. §§200 – 212 ....... 1, 2, 8, 9

35 U.S.C. §§202 – 212 ....... 33

35 U.S.C. §202 ....... 3, 34

35 U.S.C. §202(c) ....... 2, 13, 35, 36

35 U.S.C. §202(c)(1–8) ....... *passim*

35 U.S.C. §202(c)(4) ....... 34, 35, 39

35 U.S.C. §204(c) ....... 36

35 U.S.C. §204(c)(4) ....... 27

**REGULATIONS**

37 C.F.R. §401.14 ....... 37

37 C.F.R. §401.14(G) ....... 33, 34

**OTHER AUTHORITY**

*Hsiao et al*, Science, 274, 5284 (1996) ....... 4

## I. <u>STATEMENT OF RELATED CASES</u>

Counsel for Appellant the University of South Florida Board of Trustees ("USF" herein) is unaware of any case pending in this or any other court that will directly affect or be directly affected by this court's decision in this appeal

## II. <u>JURISDICTIONAL STATEMENT</u>

The United States Court of Federal Claims ("CFC") had jurisdiction over USF's Complaint pursuant to 28 U.S.C. §1498(a) by reason of the use, by an agency of the United States – National Institutes of Health ("NIH" herein) – of the subject matter of U.S. Patent No. 5,898,094 ('094 Patent' herein). NIH granted retroactive "authorization and consent" in a letter to The Jackson Laboratory, the party actually using and selling the patented subject matter, dated June 17, 2011. The "authorization and consent" referenced contracts from NIH in favor of The Jackson Laboratory dating back to as early as 1993.

The CFC entered judgment in favor of the United States of America ("Government" herein) based solely on its determination that the Government enjoys a license under the '094 Patent claims pursuant to the provisions of the Bayh-Dole Act (35 U.S.C. §§200 – 212). The court found an "implied-in-fact" agreement was formed between USF and Mayo Foundation of Minnesota ("Mayo" herein) the grantee of U.S. Grant 1PO1AG014633 ("AG014633"). The CFC found that "implied-in-fact" agreement to be a subcontract "funding agreement" pursuant

to the provisions of 35 U.S.C. §202(c). This Court has jurisdiction over this appeal pursuant to the provisions of 28 U.S.C. §1295(3).

The United States Court of Federal Claims entered judgment on September 2, 2022. This appeal was filed September 16, 2022, within the time frame established for such appeals. This appeal is from the final judgment of the U.S. Court of Federal Claims, as reflected on page 12 of the decision.

## III. STATEMENT OF THE ISSUES

The Decision of the CFC was contrary to the facts established on the record, contrary to the law established for 'implied-in-fact" agreements and contrary to the requirements and intent of the Bayh-Dole Act, 35 U.S.C. §§200 – 212.

**USF identifies the following issues for review in this matter.**

**1.** Whether the CFC erred in finding: a) that any money from Mayo's Grant was paid to USF at any time for any purpose prior to November 8, 1997 – well after the reduction to practice of the invention of the '094 Patent; and b) that any money from Mayo's Grant was paid for any purpose connected to or in support of any work related to the '094 Patent.

**2.** Whether the CFC committed multiple mistakes of law in 'creating' an implied-in-fact agreement between Mayo and USF as of October 1996 which satisfied the requirements of a "Funding Agreement" under the Bayh-Dole Act sufficient to give the Government a license under the '094 Patent.

**3.** Whether the CFC erred in finding that an implied-in-fact agreement that did not reflect the elements of 35 U.S.C. §202(c)(1–8) was nonetheless a "funding agreement" pursuant to 35 U.S.C. §202 that provided the Government a license to use the mice of the '094 Patent.

## IV. STATEMENT OF THE CASE

Alzheimer's disease was characterized by Alois Alzheimer in 1906. Today, more than 6 million Americans are diagnosed as suffering from Alzheimer's disease. No cure has been identified. For over 90 years following its characterization, there were no experiments conducted to identify treatments or causes of Alzheimer's disease, because no animal model for that disease existed. No naturally occurring animal other than man contracts the disease. Therefore – to study possible treatments and prevention, without experimenting on humans, an animal model needed to be created. Beginning in early 1995, researchers at USF began to focus on specific technology that would provide an animal model of Alzheimer's disease and permit the development of treatments and prevention of Alzheimer's disease. To this end, an Application for Grant was prepared, Appx2793-2844 seeking funds from the Federal Government to support research in on five projects each related to Alzheimer's disease but separate and distinct from each other in terms of the work to be done. Projects 1–5 were described (Appx1869-1870) as:

> Project 1 – To develop a better understanding of the role of mutations in Presenilin Genes in the development of early onset of Alzheimer's disease;
>
> Project 2 – To better understand the role of specific gene promoter elements which direct the expression of Presenilin Genes;
>
> Project 3 – An effort to better correlate the understanding of the effect of mutations in Presenilin Genes with those in APP genes involved in the development of Alzheimer's disease;
>
> Project 4 – To assess the effects of introducing mutations in genes involving the presenilin and APP genes; and
>
> Project V – To study the impact of Alzheimer's disease related mutations in the intact brains of rats.

Of those five projects, only one – **Project IV** – called for the creation of mice expressing gene mutations prepared by cross-breeding mice that expressed one Alzheimer's related mutation – the APPswe mutation, with mice that expressed a different class of Alzheimer's disease related mutations, presenilin gene mutations. The Grant Application discussed this aspect of Project IV in detail (Appx1989) under the heading "mouse crosses" noting that the genetically altered mice might accelerate and enhance the Alzheimer's disease pathology exhibited by such mice. Then extant mice models, such as those described in *Hsiao et al*, Science, 274, 5284 (1996) did not exhibit Alzheimer's disease pathology until they were too old to be the subjects of useful testing.

The lead investigators for Project IV, John Hardy and Karen Duff prepared mice exhibiting genetic mutations which caused the mice to exhibit Alzheimer's

disease pathology much earlier in time than any other mice or other test organism. In fact, these mice exhibited Alzheimer's disease pathology five months after birth. These "double cross mice," expressing a presenilin mutation[1] and the APPswe mutation, exhibited Alzheimer's disease pathology so early that they could be test beds for experiments on possible causes, treatments, and cures of Alzheimer's disease. Those mice were claimed in the '094 Patent, including Claims 7 and 8. The first provisional patent application disclosing those "double cross mice" was filed by USF, naming Hardy and Duff as inventors, on October 26, 1996.

The Grant Application submitted in late 1995 seeking funding to conduct research on all five projects was approved and the Grant awarded on September 30, 1996. This was a time well after researchers at USF had begun work raising the double cross mice[2] of the '094 Patent. The raising of those mice, and their characterization by then-conventional techniques including tissue staining, involved several individuals at USF, including Marcia Gordon and Leigh Holcomb, who worked in the laboratory of David Morgan, which had the facilities to stain and characterize tissue samples. Appx2008. The project leader for all five projects, John Hardy, left USF- going to Mayo in June, 1996. As a consequence,

---

[1] There were about 30 different presenilin mutations that had been identified by 1995.

[2] Work on creating breeding lines to create the "double cross mice" began before August, 1996.

the Grant funds, when approved by NIH on September 30, 1996, were awarded to Mayo, not USF. In December 1996 Karen Duff also left USF for Mayo.

After Duff went to Mayo in December 1996, the cross-bred mice previously prepared were being monitored to see if, and when, they would exhibit Alzheimer's disease pathology. To this end, "double cross mice" were transferred to Mayo with Duff. There is no evidence anywhere that suggests that anyone at USF, including Marcia Gordon and David Morgan, did any work of any sort on the mice of the '094 Patent after the Grant award in October of 1996 other tissue staining. When Duff left USF, she took with her to Mayo mice that had been bred Appx0576 and were then being monitored – that is why, when Duff announced the exhibition of accelerated Alzheimer's disease pathology by those mice on April 25, 1997 – an actual reduction to practice of the mice of the '094 Patent - she sent that announcement from Mayo to USF. **The actual reduction to practice of the mice of the '094 Patent occurred at Mayo, not USF.** Appx0007, Appx1271-1274. After the Grant was awarded neither David Morgan nor Marcia Gordon nor anyone else at USF other than Duff did inventive work on the mice of the '094 Patent. The sacrificed mice of the actual reduction to practice were stained in the laboratory at USF using conventional technology and shown to exhibit the characteristic "plaques" of Alzheimer's disease.

That actual reduction to practice of the mice of the ‘094 Patent occurred on April 25 1997. Appx0007. USF filed a patent application on those mice shortly after the reduction to practice – on July 30, 1997. Even before the patent issued USF successfully licensed the ‘094 Patent to two different types of licensees – large pharmaceutical companies at a uniform price of $400,000 per license, and smaller researchers like universities who paid the cost of the research desired, including the cost of maintenance by USF of the mice in question, to which research cost was added a license fee equaling twelve percent (12%) of the cost of work. Appx2768-2774.

The ‘094 Patent issued in the United States, and around the world. It was licensed before it was issued because this was the first ever animal model of Alzheimer’s disease that exhibited pathology at a date early enough that it could be used for testing. Shortly after issuance of the ‘094 Patent, The Jackson Laboratory (“Jackson” herein), a private company of Maine, began making and selling mice satisfying Claims 7 and 8 of the ‘094 Patent with the support of the Government. In June 2011, NIH granted a retroactive “authorization and consent” in a letter to Jackson based on Government contracts in favor of Jackson dating back to 1993.

USF filed suit in the U.S. Court of Federal Claims seeking recovery for the unlawful use of its patented invention under 28 U.S.C. §1498(a) on December 18, 2015. As one defense to USF’s claim, the Government asserted it was entitled to

license under the ‘094 Patent pursuant to the Bayh-Dole Act. Following discovery, which generated no evidence of such a license in favor of the Government, USF moved for summary judgment. The motion arguing there was no license in favor of the Government under the ‘094 Patent relied on the total absence of evidence of any “funding agreement” that would satisfy the Bayh-Dole Act, 35 U.S.C. §§200 – 212. Specifically, USF argued there was no “funding agreement” or implied-in-fact subcontract between USF and Mayo prior to the first actual reduction to practice of the subject matter of the claims of the ‘094 Patent on April 25, 1997**.** In denying USF’s Motion, the CFC conceded that:

> There does not appear to be much, if any, caselaw that directly addresses implied contract theories as they might apply to funding agreements between a grantee and a subgrantee that would satisfy the section 202.

**In fact, there was no precedent at all for such an implied funding agreement.**

At trial, USF relied on the testimony of Jon Soderstrom, an experienced expert on patent licensing. He testified that USF’s damages should be measured by the Established Royalty framework. Appx2768-2774. At no point did any witness offer testimony indicating the Established Royalty standard was not appropriate. The parties offered testimony of experts on the issue of patent validity, but no Government witness addressed the acknowledged long felt need for the patented mice of the ‘094 Patent as well as the early commercial success of USF in licensing the patent. That in fact the mice sold by Jackson infringed the claims of

the ‘094 Patent was so clear that the parties stipulated that the mice accused by USF literally infringed Claims 7 and 8 of the ‘094 Patent.

The CFC looked only at the question of whether the Government was entitled to a license under the Bayh-Dole Act, 35 U.S.C. §§202 – 212. The court concluded that USF and Mayo, the Federal Award Grantee, had arrived at an “implied-in-fact” agreement on a subcontract under Grant AG014633 as early as the date of the Grant – October 1, 1996. In creating the story that a subcontract from Mayo to USF existed as of the very first day of the Grant, the Court made three critical errors.

**1.** The court “expressly concluded” at Appx0008 that the work in question gave rise to a license in favor of the Government under the ‘094 Patent – the subject of Project IV, yet the CFC also found the money from the Mayo Grant was to fund the work of Marcia Gordon and David Morgan to support work on Project V under the Grant. **Project V, and the proposed work of Morgan and Gordon, was not related to the mice of the ‘094 Patent, which was the subject of Project IV.** Appx1971-1999.

**2.** In the same vein, the CFC specifically found that Marcia Gordon of USF was paid with Grant funds for her work on Project V beginning in October 1996. **Yet there is no evidence whatsoever that Morgan or Gordan received payment from funds provided by Mayo until November of 1997.** Morgan’s

testimony was that *USF* advanced Morgan and Gordon funds for Project V in the hope and anticipation that Mayo would repay them. The evidence is clear – USF paid the money for Gordon in advance of any subcontract with Mayo.

**3.** The court's opinion specifically found that money from Mayo went to USF to support work on the '094 Patent. Appx0010. No one so testified. Testimony **WAS** offered by four different witnesses that no money or benefit from Grant AG014633 could flow to USF from Mayo until a subcontract between Mayo and USF was signed. That subcontract was signed November 8, 1997, months after the actual reduction to practice of the '094 Patent mice.

> **Karen Duff so testified**– and recalled that the subcontract under that Grant was entered into late. Appx0136, Appx0139.
>
> **David Morgan so testified** – and could not recall when the subcontract was signed, but testified it would not have happened immediately upon the issuance of the Grant. Appx0522-0524.
>
> **Marcia Gordon so testified** Appx0653, and specifically identified the express contract signed by Mayo and USF dated November 8, 1997 as the only subcontract between USF and Mayo under AG014633. Appx0654-0655.
>
> **Stephen Snyder**, the Government's designee under Rule 30(b)(6) **so testified**, Appx2605-2609 and testified that such a subcontract would have been in the file at NIH had it existed by the filing date of the '094 Patent, Appx2608-2611. As of July 30, 1997 no such subcontract existed.

Notably, and perhaps most disturbingly, the CFC found USF and Mayo arrived at an implied-in-fact subcontract agreement notwithstanding the fact ***no***

***one from Mayo testified, no information regarding the actions or desires of Mayo prior to November 8, 1997 was provided and no documents from Mayo reflecting Mayo's intentions prior to November 8, 1997 were ever advanced.***

There was no evidence of any 1) "meeting of the minds" between Mayo and USF; 2) consideration between USF and Mayo; or 3) an unambiguous offer and acceptance between Mayo and USF, all required for an "implied-in-fact" agreement and the CFC did not point to any. There was no Governmental authority for such a subcontract identified by the CFC, but the court nonetheless found the implied-in-fact subcontract provided the Government a paid-up license under the '094 Patent.

Fundamentally the CFC created an implied-in-fact license in favor of the Government simply to shield the Government from having to pay USF the fees owed for the license taken, when the facts *found by the court* are inconsistent with such a conclusion and the law precludes such a conclusion. To arrive at its creation, the CFC disregarded the difference between money advanced by USF to Gordon *in the absence of any understanding with Mayo* and money paid by Mayo to USF much later in time. Appx0010. When USF advanced money to Gordon and Morgan before the subcontract of November, 1997 – there was no implied-in-fact agreement and no understanding between the parties. USF was simply supporting its own scientists with money Morgan said it hoped to recover later.

## V. SUMMARY OF THE ARGUMENT

The decision of the CFC was contrary to the facts of record, contrary to the law governing implied-in-fact agreements and contrary to the provisions and intent of the Bayh-Dole Act.

The court concluded that Marcia Gordon at USF was paid with funds obtained from Mayo under Federal Grant AG014633 beginning October 1, 1996 only by seriously misstating the testimony of David Morgan. His testimony was *not* that Marcia Gordon was paid with funds from the Mayo Grant beginning in October 1996. To the contrary, his testimony, and that of others, was that did not, and could not, happen. Rather, *USF advanced* money to Gordon, and Morgan's laboratory, with the hope that it might be paid by Mayo later on. Even Morgan made it clear – Gordon's work before November 1997 was paid by USF as an advance on money that might be paid back later. Appx0006. The CFC wrongly stated that money from the Federal Grant was paid by Mayo to USF for work on the mice of the '094 Patent – when in fact there was no evidence that any such money was paid. The money ultimately paid by Mayo to USF under the Grant was for Project V, which did not involve the creation of the double cross mice or any other transgenic mice. USF and USF alone paid for the work on Project IV, the development of the mice of the '094 Patent.

Beyond clear factual errors, the CFC below found the existence of an implied-in-fact agreement between USF and Mayo that satisfied the requirements of the Bayh-Dole Act only by 1) disregarding the established legal framework for determining the presence of a "meeting of the minds" required for such an agreement; 2) by ignoring the existence an express agreement reached by USF and Mayo on November 8, 1997 for the exact work the court insisted was the subject of the "implied-in-fact" agreement it found – the work of Project V; and 3) by failing to appreciate that the work the court found was the subject matter of the implied-in-fact agreement was work not related to the '094 Patent.

Beyond the CFC's specific errors committed in mischaracterizing the testimony at trial and ignoring legal requirements for establishing an "implied-in-fact" agreement, the court committed legal error in finding any "implied-in-fact" agreement on this record could satisfy the requirements of a "funding agreement" as that term is defined in 35 U.S.C. §202(c). The requirements of a "funding agreement" pursuant to the Bayh-Dole Act are deliberately made precise and specific to effectuate the statute's intent to transfer the fruits of government funded technology with reasonable clarity and precision – the CFC's decision does violence to that purpose.

## VI. ARGUMENT

The CFC's decision relies on its erroneous determination that USF and Mayo entered into an implied subcontract under Grant AG014633 as of October 1996, pursuant to which the Court insisted funds were paid to USF to support work on the mice of the '094 Patent. That determination is wrong and contrary to record facts.

The CFC mischaracterized the testimony of David Morgan and Marcia Gordon, stating they "testified that Marcia Gordon was paid with funds from the NIH grant beginning October 1, 1996" Appx0009 when in fact their testimony was to the contrary. Morgan and Gordon, as well as Duff and the Government's 30(b)(6) designee, Stephen Snyder, all testified that **no money under the Grant could flow to USF until a subcontract under that Grant was arrived at by Mayo and USF. It was undisputed and the CFC found that subcontract was agreed to on November 8, 1997.** Appx0009.

The CFC further concluded that the "implied-in-fact" agreement it created benefitted USF in a fashion to support the work that led to the first actual reduction to practice of the subject matter of the '094 Patent – the mice that were the first ever animal models of Alzheimer's disease. That reduction to practice was verified on April 25, 1997. The court reached this conclusion despite the fact that **no testimony, or other evidence, supports the notion that money from the Mayo**

**Grant was used to support work on those mice before April 25, 1997** when the invention of the '094 Patent was reduced to practice.

The CFC constructed a story that Mayo and USF must have entered into an "implied-in-fact" agreement satisfying the requirements of the Bayh-Dole Act. The CFC so found without ever hearing from a single witness from Mayo or considering any evidence pertaining to Mayo, either in the form of testimony or in the form of documents dated prior to the subcontract of November 1997. The court reached this conclusion without applying the established analysis for determining when an implied-in-fact contract is reflected by the conduct of the parties.

**Even if** there has been demonstration of the elements of an implied-in-fact subcontract, the CFC expressly found that the subcontract would have been for **Project V** of the Grant 014663. Appx0008. "The work in Dr. Gordon's and Dr. Morgan's lab was included in the NIH grant application as Project Five…". Respectfully, even if we assume that somehow there might have been an implied-in fact subcontract between Mayo and USF – it would not have given rise to a license in favor of the Government. The ONLY implied-in-fact subcontract the CFC identified was one for Project V of the Grant. Project V did not refer to or involve the mice of the '094 Patent in any way.

Beyond this, any conclusion by the CFC that an implied-in-fact contract existed is necessarily erroneous. The decision appealed from specifically found

that there was an express, written subcontract between Mayo and USF effective November 8, 1997. Appx0009. That express written subcontract was for the **very work** the court concluded was the subject of the only "implied-in-fact" subcontract between Mayo and USF – Project V of the Grant, Appx0004. Even leaving aside the fact that Project V had nothing to do with the '094 Patent and could not give rise to a license under it, the court did not explain how, contrary to law, both an implied-in-fact contract and express written contract for the same exact work could both exist.

The work that the CFC determined was the subject of an implied-in-fact contract – Project V of AG014633 – was not related to the work undertaken to generate the "double cross" mice of the '094 Patent which was set forth as Project IV of the Grant. USF supported and funded the work for Project IV, which was entirely separate from Project V– as explicitly detailed in the allowed Grant Application – compare Appx1971-1999 (Project IV) with Appx2000-2035 (Project V).

At best, the CFC confused the work that Morgan and Gordon *wanted* to perform under Project V of the Grant with the work that ***was*** performed by Dr. Duff under Project IV – wrongly awarding the Government a license under Project IV even though the Government *did not fund that work.* This is legal error. To reach this result the court **ignored** the requirements of law to establish a an "implied-in-fact" agreement, **ignored** the existence of an express contract for the

exact work the court indicated was the subject of the "implied-in-fact" agreement, and **ignored** the fact that the work the CFC asserted was the subject of the "implied-in-fact" agreement was distinct from the '094 Patent.

Beyond the CFC's creation of an "implied-in-fact agreement where none existed, the court necessarily concluded that the provisions of 35 U.S.C. §202(c)(1 – 8) were satisfied by an "implied-in-fact" agreement so as to provide the Government with a license to use the subject matter of the '094 Patent. The CFC so found even though the court had expressly found three years earlier that there was no case law that supported that conclusion, Appx0075, notwithstanding hundreds of decisions on the Bayh-Dole Act funding provisions and structure by federal courts including the Supreme Court of the United States, *Stanford University v. Roche Molecular Systems, Inc*., 563 U.S. 776 (2011).

There is no case law support for the creation of an implied-in-fact agreement satisfying the "funding agreement" requirements of the Bayh-Dole Act because the entire purpose of that Act is to regularize the flow of benefits to universities and research institutions under that Act. To give that effect, the statute expressly requires a detailed "*funding agreement*" that must satisfy multiple express requirements. None of those requirements were identified as aspects of the "implied-in-fact" agreement created in the CFC's order – concluding that those eight requirements of the statute could be satisfied by an "implied-in-fact"

agreement without the testimony of one of the parties to that contract is legal error that threatens to undo the purpose of the Bayh-Dole Act.

## I. Standard of Review

For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable de novo), questions of fact (reviewable for clear error), and matters of discretion (reviewable for "abuse of discretion"). *Pierce v. Underwood*, 487 U.S. 552, 557 (1988). Respectfully, the decision below reflects clear errors of fact and clear errors of law.

## II. The Court Misstated the Testimony It Relied Upon

### A. Marcia Gordon Did Not Receive Funds Under the Federal Grant Before November, 1997

To provide the Government with a license to use the mice of the '094 Patent and escape liability for Jackson's use and sale of the patented invention, the CFC needed to find that funds from the Federal Grant awarded to Mayo September 30, 1996 were provided by Mayo to USF before the actual reduction to practice of the subject matter of the '094 Patent on April 25, 1997. The CFC made that finding only by misstating the testimony of David Morgan, a member of the faculty at USF. The CFC's decision asserts "Dr. Morgan and Dr. Gordon both testified that Dr. Gordon was paid with funds from the NIH grant beginning October 1, 1996." Appx0009. The court referenced Dr. Morgan's testimony at "78-80" and Gordon's

testimony at "148-157" of the transcript of the third day of trial (ECF 272). **That is not what Morgan and Gordon testified!**

Morgan testified he requested an **advance from USF**, not Mayo. He identified the USF account and testified he requested from USF for "an advance, an underwriting" to secure funds *in advance of the money he hoped would later be provided by the Grant*. Appx0545-0546. That is precisely what Morgan testified on cross-examination he would have had to do – get money in advance from USF and hope for reimbursement from Mayo once, if ever, a subcontract between USF and Mayo was agreed to. Appx0565-0566. Compounding the CFC's clearly erroneous view of Morgan and Gordon's testimony, the advance from USF they testified they were seeking was an advance to fund work on **Project V** of the Grant, which had nothing to do with the '094 Patent, rather than work on Project IV, which did. **Securing funding from USF for work that might be reimbursed by Mayo in the future would NOT create an implied-in-fact license.**

Gordon's testimony also established she did not receive any funds from Mayo under the Grant until November 1997. Gordon testified she was paid by USF out of a variety of grants other than the Mayo Grant for her work on the mice of the '094 Patent under Duff's direction prior to Duff's departure for Mayo. Appx0648. She further testified explicitly that she could not have received any funds from the Grant until "Mayo Clinic and the University of South Florida work

out a consortium agreement, and USF gets what's called a subcontract." Appx0653-0655. Gordon testified that the subcontract dated November 8, 1997, JTX-8, is the one and only subcontract USF and Mayo agreed to under Grant AG014633. Appx0655. **In addition to Gordon, Morgan, the Government's witness, Snyder, as well as Duff, testified that no money could be provided to USF under the Grant until a subcontract under the Federal Grant was agreed to by USF and Mayo. That agreement, JTX-8, was executed November 8, 1997 – months after the actual reduction to practice of the mice of the '094 Patent** in April 1997. Quite simply, there was absolutely no testimony that Gordon was paid out of funds under Grant AG014633, and consistent testimony from multiple witnesses that a payment under the Grant to Gordon prior to that date would not have been possible.

### B. There Is NO Testimony that Mayo Grant Money Went to USF to Pay for the Mice of the '094 Patent

No one ever testified that the work involved in creating and characterizing the double cross mice of the '094 Patent was paid for out of the Grant. It is true that the mice were initially bred and raised at USF, before the Grant was ever awarded. Gordon worked on those mice funded by other grants. Appx0652. Karen Duff left USF for Mayo in December, 1996 – before the mice had grown to the point that they exhibited accelerated Alzheimer's disease pathology. Dr. Morgan

testified that Duff had a colony of the double cross mice at Mayo with her. "Dr. Duff was the one who had the colony of doubly transgenic mice." Appx0561.

USF had a vivarium, and a mouse colony, and Dr. Morgan's laboratory for staining proteins long before, and long after, the mice of the '094 Patent were conceived and reduced to practice. It is clear why Duff reported the reduction to practice of the double cross mice in a facsimile dated April 25, 1997 – that facsimile went from Mayo – where Duff was – to **the office of the Patent Attorney at USF to initiate the process to secure patent protection!** The reduction to practice was characterized in part by a micrograph of a mouse's brain showing plaque formation done at USF in the referenced laboratory. Among others, Gordon often did such work – she was frequently looking for improvements in the "signal to noise" ratio. Appx0638. Importantly, Dr. Duff's observations regarding the first documented actual reduction to practice of the '094 Patent makes it clear that the staining involved was conventional, "using standard methods," Appx1272, not requiring inventive work from USF's (Morgan's) laboratory.

**But that work was not funded by the Grant.** The evidence is clear that no Grant funds came from Mayo to USF until after the November 1997 express consortium agreement. Appx1265-1270. The work on the '094 Patent, and the mice claimed in it, began and reached fruition without ANY funding under the Federal Grant AG014633 – no one testified to the contrary.

## III. The Court Found an Implied-in-Fact Agreement to Exist Only by Ignoring the Requirements for Such an Agreement, The Prior Existence of an Express Contract for the Same Work and Extended a License to the Government for Entirely Separate Work That Would Not Provide a License Under the '094 Patent

In addition to clearly erroneously misstating the testimony of Gordon and Morgan, the CFC's decision created out of whole cloth an "implied-in-fact" agreement that it concluded somehow met the standard of a "funding agreement" pursuant to the Bayh Patent Dole Act such that the Government enjoyed a license to use the mice of the '094 Patent. No such "implied-in-fact" agreement was demonstrated, nor could one have legally existed – such an agreement would have required a "meeting of the minds" between USF and Mayo. The record reflects no testimony from Mayo at all, and no documents from Mayo dated before November 1997. How could there have been a "meeting of the minds" before April 25, 1997 when there was no evidence of any conduct by Mayo in that regard until November 1997? Beyond this fundamental problem, the CFC failed to make multiple findings that are a prerequisite for an "implied-in-fact" agreement to be demonstrated.

### A. The Court Erred in Failing to Apply the Proper Standard

The CFC found that an "implied-in-fact" subcontract between Mayo and USF began October 1, 1996, the first business day of the Grant Award. Appx0012. The standard for establishing the existence of an implied-in-fact contract is well known – the CFC neither applied that standard, nor suggested any different

standard should be applied. This Court applied that standard in *City of El Centro v. U.S.*, 922 F.2d 816, 820 (Fed. Cir. 1990):

> An implied-in-fact contract requires findings of: 1) mutuality of intent to contract; 2) consideration; and, 3) lack of ambiguity in offer and acceptance. *Russell Corp. v. United States* 537 F.2d 474, 482 (Ct. Cl. 1976), *cert. denied*, 429 U.S. 1073 (1977); *Fincke v. United States*, 675 F.2d 289, 295 (1982). When the United States is a party, a fourth requirement is added: the Government representative "whose conduct is relied upon must have actual authority to bind the government in contract." *Juda v. United States*, 6 Cl. Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947).

The CFC simply did not follow the framework for determining when an implied-in-fact contract is present. None of the required "findings" can be found in the court's opinion. None of these required elements were present or even referenced by the court's decision because they are not reflected by the evidence.

**<u>No Mutuality of Intent to Contract</u>**

There is absolutely no evidence, of any kind, that Mayo wanted or intended to enter into a subcontract under AG014633 with USF until November, 1997. Mayo had a specific form and a lengthy list of requirements for USF in order to enter into such a subcontract. They are reflected in the express subcontract that was Joint Exhibit 8, "JTX-8." Appx1265-1270. The CFC does not cite to any indication that anyone from Mayo or acting on behalf of Mayo wanted to proceed with such a subcontract beginning October 1, 1996.

The requirement for mutuality of agreement in the absence of a written contract is frequently referred to as a requirement for a "meeting of the minds." *Turping v. United States*, 913 F.3d 1060, 1065 (Fed. Cir. 2019):

> "An implied-in-fact contract is one founded upon a meeting of minds and is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003).

There could be no evidence of a meeting of the minds between Mayo and USF as of April 25, 1997 – no testimony or evidence reflecting Mayo's intent or conduct prior to the express contract of November 1997 was ever provided or made of record.

**No Consideration**

It is black letter law that all contracts require consideration. This Court's precedent has specifically recognized that consideration is required to establish the existence of an implied-in-fact agreement involving the Government. The burden was on the Government to demonstrate, based on the conduct of USF and Mayo, that necessary element along with all others. *Lewis v. U.S.*, 570 F.3d 597, 601 (Fed. Cir. 1999). While the decision of the CFC insists that an implied-in-fact contract was created between USF and Mayo Foundation on the first day of the award of Grant AG014663[3], the court's analysis did not include identification of any sort of

[3] The date of the contract award is September 30, 1996. The Court found Mayo and USF had arrived at an implied-in-fact contract approved by the Government by October 1, 1996. It is difficult to believe that the two parties could have acted so quickly, when there is no evidence that they had communicated with each other at that point.

consideration, a fundamental error of law. Evidence of adequate consideration must be presented. *Jossi v. Derwinski*, 1993 WL 173704, *1 (9th Cir. 1993).

There was no testimony establishing any sort of consideration – nor would any consideration flowing from Mayo to USF in support of work on the '094 Patent have made any sense after September of 1996. Much of the work that led to that invention at USF had already been performed. The strains of mice expressing a mutation in an APPswe gene and a presenilin mutation had already been made at USF. Those mice had been cross-bred at USF, and their offspring were being observed closely in anticipation of their exhibition of Alzheimer's disease pathology. The Grant Award was not made until September 30, 1996, and by December, 1996 Duff had left USF – following John Hardy to Mayo Clinic in Florida. Morgan confirmed that Duff had the double cross mice with her (at Mayo). There was simply no inventive work left to be done at USF with respect to the '094 Patent mice to support consideration for an agreement with Mayo under the Grant.

What sort of consideration to support the work on Project IV would Mayo have offered and USF accepted? No work was moving forward at USF – Duff, at Mayo, was waiting for the mice to mature. Where the existence of an implied-in-fact agreement is asserted, as the Government did here, it is that party's burden to demonstrate with some clarity what consideration was provided. *ITT Federal Support Services v. U.S.*, 531 F.2d 522, 523 (Ct. Cl. 1976). USF respectfully

submits it was legal error to fail to apply the legal standard for an implied-in-fact contract to be demonstrated, as no consideration was identified nor could consideration reasonably have been advanced. The work had been done – Duff was simply waiting for the mice to mature.

Critically, the CFC repeatedly accepted payments advanced by USF at Morgan's request as evidence of a "tacit understanding" between USF and Mayo. See. e.g., Appx0014. This is inaccurate. There was no "understanding" or "agreement" between USF and Mayo before November 1997, tacit or otherwise. The court characterized Morgan's unilateral anticipation as reflective of some sort of mutual understanding – but it was only a hope expressed by Morgan – no one from Mayo testified as to such an understanding. A unilateral expectation or hope, not reflected by the other party (here, Mayo) does not establish consideration for an implied-in-fact agreement.

**No Offer and Acceptance**

The third element this Court's caselaw requires to support the existence of an implied-in-fact contract is evidence, reflected in the conduct of the parties, of "unambiguous offer and acceptance." *Taylor v. U.S.*, 597 Fed. Appx. 644, 645 (Mem) (Fed. Cir. 2015):

> As far as Mr. Taylor's breach of contract claim was concerned, the court explained that Mr. Taylor had failed to demonstrate the existence of the elements of offer and acceptance and valid consideration necessary for an implied-in-fact contract with the

government. See *Kam–Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012)

The record is devoid of any evidence concerning the conduct of Mayo until November, 1997 when Mayo and USF agreed to their first (and only) express subcontract. Gordon so testified, Appx0654-0655. Four witnesses were asked how USF could receive money under the Grant to conduct research described therein. Each of those witnesses provided the exact same answer – no money from Mayo under the Grant could be provided to USF until a subcontract, specifically, a Consortium Agreement, was executed. Morgan, Gordon, Duff and the Government's witness pursuant to 30(b)(6), Steven Snyder, gave that same answer.

The finding that an implied-in-fact subcontract existed between USF and Mayo before April 25, 1997 when the inventive mice were reduced to practice is not supported by any evidence, much less evidence of a non-ambiguous offer and acceptance, which would have had to come from an authorized representative of Mayo and one from USF.

**No Government Authority**

The decision below concluded that USF was funded pursuant to an implied-in-fact agreement satisfying, the Bayh-Dole Act and specifically 35 U.S.C. §204(c)(4) which would convey a license to the Government to use the subject matter of that work – the mice of the '094 Patent. Such an implied-in-fact agreement would have required evidence of the conduct of an individual with

"actual authority to bind the government in contract." *Juda v. United States*, 6 Cl. Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)). Who is that individual?

Only one individual testified on behalf of the Government. Stephen Snyder, the contracting officer for Grant AG014633 testified that he would not have had any role or authority to provide compensation to USF - "strictly a hands-off situation." Appx2610. He also testified 1) any 1996 subcontract between Mayo and USF would have been present in the file at NIH that he was unaware of any subcontract of any type between Mayo and USF as of the filing date of the '094 Patent. Appx2607. Clearly Stephen Snyder did not, and could not, provide "actual authority" to bind the Government to an implied-in-fact agreement that would oblige the Government to ensure consideration for work on Project IV was provided to USF. He did not testify that anyone else did, either.

Respectfully, the Government may neither take rights, nor give them, under an implied-in-fact contract without approval from someone in the Government with actual authority. *Hanson v. U.S.*, 1988 WL 98384*1 (Fed. Cir. 1988) citing *Prudential Ins. Co. of America v. United States*, 801 F.2d 1295, 1297 (Fed. Cir. 1986), *cert. denied*, 107 S. Ct. 1289 (1987); *Pacific Gas & Elec. Co. v. United States*, 3 Cl. Ct. 329, 338–39 (1983), *aff'd*, 738 F.2d 452 (Fed. Cir. 1984).

There was no implied-in-fact agreement between USF and Mayo for of any kind, much less one to work on the mice of the '094 Patent. The brief discussion above shows none of the four elements required for such an agreement were demonstrated. USF requests the decision be reversed, and the case remanded to the CFC for resolution of USF's claims for damages under 28 U.S.C. §1498(a).

### B. The Court Erred in Granting an Implied-in-Fact License Where an Express Contract for the Same Work Was Established

The CFC specifically found that beginning October 1, 1996 USF and Mayo had entered into an agreement to support work at USF specifically for Project V of the Grant. Appx0008. Even if Mayo and USF had entered into such a subcontract the subcontract would have been, *pursuant to the CFC's own words*, for work on **Project V**. Such an agreement could not have given rise to rights in favor of the Government under the '094 Patent – that was supported by work done under Project IV, work supported solely by USF.

No such agreement existed before November 1997, no matter which project it was for. The decision below found that USF and Mayo had demonstrated by conduct their agreement to enter into an implied-in-fact agreement for work on Project V that embraced the provisions of 35 U.S.C. §202(c)(1–8). Ignoring the fact that no implied-in-fact agreement for work on Project V could give rise to a license in favor of the Government on a different Project, such an implied license

is barred by established law – there can be no implied license for work that is the subject of an express contract governing that same work. *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc) citing *Atlas Corp. v. United States*, 899 F.2d 745, 754 – 55 (Fed. Cir. 1990):

> [I]t is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract.

There was in fact an express contract dealing with the exact same subject matter – that subject matter was identified by the court below as **Project V** of Grant AG014633. Appx1265-1270.

That subcontract – that Consortium Agreement - is dated November 9, 1997. There was never an earlier subcontract – Gordon so testified. Appx0654-0655. Quite simply, where an express contract for the work specified by the CFC, work on Project V of the Awarded Grant, was arrived at between the parties, any argument that an implied-in-fact contract for the exact same work is foreclosed. *Bank of Guam v. United States*, 578 F.3d 1318, 1330 (Fed. Cir. 2009).

### C. The Subcontract Between Mayo and USF was for Project V Not the '094 Patent

There was, ultimately, a subcontract between USF and Mayo under Federal Grant AG014633. That subcontract did not arise until November 1997 well after Duff's actual reduction to practice of the '094 Patent in April 1997. Moreover,

even if, contrary to the evidence and arguments discussed above, an earlier version of that subcontract was arrived at by Mayo and USF, the funding received by Morgan, Gordon and USF *would have been for Project V of Grant AG014663*. Indeed, the court expressly found that it was Project V that was the subject of the "immunohistochemistry" work that Morgan and Gordon were involved with. Appx0008. Indeed, the court drew this conclusion based in part on the description of the "initial budget in the grant materials (that) specified that Dr. Morgan's and Dr. Gordon's salaries and fringe benefits would be paid in part with grant funds." Appx0008.

Respectfully, the information provided in the Grant Application that was approved, that pertained to the "salaries and fringe benefits" referenced in the court's decision that would be paid to Gordon under the Grant was solely and exclusively for work under Project V. Indeed, the details for Project V in the awarded Grant specifically note that "Dr. Gordon's role is to perform immunocytochemical procedures" which was so central to the CFC's decision below, but has nothing to do with Project IV, the work that led to the '094 Patent. The court simply found a license in favor of the Government under the '094 Patent because, at some point in time, Morgan and Gordon engaged in work on a project distinct from Project IV.

Viewing the evidence most favorably to the Government, the Government would not have enjoyed a license under the '094 Patent, even if there was a an implied-in-fact agreement to fund Project V that somehow satisfied the Bayh Dole Act requirements of 35 U.S.C. §202(c)(1–8). Even assuming the improbable combination of fact and law required – at best the Government would enjoy a license under the work of Project V – distinct from Project IV – the double cross mice. Where a party like USF pursues work that is funded under a Government Grant like AG014663, like Project V of the Grant award, at the same time it is pursuing closely related work not funded by a Government Grant, like the work specific to the '094 Patent which was done by USF without Government funds, no license in favor of the Government arises under the work not funded by the Government. *Ciba-Geigy Corp. v. Alza Corp*., 804 F. Supp. 614, 626 (DNJ 1992). It was error for the CFC to conclude otherwise.

## IV. It Was Error to Find an Implied-In-Fact Agreement on this Record Could Satisfy the Requirements of a 'Funding Agreement' Under the Bayh-Dole Act

The burden is on the Government to point to that aspect of its "funding agreement" with a non-profit entity like Mayo/USF that provides it with a license under a patent if the patent was the product of federal funding. Such a license is not simply implicit in all funded work. *Madey v. Duke University*, 413 F. Supp. 2d

601, 612 (MD NC 2006) (affirmed in relevant part, 307 F.3d 1351 (Fed. Cir. 2002). ……):

> In order to establish that it is entitled to the Government License defense, the Government must point to a funding agreement between itself and the original patent holder and must establish that the patented invention was conceived or first reduced to practice under that funding agreement. See *Technical Dev. Corp.*, 597 F.2d at 746.

Neither the CFC nor the Government did or could "point to a funding agreement" with USF, let alone establish that the mice of the '094 Patent were conceived or reduced to practice in the course of such funded work before the actual reduction to practice of the mice of the '094 Patent. No such "funding agreement" came into existence until well after that actual reduction to practice on April 25, 1974.

One reason why, as the CFC observed, there is no "caselaw that directly addresses implied contract theories as they might apply to funding agreements between a grantee and a subgrantee that would satisfy the section 202" is that the Government simply does not enter into implied-in-fact funding agreements with non-profit entities under 35 U.S.C. §§202 – 212! Rather, funding agreements between a contractor and the Government, or a contractor under a funding agreement and a subcontractor, **must** import the standard "Patent Rights" provisions of 37 C.F.R. §401.14(G) or its equivalent:

> (1) The contractor *will* include this clause, suitably modified to identify the parties, in *all* subcontracts, regardless of tier, for experimental, developmental or *research work* to be performed by a subcontractor. The subcontractor will retain all rights provided for the

> contractor in this clause, and the contractor will not, as part of the consideration for awarding the subcontract, obtain rights in the subcontractor's subject inventions.
>
> (2) The contractor *will* include in all other subcontracts, regardless of tier, for experimental developmental or research work the patent rights clause required by (cite section of agency implementing regulations or FAR). (Emphasis Supplied).

In the absence of such language, the agreement does not satisfy the requirements of a "funding agreement" pursuant to 35 U.S.C. §202 and the rights provided therein in favor of the Government do not arise.

To the best of undersigned counsel's knowledge and belief, following a diligent search using multiple computer databases, the decision appealed from herein *is the first decision by a Federal Court anywhere in the forty-two-year history of the Bayh-Dole Act finding an implied-in-fact agreement adequate to satisfy the requirements of a 'funding agreement' and confer a license on the Government for use of patented technology.* The mandatory language of 37 C.F.R. §401.14(G) makes it clear why this is so. Respectfully, in the total absence of any case law that would provide some rationale or basis for forgiving the mandatory requirement of statute and regulation that any "federal funding agreement" expressly provide a license to the Government, no implied-in-fact license can create a license under 35 U.S.C. §202(c)(4).

### A. There Are Good Reasons the CFC's Imagined Implied-in-Fact Agreement Does Not Satisfy the Bayh-Dole act Requirements

USF respectfully submits there are good and compelling reasons why, on a record of the type here which reflects no testimony, records or evidence from one of the parties asserted to have entered into a 'funding agreement' of the type contemplated by 35 U.S.C. §202(c), no implied-in-fact agreement might satisfy the requirements of statute.

A primary purpose of the Bayh-Dole Act is to ensure that the public benefits from inventions made with federal funds. *Network Signatures, Inc. v. Citibank, N.A.*, 2008 WL 5216032*3 (C.D. Cal. 2008). To this end, the Act presents a specific and multi-part hierarchy of requirements that characterize monetary agreements (Grants) between the Government and non-profit parties like Mayo or USF. In order to ensure that there is a regular process and standard applied to determine when and where the Government acquires rights in federally funded inventions, the Bayh-Dole Act relies on the definition of a "funding agreement."

If in fact an invention comes from what the Act defines as work pursuant to a "funding agreement" – the Government acquires the rights specifically provided for by statute – including a "nonexclusive, non-transferrable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States any subject invention." 35 U.S.C. §202(c)(4). It should be noted that the paid-up

license referred to is not simply a consequence of federal funding – it is an essential element that must be present in any agreement that precedes funding. 35 U.S.C. §202(c):

> Each funding agreement with a small business firm or nonprofit organization *shall contain appropriate provisions to effectuate the following:*…the Federal agency shall have a non-exclusive, non-transferrable, irrevocable, paid-up license. (Emphasis supplied)

No such provisions appear in the CFC's discussion of the nature of the implied-in-fact agreement it advanced.

The Bayh-Dole Act sought to regularize the requirements for such cooperation – accordingly, the eight elements of 35 U.S.C. §204(c) are a *prerequisite* for a funding agreement to exist – for a nonprofit to engage in research using federal funds. Such a 'funding agreement' requires, per statute, express agreement between the parties (such as subcontractors) on the eight elements of a "funding agreement" *before* any research supported by federal funding can begin, as reflected in the provisions of 35 U.S.C. §202(c)(1-8).

The CFC made no finding with respect to any basis for concluding USF and Mayo agreed to any of these provisions. Respectfully, it is at best unlikely that any two parties would and could reach an "implied-in-fact" agreement on each and all of these items – they are too complex and too specific. Instead, parties to a contract or subcontract supported by federal funding import the standard language of the

Patent Right Clauses of the Government regulations.[4] To assert they had so agreed on the very first working day of the Grant is not plausible in the absence of any conduct by Mayo reflective of such an agreement.

The requirements are complex and specific for a reason – memory not committed to writing or other fixed medium is an uncertain thing – it changes and is altered by time, if nothing else. This is in part WHY parties to a subcontract under a federal funding grant incorporate the provisions of 37 C.F.R. §401.14. To permit parties to engage in research using federal funding with nothing more than the "implied-in-fact" basis found by the CFC it in this matter would give rise to endless litigation over what one party actually promised the other party and when, depending on whether the party in question wants the research to have been the product of funded research. Respectfully, such misapplication of the Bayh-Dole Act would undermine and reverse some of the progress made since 1980 on the use of Federal funding to improve research and its results.

After the Court of Federal Claims denied what USF believed were strong motions for summary judgment on four separate issues, including several involving patentability, those several issues were all tried, following extensive and expensive trial preparation and a four-day trial. The CFC then dismissed the entire case based

[4] One example of this is the express subcontract entered into between USF and Mayo in November of 1997. See, e.g., Article 17 of that Consortium Agreement, p. 4. Appx1268.

on the conclusion about one issue – an implied-in-fact license that no court had ever found in connection with the Bayh Dole Act. The court never addressed the other issues which had been fully briefed on motions and in trial briefs and the subject of extensive evidence presented at trial. USF asks that when this case is remanded the CFC be directed in clear terms to address all the issues presented so that USF is not subjected to a piecemeal ruling and piecemeal appeal. This case is over seven years old already. The case can be decided as to all issues – the trial has been held, and all evidence presented. It is time it was considered and resolved.

## VII. CONCLUSION

USF sought recovery for damages due to the taking of a license by the Government under the '094 Patent pursuant to 28 U.S.C. §1491(a). After a complete trial, the CFC found an implied-in-fact subcontract between Mayo and USF to have existed beginning October 1, 1996. The court further found that subcontract would have provided a license to the Government under the '094 Patent, pursuant to the Bayh-Dole Act, even though the work the court identified the subcontract was for was work on Project V of the Grant - NOT work pertaining to the '094 Patent. The CFC's decision was based on the court's erroneous misstatement of testimony and in the face of a complete absence of any evidence that any money or support was provided to USF for work on the mice of the '094 Patent. This is error.

The CFC found an implied-in-fact contract between USF and Mayo to have existed within one day of the award of the Grant, in the absence of any evidence at all as to the actions and intent of Mayo. Not one of the requirements of an implied-in-fact agreement (mutuality of intent, consideration, offer and acceptance and Government authority) is identified in the court's decision. The CFC did not address any behavior reflecting a mutual intent to be bound by Mayo and USF. This is error.

The work the CFC concluded was the subject of an implied-in-fact agreement between USF and Mayo was work on Project V of awarded Grant AG014633. That work was the subject of an express contract between USF and Mayo under the awarded Grant AG014633. It was error to find an implied-in-fact contract for the precise work made the subject of a written subcontract. Project V was not part of the work leading to the '094 Patent. Accordingly, even if such an implied-in-fact agreement could have existed, it was error to accord the Government a license to the '094 Patent which was not an aspect of Project V.

Precedent requires the Government point to a "funding agreement" meeting the terms of 35 U.S.C. §202(c)(4) as a prerequisite to establish a government license under the Bay-Dole Act. The Act has specific requirements and demands that must be met <u>before any federally funded research may begin</u> – it uses the vehicle of a very specific agreement – a "funding agreement" that satisfies 35

U.S.C. §202(c)(1-8) to ensure the benefits of federally funded research may be realized. Altering that vehicle to require only a generic "implied-in-fact" agreement where none of the eight different requirements of the statute need even be suggested or discussed before federal funds may be dispersed would undermine the Bayh-Dole Act itself.

Respectfully submitted,

/s/ Steven B. Kelber
Steven B. Kelber
The Kelber Law Group
6701 Democracy Blvd., Suite 300
Bethesda, MD 20817
Tel: (240) 506-6702
E-Mail: steve@kelberlawgroup.com

Jerry Stouck
The Law Offices of Jerry Stouck
10863 Symphony Park Dr
North Bethesda, MD 20852
Tel: (301) 807-5100
E-Mail: jerrystouck@verizon.net

Counsel for Appellant
UNIVERSITY OF SOUTH
FLORIDA BOARD OF TRUSTEES

# ADDENDUM

# TABLE OF CONTENTS

**Pages**

Entry of Judgment
filed September 2, 2022 ........................................................ Appx0004

Verdict in Favor of Defendant
filed September 2, 2022 ........................................................ Appx0005

Joint Exhibit:

JTX 1 U.S. Patent No. 5,898,094
dated April 27, 1999 ........................................ Appx1141

# In the United States Court of Federal Claims

**No. 15-1549 C**
**Filed: September 2, 2022**

**UNIVERSITY OF SOUTH FLORIDA, BOARD OF TRUSTEES**

**v.**

**THE UNITED STATES**

**JUDGMENT**

Pursuant to the court's Opinion, filed September 2, 2022,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant.

Lisa L. Reyes
Clerk of Court

By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 15-1549C

(E-Filed **UNDER SEAL**: September 2, 2022)
(Reissued: September 14, 2022)[1]

| | |
|---|---|
| UNIVERSITY OF SOUTH FLORIDA, BOARD OF TRUSTEES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Trial; Patent Infringement; 35 U.S.C. § 202(c)(4); Bayh-Dole Act; Paid-Up License; Affirmative Defense. |

Steven B. Kelber, Bethesda, MD, for plaintiff. Jerry Stouck, Rockville, MD, of counsel.

Walter W. Brown, Senior Litigation Counsel, with whom were Brian M. Boynton, Principal Deputy Acting Assistant Attorney General, and Gary L. Hausken, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Joshua I. Miller, Carrie E. Rosato, and Brian N. Gross, of counsel.

OPINION

CAMPBELL-SMITH, Judge.

In this patent dispute, plaintiff filed suit alleging that defendant infringed its patent by allowing a third party to use and manufacture the invention described in its patent. See ECF No. 1 (complaint). The court held trial in this matter in December 2021, after

[1] This opinion was filed under seal on September 2, 2022. See ECF No. 286. The parties were invited to identify source selection, propriety, or confidential material subject to deletion on the basis that the material is protected or privileged. No redactions were proposed by the parties. See ECF No. 288 (notice). Thus, the sealed and public versions of this opinion are identical, except for the publication date and this footnote.

which the parties filed post-trial briefing.[2] See ECF No. 274 (plaintiff's post-trial brief); ECF No. 279 (defendant's post-trial brief); ECF No. 280 (plaintiff's post-trial reply brief). This case has now been fully heard and is ripe for decision.

The court has considered all of the evidence and the parties' arguments and addresses the issues that are pertinent to the court's ruling in this opinion. Based on the evidence presented at trial, and for the following reasons, the court finds that defendant held a license pursuant to the Bayh-Dole Act, 35 U.S.C. § 202(c)(4), and is thus not liable for infringement of plaintiff's patent. The court, therefore, enters judgment in defendant's favor.

## I. Findings of Fact

### A. Patent Overview

Plaintiff holds the rights to United States Patent Number 5,898,094 (the '094 patent), which is titled "Transgenic Mice Expressing APPK670N,M671L and a Mutant Presenilin Transgenes." ECF No. 282-1 at 1 (joint exhibit 1). The '094 patent issued on April 27, 1999. See id. The patent involves "[a] method of preparing a transgenic animal model with enhanced, accelerated pathology for Alzheimer's Disease." Id. The patent notes that "[t]ransgenic model systems are needed to study neurodegenerative disorders, both to understand the underlying disease pathology as well as to test treatment protocols." Id. at 4.

In more concrete terms, the patent "showed people how to make a good, robust mouse model of Alzheimer's disease," ECF No. 270 at 42 (testimony of Dr. Karen Duff), by crossing mice with specific genetic mutations so that they would develop "enhanced" Alzheimer's pathology at an "accelerated" pace, id. at 45. The mice produced by using

---

[2] In addition to the post-trial briefs, the court considered the trial transcript, see ECF No. 270; ECF No. 271; ECF No. 272; ECF No. 273, and all of the exhibits introduced by the parties, including those filed on the docket in this matter, see ECF No. 282 (notice and exhibits), ECF No. 283 (corrected notice). The court notes that the official trial record is the trial transcript and the exhibits admitted at trial as recorded therein. The clerk's office, however, does not as a matter of practice include trial exhibits when it uploads trial transcripts to the court's case management/electronic case filing system; the court, therefore, requested that the parties upload the relevant exhibits for ease of access and clear citation in this opinion. Notwithstanding that request, the official record remains the trial transcript. The court further notes that the court reporter received the exhibits electronically from the parties during trial, and again after trial. The court understands that there was an administrative issue between the parties and the court reporter regarding the exhibits that delayed their transmission to the clerk's office and the transcript was transmitted prior to the exhibits. The court delayed release of this opinion for a time while awaiting the resolution of that issue.

the methods outlined in the patent are thus of utility in the research of Alzheimer's Disease and other neurodegenerative disorders. See ECF No. 282-1 at 4-5.

B. Patent Background

Dr. Karen Duff and Dr. John Hardy—named co-inventors on the patent, see id. at 1—were professors at the University of South Florida (USF) and worked together on research involved in the patent. See ECF No. 270 at 40, 44-45 (testimony of Dr. Duff); ECF No. 282-2 at 5-20 (joint exhibit 2, provisional patent application describing the research and desired outcomes). Dr. Duff and Dr. Hardy submitted a provisional patent application in October 1996 describing their research, which involved producing mice by:

> crossing one transgenic animal containing within its genome at least one copy of a first expressible wildtype or mutant mammalian transgene responsible for causing a particular Alzheimer's related pathology in humans with another transgenic animal containing [ ] within its genome at least one copy of a second expressible wildtype or mutant mammalian transgene also responsible for causing the particular Alzheimer's related pathology in humans to produce offspring containing within its genome at least one copy of both the first and second expressible wildtype or mutant mammalian transgenes responsible for causing the particular Alzheimer's related pathology in humans.

ECF No. 282-2 at 9; see also id. at 4 (date of the application).

The doctors, along with other researchers, also submitted an application to the National Institutes of Health (NIH) for grant funding in September 1995. See ECF No. 282-48 (defendant exhibit 59, grant application materials). The grant application sought funding for "five, mutually interlinking projects aimed at elucidating the role of the presenilins in Alzheimer's disease." Id. at 3. The proposed initial budget period for the grant was July 1, 1996, through June 30, 1997, and the application requested additional funding for four more years—five years of funding total. See id. at 12-14. On September 30, 1996, the NIH issued a National Institute on Aging program project grant, number 1P01AG014633 (AG014633) titled "Presenilins and Alzheimer's Disease," to the Mayo Clinic, where Dr. Duff and Dr. Hardy had taken positions. See ECF No. 282-42 (defendant exhibit 41, NIH grant materials); ECF No. 282-47 at 10 (defendant exhibit 56, notice of grant award); ECF No. 270 at 56 (testimony of Dr. Duff).

On April 25, 1997, Dr. Duff faxed a letter marked "urgent" to William Coppola in plaintiff's department dealing with patent applications detailing the process she and Dr. Hardy had engaged in and the results of their work. See ECF No. 282-28 (defendant exhibit 12, fax to Mr. Coppola); ECF No. 270 at 57-59 (testimony of Dr. Duff). This letter constituted the first documented evidence that the mice the inventors had been working on "did, indeed, develop pathology . . . at an age which was far accelerated."

ECF No. 270 at 59 (testimony of Dr. Duff); see also id. at 64 (Dr. Duff confirming that the letter was the "first documented evidence" she had of the mice). The doctors then submitted their patent application on July 30, 1997, and the patent is dated April 27, 1999. See ECF No. 282-1 at 1. The patent was assigned to plaintiff at that time. See id.

Dr. Duff and Dr. Hardy also published an article in Nature Medicine in January 1998 documenting the invention. See ECF No. 282-27 (def. exhibit 11). Dr. Duff testified at her deposition that "the invention actually became the 1998 Nature Medicine paper," ECF No. 282-62 at 70 (def. exhibit 439), though she testified at trial that she did not recall "which batches of animals were in the patent versus th[e] paper," and "whether they're exactly the same mice," she could not say, ECF No. 270 at 106. The article notes that the research documented therein was "supported by the Mayo/USF Program Project on the presenilins (AG146133)."[3] ECF No. 282-27 at 4.

C. Research Funding History

The research performed that resulted in the subject patent proceeded in multiple steps. See ECF No. 270 at 68-69 (testimony of Dr. Duff). Dr. Duff first had the "idea to create the[ ] mice" and "generated the presenilin mice," and then "was responsible for crossing [the] two mice together, for aging them . . . , and for discussing . . . exactly what would happen to those mice, making a decision on when to sacrifice them and . . . what procedures to perform on them." Id. at 69. Dr. Duff moved from USF to Mayo in December 1996 and "delegated" the immunohistochemistry work on the mice to Dr. Marcia Gordon's and Dr. David Morgan's lab at USF. Id. at 68. Immunohistochemistry is a "technique where you use an antibody, which is labeled with a dye, to identify the protein of interest in tissue sections . . . . [it] would have been applied to identify the amyloid plaques" in the tissue from the mouse brains. Id. at 65. The testing generated the proof of accelerated Alzheimer's pathology that was included in the fax that Dr. Duff sent as evidence of the pathology. See id. at 65-66 (Dr. Duff's testimony referencing Figure 1 included in the fax to William Coppola); ECF No. 282-28 at 3.

The work in Dr. Gordon's and Dr. Morgan's lab was included in the NIH grant application as Project Five, titled "Regulation and Function of the Presenilins in Rodent Brain." See ECF No. 282-29 at 208-09 (def. exhibit 17); see also id. at 212. Dr. Morgan is listed as the principal investigator and Dr. Gordon is listed as a co-principal investigator. See id. at 209. Dr. Gordon's role is described in the grant materials as "perform[ing] many of the histochemical procedures," and "play[ing] the major role in analyzing the histochemical data." Id. at 212. And, Dr. Morgan's role is described as "perform[ing] many of the surgical procedures," and "closely direct[ing] all experiments using molecular biological approaches." Id. The initial budget in the grant materials

---

[3] Dr. Duff testified that the grant number should have read "AG014633." See ECF No. 270 at 107.

specified that Dr. Morgan's and Dr. Gordon's salaries and fringe benefits would be paid in part with grant funds. See id. at 210.

Because Dr. Gordon and Dr. Morgan were located at USF and the grant funds ultimately were awarded to Mayo, see ECF No. 282-42 at 3, the funds were the subject of a consortium agreement—a subcontract—between the two entities, see ECF No. 282-5 at 2-7 (joint exhibit 8). Mayo signed the subcontract on November 5, 1997, and plaintiff signed on November 8, 1997. See id. at 7. The subcontract had an effective period of September 1, 1997, to August 31, 1998. See id. at 3. Plaintiff's proposal review and certification form indicates that plaintiff's internal account number for the funds was 6113-120-LO. See ECF No. 282-47 at 15; see also ECF No. 272 at 68 (testimony of Dr. Morgan). It also indicates that the project period was from September 1, 1996, through August 30, 1999, and the budget period was September 1, 1997, through August 30, 1998. See ECF No. 282-47 at 15. A second such form indicated the same project period and a budget period of September 1, 1998, through August 30, 1999. See id. at 13.

The parties presented no form for the first year of the project, from September 30, 1996, through August 30, 1997. See ECF No. 272 at 65-76 (testimony of Dr. Morgan discussing the forms). Dr. Morgan testified, however, that he "assumed" plaintiff "would have gotten funding prior to the start of year two." Id. at 75. He based that testimony on the forms and the grant award for the second year of the grant. See ECF No. 282-47 at 10; ECF No. 272 at 73-75. Dr. Morgan also reviewed a document that indicated that the "[t]he second year of the subcontract for NIH grant Account # 6113-127-LO closes August 31, 1998. This is a Mayo Clinic Subcontract Grant from the [NIH],"[4] ECF No. 282-47 at 7, and concluded that the first year of the subcontract would have been from September of [19]96 to August of . . . [19]97," ECF No. 272 at 76.

Dr. Morgan and Dr. Gordon both testified that Dr. Gordon was paid with funds from the NIH grant beginning October 1, 1996. See id. at 78-80 (testimony of Dr. Morgan); id. at 148-57 (testimony of Dr. Gordon). Both based their testimony on their understanding of Dr. Gordon's employment forms. See id.; see also ECF No. 282-46 at 1-14 (def. exhibit 51, Dr. Gordon's various employment forms). Dr. Gordon's employment contract notes that her appointment ran from October 1, 1996, through June 12, 1997, and was "funded through contract/grant Mayo Clinic, account # 6113120LO." ECF No. 282-46 at 14. It further states that her "employment ends with the expiration of this contract or the cancellation of the contract/grant, whichever occurs first." Id. The

[4] Trial testimony clarified that USF had two account numbers for the grant. See ECF No. 272 at 155-57 (testimony of Dr. Gordon). Dr. Gordon stated that "sometimes the university would give you a new account number for a new fiscal year of a grant . . . . It could be a completely different grant or it could be a different fiscal year of the same grant." Id. at 155. She did not recall working on any other grant tied to the Mayo Clinic. See id. at 157. The court thus concludes, based on the testimony and the statement in the document, that both account numbers reflect the Mayo Clinic subcontract grant.

contract was signed by plaintiff's representative on October 22, 1996, and was signed by Dr. Gordon on May 2, 1997. See id. Likewise, Dr. Gordon's appointment change form listed her appointment date as October 1, 1996, and the end date as June 12, 1997, with her salary being paid out of account number 6113120LO—the Mayo grant account number. See id. at 12. And, her appointment status form lists the same appointment dates, the same payment account, and a preparation date of December 16, 1996. See id. at 10. A second appointment status form with a preparation date of June 2, 1997, lists Dr. Gordon's appointment dates as January 1, 1997, through June 12, 1997, and the same Mayo grant payment account number. See id. at 9.

Dr. Gordon testified that her position at the time was grant-funded—her salary had to be supported by "funding from a grant." ECF No. 272 at 150. She stated that she did not recall working on any Mayo Clinic grant other than the one awarded by NIH. See id. at 157. She also testified that the delay in her signature on her employment contract was a result of "[u]niversity bureaucracy at its finest," because the contract was awaiting the signature of the university president for six months after the human resources person signed it. Id. at 150. But, she noted, she would have been paid even while the contract was pending signature, and her salary would have come from the Mayo grant. See id. at 151. Dr. Gordon explained that "if the grant was funded and awarded, . . . even if the physical check hadn't come from the NIH yet . . . there was a system of underwriting . . . so [USF] would underwrite certain things, and the would include salary, and then the university would recoup those funds once the physical . . . check was actually deposited." Id. at 156.

Dr. Morgan's testimony agreed with Dr. Gordon's as to her employment documents, and he also noted that plaintiff would have been charging expenses and salaries to the Mayo grant by "late 1996," and that "it's plausible that [he] would have also requested an underwrite at that time." Id. at 77. Dr. Morgan explained further that Dr. Gordon would have been paid under the subcontract as of October 1996, "or else there were 'rets' that were prepared to retroactively charge for salary that was paid from another source for that," meaning that "the department may have essentially subsidized her for some period of time, and then the grant was charged once . . . the subcontract was finalized for that purpose." Id. at 79. Dr. Morgan concluded that "because [they] were working on that project, and that was the first year of the grant, [ ] starting in September of 1996," and "because there was an account number that it stated as paying for her salary," it made sense to him that Dr. Gordon was paid under the Mayo subcontract. Id. at 80. He further stated that his recollection, although without documentation, was that plaintiff "had funds by December [1996] that we were using in order to pay for the mouse costs and pay for the reagents that we used. . . . And people's salaries as well." Id. at 94; see also id. at 120-21 ("[W]hat I would have assumed I would have done, is that once I learned from the Mayo Clinic that they had received the notice of award from the NIH . . . . I would have gone to USF and requested that they provide an advance on that award . . . . [W]e were very dependent financially upon this project.").

## II. Legal Standards

The Bayh-Dole Act requires that a funding agreement between the United States and a nonprofit organization include a provision stating that "[w]ith respect to any invention in which the contractor elects rights, the Federal agency shall have a nonexclusive, nontransferrable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States any subject invention throughout the world." 35 U.S.C. § 202(c)(4). The Act defines "funding agreement" as "any contract, grant, or cooperative agreement entered into between any Federal agency . . . and any contractor for the performance of experimental, developmental, or research work funded in whole or in part by the Federal Government. Such term includes any . . . subcontract of any type." 35 U.S.C. § 201(b). It further defines "subject invention" to mean "any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement." Id. § 201(e). Thus, the Act "vests in the government the right to a paid-up license to practice the invention when the contractor elects to retain title." Campbell Plastics Eng'g & Mfg., Inc. v. Brownlee, 389 F.3d 1243, 1247 (Fed. Cir. 2004).

Defendant may raise the existence of a license as a defense when it is sued for patent infringement. See Tech. Dev. Corp. v. United States, 597 F.2d 733, 746 (Ct. Cl. 1979); see also Madey v. Duke Univ., 413 F. Supp. 2d 601, 611 (M.D.N.C. 2006) ("[C]ourts have recognized that the license may be raised by the Government as an affirmative defense when the Government is sued for patent infringement in the Court of Federal Claims."). To successfully raise the defense, defendant "must establish by a preponderance of the evidence that a conception or a first actual reduction to practice occurred in the performance of a Government contract." Tech. Dev. Corp., 597 F.2d at 746 (citation omitted). If it does so, defendant is "not liable for royalties for any uses of that invention within the scope" of the license. Madey, 413 F. Supp. 2d at 612.

To prove the defense by a preponderance of the evidence, defendant must prove that "'the existence of a fact is more probable than its nonexistence.'" Ortiz v. Principi, 274 F.3d 1361, 1365 (Fed. Cir. 2001) (quoting In re Winship, 397 U.S. 358, 371-72 (1970)). In other words, a preponderance "'describe[s] a state of proof that persuades the factfinders that the points in question are more probably so than not.'" Id. (quoting Mueller & Kirkpatrick, Evidence § 3.3 (1995)) (emphasis removed). It is "the greater weight of the evidence, evidence which is more convincing than the evidence which is offered in opposition to it." Hale v. Dept. of Transp., F.A.A., 772 F.2d 882, 885 (Fed. Cir. 1985).

## III. Analysis

The court is persuaded that the greater weight of the evidence demonstrates that defendant has a license to the '094 patent, and thus has successfully asserted an

affirmative defense to plaintiff's claim. Specifically, the court is persuaded that the evidence shows that the subject invention was first reduced to practice while the inventors were working pursuant to a funding agreement. See 35 U.S.C. § 202(c)(4); see also id. §§ 201(b), 201(e).

A. The '094 Patent Was First Reduced to Practice in April 1997

The parties agree, and the evidence demonstrates, that the invention described in the '094 patent was first reduced to practice in April 1997. See ECF No. 274 at 31 (plaintiff stating that the "first actual reduction to practice is reflected in the letter written by Karen Duff . . . on April 25, 1997"); ECF No. 279 at 10 (defendant stating that it "agrees with [plaintiff] that its first actual reduction to practice occurred in April 1997").

The evidence introduced at trial shows that on April 25, 1997, Dr. Duff faxed a letter to plaintiff's department handling patent matters detailing the process she and Dr. Hardy had engaged in to create the mice that were eventually documented in the '094 patent, and the results of their work. See ECF No. 282-28 (fax from Dr. Duff to Bill Coppola). And the trial testimony established that this constituted the first documented evidence that the mice the inventors had been working on "did, indeed, develop pathology . . . at an age which was far accelerated." ECF No. 270 at 59 (testimony of Dr. Duff); see also id. at 64 (Dr. Duff confirming that the fax was the "first documented evidence" of the mice).

The court thus concludes that the invention detailed in the '094 patent was first reduced to practice in April 1997.

B. Plaintiff Was Using NIH Grant Funds as Early as October 1996

Defendant argues in its post-trial brief that NIH program project grant AG014633 funded plaintiff's first reduction of the invention to practice. See ECF No. 279 at 10-14. Plaintiff, however, contends that no grant funds flowed to plaintiff until the formal subcontract between the Mayo Clinic and plaintiff was signed in November 1997. See ECF No. 274 at 32-33; ECF No. 280 at 8-11. According to plaintiff, it "paid for the work on the mice of the '094 Patent up to, through and beyond April 25, 1997." ECF No. 280 at 8 (emphasis in original). And, plaintiff contends, four witnesses testified "the only way for money to have flowed to [plaintiff] from the NIH grant in question . . . would have been for a subcontract to be entered into between Mayo Clinic . . . and [plaintiff]." ECF No. 274 at 32 (emphasis in original).

The evidence, however, shows that plaintiff paid for the work done by Dr. Gordon at USF with the NIH grant funds. The trial record demonstrates that plaintiff assigned account number 6113-120-LO to the grant funds that came from NIH to the Mayo Clinic and then to plaintiff. See ECF No. 282-47 at 15; see also ECF No. 272 at 68 (testimony

of Dr. Morgan). Trial testimony also established that Dr. Gordon was paid with funds out of that account beginning October 1, 1996. See ECF No. 272 at 78-80 (testimony of Dr. Morgan); id. at 148-57 (testimony of Dr. Gordon). Dr. Gordon's employment documents likewise indicate that she was paid with funds out of plaintiff's grant account for an appointment term beginning in October 1996. See ECF No. 282-46 at 10, 12, 14.

Specifically, trial testimony revealed that Dr. Gordon would have been paid under the subcontract as of October 1996, "or else there were 'rets' that were prepared to retroactively charge for salary that was paid from another source for that," meaning that "the department may have essentially subsidized her for some period of time, and then the grant was charged once . . . the subcontract was finalized for that purpose." ECF No. 272 at 79 (testimony of Dr. Morgan). Dr. Morgan, a principal investigator on the grant and specifically for the project being conducted at USF, concluded that "because [he and Dr. Gordon] were working on that project, and that was the first year of the grant, [ ] starting in September of 1996 . . . . And . . . because there was an account number that it stated as paying for her salary," it made sense to him that Dr. Gordon was paid under the NIH grant by the Mayo Clinic subcontract. Id. at 80.

The greater weight of the trial testimony also established that plaintiff was using NIH funds by December 1996 to pay for costs associated with conducting the immunohistochemistry work that was a key part of the research that led to the '094 patent. See id. at 94 (Dr. Morgan testifying that his recollection, although without documentation, was that plaintiff "had funds by December [1996] that we were using in order to pay for the mouse costs and pay for the reagents that we used . . . [a]nd people's salaries as well"); see also id. at 120-21 (Dr. Morgan testifying, "what I would have assumed I would have done, is that once I learned from the Mayo Clinic that they had received the notice of award from the NIH . . . . I would have gone to USF and requested that they provide an advance on that award . . . . [W]e were very dependent financially upon this project.").

The court finds the testimony of Dr. Morgan and Dr. Gordon credible and is persuaded "that the points in question are more probably so than not.'" Ortiz, 274 F.3d at 1365 (quoting Mueller & Kirkpatrick, Evidence § 3.3 (1995)). The court therefore concludes that the evidence establishes that plaintiff's work on the mice in the '094 patent was performed using funds from NIH grant AG014633 as early as October 1996.

### C. Plaintiff Performed the Work on the '094 Patent Pursuant to an Implied Subcontract with the Mayo Clinic

The trial record establishes that, beginning in October 1996, plaintiff operated pursuant to an implied contract with the Mayo Clinic for grant funds under the NIH AG014633 grant. Plaintiff argues that "[t]here simply never was an implied subcontract between [plaintiff] and Mayo Clinic." ECF No. 280 at 8. According to plaintiff, because

there was an express subcontract between plaintiff and the Mayo Clinic that was signed in November 1997, there "could not have been an implied contract." Id. at 11. Defendant contends, however, that "[w]hen the evidence is viewed properly, it is clear that an implied contract existed between USF and Mayo at the time of the April 1997 actual reduction to practice," because "the conduct of the parties indicated that a subcontract existed," given that Dr. Gordon's salary was paid out of grant funds. ECF No. 279 at 16.

"[A]n implied-in-fact contract is one 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Atlas Corp. v. United States, 895 F.2d 745, 754 (Fed. Cir. 1990) (quoting Porter v. United States, 496 F.2d 583, 590 (Ct. Cl. 1974)). In the court's view, such a contract existed between plaintiff and the Mayo Clinic.

As the court determined above, trial testimony established that Dr. Gordon was paid out of plaintiff's internal account for the grant funds. See ECF No. 272 at 78-80 (testimony of Dr. Morgan); id. at 148-57 (testimony of Dr. Gordon). Regardless of whether plaintiff underwrote those funds for a time before money flowed from the Mayo Clinic, it is clear in the record that plaintiff had a "tacit understanding" with Mayo that the funds would eventually arrive. Atlas Corp., 895 F.2d at 754; see also, e.g., ECF No. 272 at 120-21 (Dr. Morgan testifying, "what I would have assumed I would have done, is that once I learned from the Mayo Clinic that they had received the notice of award from the NIH . . . . I would have gone to USF and requested that they provide an advance on that award . . . . [W]e were very dependent financially upon this project."). And plaintiff was using grant funds as early as October 1996 to fund the immunohistochemistry work that contributed to the '094 patent.[5] See ECF No. 282-46 at 10, 12, 14 (Dr. Gordon's employment documents reflecting payment of her salary out of the grant account beginning October 1, 1996). The court thus finds that the conduct of the parties (plaintiff's creating a grant account and charging Dr. Gordon's salary to the account), in light of the surrounding circumstances (the grant having been awarded in September 1996 and testimony that plaintiff was financially dependent on the award, see ECF No. 272 at 121), indicates plaintiff's and Mayo's "tacit understanding" that grant funds would flow from the NIH to the Mayo Clinic and ultimately to plaintiff. Atlas Corp., 895 F.2d

[5] Plaintiff argued that the work done at USF by Dr. Gordon and Dr. Morgan was to "document behavior in presenilin rodents, not to make new genetic variants." ECF No. 274 at 34. The court cannot credit this argument in light of trial testimony that established that the USF doctors did immunohistochemistry work pursuant to the grant project, and that immunohistochemistry was the testing that generated the proof of accelerated Alzheimer's pathology. See ECF No. 270 at 65-66 (Dr. Duff's testimony referencing Figure 1 included in the fax to William Coppola); ECF No. 282-28 at 3. This testing appears to the court to be integral to the project, especially so because it was included in the fax that Dr. Duff sent as evidence of the pathology. See id.

at 754. The court therefore holds that the Mayo Clinic and plaintiff entered into an implied subcontract on October 1, 1996, which is the same date as Dr. Gordon's appointment as documented in her employment forms. See ECF No. 282-46 at 10, 12, 14.

D. Defendant Held a Paid-Up License Pursuant to the Bayh-Dole Act

The Bayh-Dole Act requires that a funding agreement between the United States and a nonprofit organization include a provision providing that "[w]ith respect to any invention in which the contractor elects rights, the Federal agency shall have a nonexclusive, nontransferrable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States any subject invention throughout the world." 35 U.S.C. § 202(c)(4). This court has held that "where a patentee has been intimately involved in all phases of performance of a Government-funded contract during the performance of which the invention was conceived and/or first actually reduced to practice, and the work was, in fact, paid for in substantial part or entirely out of Government funds, the Government is entitled to a license." Tech. Dev. Corp., 597 F.2d at 746. To establish its right to a license, therefore, defendant must demonstrate that there was a funding agreement in place at the time the '094 patent was conceived or first reduced to practice.

The court finds here that defendant has met its burden and has demonstrated that the work on the '094 patent meets the terms of Bayh-Dole Act such that defendant held a license. As an initial matter, the work was performed pursuant to a funding agreement. The trial record established that plaintiff and the Mayo Clinic entered into an implied subcontract beginning in October 1996 with respect to grant funds awarded by the NIH. See supra Sections III.B. and III.C. The Act defines a funding agreement to include "any contract, grant, or cooperative agreement entered into between any Federal agency . . . and any contractor for the performance of experimental, developmental, or research work funded in whole or in part by the Federal Government. Such term includes any . . . subcontract of any type." 35 U.S.C. § 201(b). Thus, the subcontract between Mayo and plaintiff is considered a funding agreement.

Further, the trial record established that the '094 patent constitutes a "subject invention" because it was first actually reduced to practice in April 1997, during the course of performance of work under the grant. See id. § 201(e); see also supra Sections III.A, B, and C (determining that the patent was first reduced to practice in April 1997 and that the grant subcontract began in October 1996).

The court thus concludes that plaintiff was "intimately involved in all phases of performance," and the work performed by plaintiff "was, in fact, paid for in substantial part or entirely out of Government funds." Tech. Dev. Corp., 597 F.2d at 746. Defendant is therefore entitled to a "nonexclusive, nontransferrable, irrevocable, paid-up

license" to practice the '094 patent. 35 U.S.C. § 202(c)(4). As such, defendant is not liable for infringement of the patent, and the court need not reach the parties' arguments as to prior invention, obviousness, or damages. See Madey, 413 F. Supp. 2d at 612 ("If the Government meets this burden, the Government is not liable for royalties for any uses of that invention within the scope of the Government License."). Plaintiff's claims are denied.

IV. Conclusion

Accordingly, for the foregoing reasons:

(1) The clerk's office is directed to **ENTER** final judgment in defendant's favor; and

(2) On or before **September 23, 2022**, the parties are directed to **CONFER** and **FILE** a **notice** attaching the parties' agreed-upon redacted version of this opinion, with all competition-sensitive information blacked out.

IT IS SO ORDERED.

s/Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Judge

US005898094A

# United States Patent [19]

**Duff et al.**

[11] **Patent Number: 5,898,094**

[45] **Date of Patent: Apr. 27, 1999**

[54] **TRANSGENIC MICE EXPRESSING APPK670N,M671L AND A MUTANT PRESENILIN TRANSGENES**

[75] Inventors: **Karen Duff**, Tampa; **John Hardy**, St. Augustine, both of Fla.

[73] Assignee: **University of South Florida**, Tampa, Fla.

[21] Appl. No.: **08/903,518**

[22] Filed: **Jul. 30, 1997**

**Related U.S. Application Data**

[60] Provisional application No. 60/028,937, Oct. 21, 1996, and provisional application No. 60/029,711, Nov. 12, 1996.

[51] **Int. Cl.**[6] .............................. **C12N 15/00**; C12N 5/00; A61K 49/00

[52] **U.S. Cl.** ..................... **800/2**; 800/DIG. 1; 435/172.3; 424/9.2

[58] **Field of Search** .................................. 800/2, DIG. 1; 435/172.3; 424/9.2

[56] **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,736,866 | 4/1988 | Leder et al. | 800/1 |
| 4,873,191 | 10/1989 | Wagner et al. | 435/435 |
| 5,151,508 | 9/1992 | Salbaum et al. | 536/435 |
| 5,175,383 | 12/1992 | Leder et al. | 800/2 |
| 5,175,384 | 12/1992 | Krimpenfort et al. | 800/2 |
| 5,221,778 | 6/1993 | Bryre et al. | 800/2 |
| 5,288,846 | 2/1994 | Quertermous et al. | 435/435 |
| 5,298,422 | 3/1994 | Schwartz et al. | 435/435 |
| 5,347,075 | 9/1994 | Sorge | 800/800 |
| 5,387,742 | 2/1995 | Cordell | 800/424 |
| 5,464,764 | 11/1995 | Capecchi et al. | 435/435 |
| 5,525,714 | 6/1996 | Van Broeckhoven et al. | 536/536 |
| 5,602,299 | 2/1997 | Lazzarini | 800/800 |
| 5,604,131 | 12/1997 | Wadsworth et al. | 435/536 |
| 5,612,486 | 3/1997 | McConlogue et al. | 800/2 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9451700 | 4/1991 | European Pat. Off. | C12N 15/00 |
| 9653154 | 7/1994 | European Pat. Off. | A01K 67/027 |
| 9206187 | 4/1992 | WIPO | C12N 15/00 |
| 9211358 | 7/1992 | WIPO | C12N 15/00 |
| 9213069 | 8/1992 | WIPO | C12N 15/00 |
| 9302189 | 2/1993 | WIPO | C12N 15/00 |
| 9314200 | 7/1993 | WIPO | C12N 15/00 |
| 9406908 | 3/1994 | WIPO | C12N 15/00 |
| 9412627 | 6/1994 | WIPO | C12N 15/00 |
| 9224266 | 10/1994 | WIPO | C12N 5/00 |
| 9423049 | 10/1994 | WIPO | C12N 15/87 |
| 9228123 | 12/1994 | WIPO | C12N 15/00 |
| 9606927 | 3/1996 | WIPO | C12N 5/00 |

OTHER PUBLICATIONS

Ali et al., 1996. Artificial Strain–Specific Signs of Incipient Brain Amyloidosis in APP Transgenic Mice. Neur. of Aging, 17(2):223–234.

Andra et al., 1996, "Expression of APP in Transgenic Mice: A Comparison of Neuron–Specific Promoters", Neur. of Aging, 17(2)P183–P190.

Borchelt et al., 1996, "Familial Alzheimer's Disease–Linked Presenilin 1 Variants Elevate A–β–1–42/1–40 Ratio in Vitro and in Vivo", Neuron, 17:1005–1013.

Burke and Olson, 1991. "Preparation of Clone Libraries in Yeast Artificial–Chromosome Vectors" in Meth. in Enzymology, vol. 194, Academic Press, Inc., Chap. 17, pp. 251–270.

Cai et al., 1993, "Release of Excess Amyloid β Protein from a Mutant Amyloid β Protein Precursor", Science, 259:514–516.

Capecchi, 1989, "Altering the genome by homologous recombination" Science, 244:1288–1292.

Citron et al., 1992, "Mutation of the β–amyloid precursor protein in familial Alzheimer's disease increases β–protein production", Nature 360:672.

Cruts et al., 1996, "The Presenilin Genes: A New Gene Family Involved in Alzheimer Disease Pathology", Human Molecular Genetics, 5 (Review):1449–1455.

Davies et al., 1992, "Targeted alterations in yeast artificial chromosomes for inter–species gene transfer", Nucleic Acids Research, 20(11):2693–2698.

Dickinson et al., 1993, "High frequency gene targeting using insertional vectors", Human Molecular Genet., 2(8):1299–1302.

Duff et al., 1996, "Increased amyloid–β42(43) in brains of mice expressing mutant presenilin 1", Nature, 383:710–713.

Duff and Lincoln, 1995. "Insertion of pathogenic mutation into yeast artificial chromosome containing human APP gene and expression in ES cells", Res. Adv. in Alzheimer's Disease.

Games et al., 1995, "Alzheimer–type neuropathology in transgenic mice overexpressing V717F. β–amyloid precursor protein", Nature, 373:523–527.

Goate et al., 1991, "Segregation of a missense mutation in the amyloid precursor protein gene with familial Alzheimer's disease", Nature 349:704–706.

Gordon, 1989, "Transgenic Animals", Intl. Rev. Cytol, 115:171–229.


(List continued on next page.)

*Primary Examiner*—Deborah Crouch
*Attorney, Agent, or Firm*—Kohn & Associates

[57] **ABSTRACT**

A method of preparing a transgenic animal model with enhanced, accelerated pathology for Alzheimer's Disease (AD) and the transgenic animal made by the method is disclosed. The method includes producing an $F_1$ generation by crossing a first and second transgenic parent each carrying a different expressible transgene for differing aspects of the same desired phenotype associated with AD pathology. The offspring of the $F_1$ generation are then screened and those which carry a transgene from each parental transgenic animal resulting in an enhanced pathology for Alzheimer's Disease are selected. In a preferred embodiment the AD-associated pathology is for amyloid accumulation. In an embodiment a mutant presenilin transgene and a transgene for a mutant amyloid precursor protein are used. In a further embodiment the mutant presenilin transgene is the PS1 M146L mutation and the mutant amyloid precursor protein transgene is the Swedish mutation (APP695 isoform containing a K670N,M671L mutation (APP770 numbering)).

**14 Claims, 1 Drawing Sheet**

Klenk
EXHIBIT NO. 1
KY 6/14/20

EXHIBIT
JTX 1

University of South Florida Board of Trustees vs. USA
15-1549C
Joint Exhibit No.: JTX1
Pages 1-10

OTHER PUBLICATIONS

Hsiao et al., 1996, "Correlative Memory Deficits, A–β Elevation and Amyloid Plaques in Transgenic Mice", Science, 274:99–102.

Hsiao et al., 1995, "Age–Related CNS Disorder and Early Death in Transgenic FVB/N Mice Overexpressing Alzheimer Amyloid Precursor Proteins", Neuron, 15:1203–1218.

Huxley et al., 1991, "The human HPRT gene on a yeast artificial chromosome is functional when transferred to mouse cells by cell fusion", Genomics, 9:742–750.

Jakobovits et al., 1993, "Germ–line transmission and expression of a human–derived yeast artificial chromosome", Nature, 362:255–261.

Jarrett et al., 1993, "Carboxy Terminus of β–Amyloid Protein is Critical for Seeding of Amyuloid Formation . . . ", Biochemistry, 32:4693–4697.

Lalonde and Thifault, 1994, "Absence of an Association Between Motor Coordination and Spatial Orientation in Lurcher Mutant Mice", Behavior, 24:497–501.

Lamb et al., 1993. "Introduction and expression of the 400 kilobase precursor amyloid protein gene in transgenic mice", Nature Genetics, 5:22–29.

Lavitrano et al, 1989, "Sperm Cells as Vectors for Introducing Foreign DNA into Eggs: Genetic Transformation of Mice" Cell 57:717–723.

Levy–Lahad et al., 1995, "Candidate Gene for Chromosome 1 Familial Alzheimer's Disease Locus", Science, 269:973–977.

L'Hernault and Arduengo, 1992, "Mutation of Putative Sperm Membrane Protein in *Caenorhabditis elegans* Prevents Sperm Differentiation",J. Cell Biology, 119(1):55–68.

Lo, 1983, "Transformation by Iontophoretic Microinjection of DNA Multiple Integrations Without Tandem Insertions", Mol. Cell. Biol 3(10):1803–1814.

Loring et al., 1996, "Rational Design of Animal Model for Alzheimer's Disease: Intro. of Mult. Human Genomic Transgenes . . . ", *Neur. of Aging,* 17(2):173–182.

Mann et al., 1996, "Amyloid β Protein Deposition in Chrom. 14–linked Alzheimer's Disease", Annals Neurol, 40:149–156.

Malherbe et al., 1996, "Lack of β–Amyloidosis in Transgenic Mice Expressing Low Levels of Aamilial Alzheimer's Disease Missence Mutations", 17(2): 205–214.

Mucke et al., 1994, "Synaptotrophic effects of human amyloid β protein precursors in cortex of transgenic mice", Brain Res., 666:151–167.

Neve et al., 1996, "Transgenic Mice expressing APP–C100 in the Brain", Neuro. of Aging, 17(2):191–203.

Pearson and Choi, 1993, "Expression of the human b–amyloid precursor protein gene from a yeast artificial chromosome in transgenic mice". Proc. Natl. Scad. Sci. USA, 90:10578–10582.

Reaume et al., 1996, Enhanced amyuloidogenic processing of the β–amyloid precursor protein in gene–targeted mice . . . , J. Biol. Chem. 271(38):23380–23388.

Rothstein, 1991, "Targeting, disruption, replacement, and allele rescue: integrative DNA transformation in yeast" in Meth. in Enzymology, (Academic Press) Chap. 19, 194:281–301.

Schedl et al., 1993, "A yeast artificial chromosome covering the tyrosinase gene confers copy number–dependent expression in transgenic mice", Nature, vol. 362:258–261.

Scheuner et al., 1996, "Secreted amyloid b–protein similar to that in senile plaques of AD is increased in vivo by presenilin 1 and 2 . . . ", Nature Med., 2(8):864–870.

Sherrington et al., 1996, "Cloning of a gene bearing missense mutations in early–onset familial Alzheimer's disease", Nature, 375:754–760.

Strauss et al., 1993, "Germ line transmission of a yeast artificial chromosome spanning the murine $a_1$ (I) collagen locus", Science, 259:1904–1907.

Suzuki et al., 1994, "Increased Percentage of Long Amyloid β Protein Secreted by Familial Amyloid β Protein Precursor ($\beta APP_{717}$) Mutants", Science, 264:1336–1340.

Thompson et al, 1989, "Germ Line Transmission and Expression of a Corrected HPRT Gene Produced by Gene Targeting in Embryonic Stem Cells", Cell 56:313–321.

Van der Putten et al, 1985, "Efficient insertion of genes into the mouse germ line via retroviral vectors", PNAS USA 82:6148–6152.

Duff, 1994, "Modeling Alzheimer's Disease in Transgenic Mice", J Florida M.A. 91(9):625–628.

Felsenstein et al (1995) Alzheimer's Parkinson's Diseases, L. Hanin et al, ed., Plenum Press, New York, pp. 401–409.




Fig—1A




Fig— 1B




Fig— 1C

# TRANSGENIC MICE EXPRESSING APPK670N,M671L AND A MUTANT PRESENILIN TRANSGENES

This application claims priority from U.S. Ser. No. 60/028,937, filed Oct. 21, 1996 and from U.S. Ser. No. 60/029,711, filed Nov. 12, 1996.

## FIELD OF THE INVENTION

The present invention relates to the production and use of transgenic animal models including methods of modulating the phenotype resulting from expression of the integrated transgenes. More particularly, the invention relates to improving models of neurodegerative disorders including models for Alzheimer's Disease and the animals produced therefrom.

## BACKGROUND OF THE INVENTION

Transgenic animals are being utilized as model systems for studying both normal and disease processes. In general an exogenous gene with or without a mutation is transferred to the animal host system and the phenotype resulting from the transferred gene is observed. Other genetic manipulations can be undertaken in the vector or host system to improve the gene expression leading to the observed phenotype (phenotypic expression). The gene may be transferred under the control of different inducible or constituent promoters, may be overexpressed, the endogenous homologous gene may be rendered unexpressible and the like. [PCT Application WO 92/11358; U.S. Pat. No. 5,221,778] However, even with these manipulations the desired phenotype is not always expressed (for example, see herein below regarding PS transgenes). Further, as set forth in U.S. Pat. Nos. 5,602,299 and 5,221,778 various breeding programs to change the background, insert additional transactivator transgene, make the transgene homozygous or have hosts carrying two copies of the transgene but inserted at two different sites have been disclosed. However, again these methods do not always improve the phenotypic expression of the transgene such that the model system more closely resembles the desired phenotype. Therefore additional methods are needed to improve and/or modulate the phenotype of transgenic animals.

Transgenic model systems are needed to study neurodegenerative disorders, both to understand the underlying disease pathology as well as to test treatment protocols. Alzheimer's disease (AD) is a neurodegenerative disorder with a progressive dementia characterized by the presence of extracellular amyloid deposits (composed mainly of β-amyloid (Aβ)) and intraneuronal tangles, (consisting largely of the cytoskeletal protein tau), in specific brain regions. Its symptoms include gradual memory loss, declined ability to perform routine tasks such as eating, confusion, disorientation, the inability of the patient to care for him or herself, and eventually death. The American Health Assistance Foundation has reported that presently more than four million Americans are believed to have AD, and each year 100,000 Americans die because of AD and 250,000 new cases of AD are diagnosed. Moreover, one out of every ten Americans 65 years and older have AD and almost half of those 85 years and older have the disease.

Although AD in general is associated with patients in their late 60s, 70s and older, Familial Alzheimer's Disease (FAD) has been documented in patients in their thirties and forties. FAD is genetic autosomal dominant form of AD. Although the genetic causes of FAD are not thought to be the same as AD, the FAD phenotype appears to be pathologically similar to AD. It has been reported that 10% of all AD cases are FAD.



Autopsies of patients who suffered from FAD have shown the presence of neuritic plaques made up largely of beta-amyloid (Aβ) and neurofibrillary tangles consisting largely of deposits of tau protein [reviewed in Hardy and Duff, 1993]. Beta-amyloid is a 40–42 amino acid peptide produced by the proteolytic cleavage of the larger amyloid precursor protein (APP). APP is a transmembrane protein with a single transmembrane domain running from residue 700 to residue 722. The APP gene is located on chromosome 21 and contains 18 exons. APP isoforms resulting from alternative splicing form a set of polypeptides ranging from 563 to 770 residues in length. The beta amyloid fragment is encoded by the 3' half of exon 16 and the 5' half of exon 17, which also encodes APP's transmembrane domain. Most of the beta-amyloid cleaved from APP is forty (40) amino acid residues long and designated Aβ1-40.

Another form of beta-amyloid produced in much smaller amounts relative to the production of Aβ1-40 is a peptide 42–43 amino acid residues long. It is designated Aβ1-42 (43). This peptide is selectively deposited early in the FAD process. Experiments conducted in vitro have demonstrated this peptide forms insoluble aggregates much faster than Aβ1-40. Hence it is believed that increased production of Aβ1-42(43) occurs in patients genetically predisposed to FAD and initiates its pathology. Since both forms of beta-amyloid are insoluble, they deposit on neurons in the brain.

Genetic causes of AD include mutations in the APP gene on chromosome 21, the presenilin 1 (PS1) gene on chromosome 14 and the presenilin 2 (PS2) gene on chromosome 1 [Goate et al, 1991; Sherrington et al, 1995; Levy-Lahad et al, 1995]. All known mutations which cause AD have been shown to alter the processing of APP such that more amyloidogenic Aβ (Aβ42(43)) is generated. This had led to the hypothesis that aberrant APP processing and the generation of Aβ42(43) may underlie the early etiopathogenesis of FAD [Younkin, 1995; Scheuner, 1996; Cai et al, 1993; Citron et al, 1992; Suzuki et al, 1994].

In some patients suffering from FAD, a missense point mutation in exon 17 at a codon 717 (transcript 770) of the APP gene was determined responsible for the increased formation of beta-amyloid, and hence FAD [PCT Application PCT/GB92/00123]. Soon thereafter, other point mutations were found in the same codon in patients suffering from FAD [Hardy, 1993].

In an effort to develop animal models to study pharmaceutical agents designed to treat FAD, transgenic mice have been developed containing the missense point mutations of the human APP gene in their genome [Hsiao et al., 1996; Games et al., 1995; U.S. Pat. No. 5,612,486; PCT Applications WO 92/06187; WO 93/14200; WO 96/06927]. Since a mutated APP gene is expressed in their brains, these transgenic mice have the potential to serve as models for FAD. Models with overexpression of the APP gene. (with and without mutations) have also been developed [PCT Application WO 94/24266; WO 96/06927; European Patent Application EPO 653 154 A2].

Some of these APP gene transgenic mice have been shown to produce pathology which resembles that of FAD at one year of age and older [Hsiao et al., 1996 and Games et al., 1995]. The PDAPP mouse [Games, et al, 1995] expresses an APP minigene with the V717F mutation (Note mutations are abbreviated as the amino acid at location followed by the substituted amino acid). The Tg2576 mouse

[Hsiao et al, 1996] expresses the APP695 isoform containing a K670N,M671L mutation (APP770 numbering) which is often referred to as the Swedish mutation. In addition to AD-type pathology, Tg2576 shows cognitive impairment as measured by spontaneous alternation in a "Y" maze and spatial memory in a water maze suggesting that the manipulation of APP affects cognitive function in addition to pathology.

However, other APP gene transgenic mice do not produce or have weak FAD pathology. See Neve et al, 1996 for an example of weak pathology and Hsaio et al., 1995; Andra et al., 1996; Malherbe et al., 1996; Mucke et al., 1994 for examples of APP mice which do not show pathology and see Greenberg et al, 1996 for a review of additional APP gene transgenic mice which do not show pathology or show only weak pathology.

Analysis of the above suggests that these Alzheimer's models suffer from the limitation that they are unable to produce sufficient amounts of Aβ in the brain to initiate Alzheimer's related pathology. Therefore transgenic models producing sufficient amounts of Aβ in the brain in an accelerated manner and methods of making such transgenics are needed.

Recently, mutations in other genes, termed the Presenilin I (PSI) and Presenilin II (PS2) genes located on chromosomes 14 and 1, respectively, have also been shown to cause FAD. [Cruts, et al., 1996]. Research has demonstrated that peripheral cells from individuals with these presenilin mutations produce a greater amount Aβ1-42(43) than that produced in individuals having a non-mutant PS gene [Scheuner et al., 1996]. It has been suggested that the mode of pathogenesis produced by these mutated presenilin genes involves the production of more Aβ1-42(43) relative to the amount produced by a nonmutant (wildtype) PS1 or PS2 gene. Presently, the mechanism which causes this increased production of Aβ1-42(43) is not known.

Transgenic mice carrying mutations in PS1 do not appear to develop AD-type pathology but do show an elevation of Aβ42(43) [see Example herein]. This form of Aβ is highly amyloidogenic and forms the early core of amyloid deposits in AD brain [Mann et al, 1996; Jarrett et al, 1993]. Both PS1 and PS2 are known to influence APP processing [Scheuner et al, 1996 and see Example herein]. Sequence homology between the presenilins and a *C. elegans* protein involved in protein trafficking (SPE4) suggests that the presenilins may direct the compartmentalization and trafficking of APP [L'Hemault and Arduengo, 1992] and that mutant presenilins may direct APP along a pathway that results in elevated levels of Aβ42(43). In this way the biosynthetic pathways can be considered to be interactive.

The above transgenic animals provide the current models of Alzheimer's Disease. However, as discussed herein above many of these models are incomplete, in that the full pathology seen in humans is not seen, or as seen in the PS models, no pathology just elevated levels of Aβ1-42(43) are seen. Further, the models generally require that the mice age and the pathology is not seen until nine months and generally later [Hsaio et al., 1996]. This means that the animals must be maintained for extended periods of time. The cost of maintenance makes it difficult for many investigators to use these models.

It would be useful therefore to have transgenic models which show the full range of pathology of AD at an earlier age or a selected aspect of the pathology or for that matter any other human genetically based condition. The method should allow the modulation of the phenotype resulting from the expression of the transgenes. It would further be useful to have a model for AD in which the pathology onset is earlier (accelerated). Specifically, a model in which amyloid accumulation is enhanced and accelerated.

## SUMMARY OF THE INVENTION AND ADVANTAGES

The present invention provides a method of preparing a transgenic animal model with enhanced, accelerated pathology for Alzheimer's Disease (AD) and the transgenic animal made by the method. The method includes producing an $F_1$ generation by crossing a first and second transgenic parent each carrying a different expressible transgene for differing aspects of the same desired phenotype associated with AD pathology. The offspring of the $F_1$ generation are then screened and those which carry a transgene from each parental transgenic animal resulting in an enhanced pathology for Alzheimer's Disease are selected.

In a preferred embodiment the AD-associated pathology is for amyloid accumulation. In an embodiment a mutant presenilin transgene and a transgene for a mutant amyloid precursor protein are used. In a further embodiment the mutant presenilin transgene is the PS1 M146L mutation and the mutant amyloid precursor protein transgene is the Swedish mutation (APP695 isoform containing a K670N,M671L mutation (APP770 numbering)).

The present invention also provides a method of modulating the phenotype of a transgenic animal model and the transgenic organism with the modulated phenotype. An $F_1$ generation is produced by crossing a first and second transgenic parent, each carrying a different expressible transgene at different steps in the same and/or interactive biosynthetic pathway for the desired phenotype of a transgenic animal. The offspring are screened and offspring selected in the $F_1$ generation which carry a transgene from each transgenic parent thereby providing a modulated phenotype.

The method of the present invention also provides a method of screening for two expressible transgenes which when expressed in the same animal result in a modulated phenotype. In this method an $F_1$ generation is produced by crossing a first and second transgenic parent each carrying a different expressible transgene at different steps in the same or an interactive biosynthetic pathways for the phenotype under consideration. Offspring are identified among the $F_1$ generation which carry a transgene from each transgenic parent and which result in a modulated phenotype. When offspring are identified with a modulated phenotype, a transgenic animal carrying the two expressible transgenes can be made.

## DESCRIPTION OF THE DRAWINGS

Other advantages of the present invention will be readily appreciated as the same becomes better understood by reference to the following detailed description when considered in connection with the accompanying drawings wherein:

FIGS. 1A–C are graphs showing early behavioral changes in transgenic mice. Mice were tested for spontaneous alternation behavior in a symmetrical "Y" maze at 12–14 weeks. The alternation performance was decreased in the parent carrying the APP695 isoform containing a K670N,M671L mutation and doubly transgenic mice compared to M146L and non-transgenic litter mates (FIG. 1A). The activity of the mice in the "Y" maze was elevated in the doubly transgenic mice relative to all other genotypes (FIG. 1B). The frequency plot of "Y" maze activity measurements for each

mouse indicates a right-shift in the frequency distribution (FIG. 1C). Doubly transgenic mice (dashed line; n=21) and the frequency distribution of the non-transgenic plus M146L mice (solid line; n=63) which had identical means and standard deviations (see FIG. 1B).

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention provides a method of producing a successor generation of transgenic animals with a modulated phenotype from that of the original/initial transgenic animals. The modulation can be either an enhancement of the original observed phenotype seen in the initial transgenic animals or a diminution of the phenotype. By modulation is meant that the characteristic phenotype shown by the transgene is more pronounced, appears earlier or later; where protein is produced more or less protein is produced than the parent strains or the like. Where earlier or accelerated, it is meant that the observed phenotype is seen at least one month earlier in the lifespan than the phenotype in the parental strain or similarly for later appearance.

For example, a modulated phenotype for a human disease model would show a pathology associated with the disease that more accurately reflects the human pathologic state including having more of the characteristics of the disease than the initial transgenic animal parental strains or the like. Alternatively, a modulated phenotype could reflect a faster or slower onset of the pathology of the human disease.

Specifically, the method produces an $F_1$ generation by crossing a first and second transgenic parent specifically selected to complement each other. By complement is meant that the transgenic parent carries a different expressible transgene at different steps/aspects in the same or interactive biosynthetic pathway for the phenotype or phenotype aspect that is to be modulated. In general the term aspect is used to describe a significant part/facet/feature of the phenotype that is being modulated. In general the term biosynthetic pathway is used as is known in the art. However, in producing a phenotype often the products of one biosynthetic pathway must interact with those of another to produce the observed phenotype and so the term can be used in a broader concept to include several specific biosynthetic pathways which interact to provide an observed phenotype.

In general where the transgene carries a mutation it is referred to by the mutation. The mutation is abbreviated by the non-mutant amino acid followed by the location in the sequence followed by the substituted amino acid.

The transgene generally is a human gene where a human condition is being studied. The transgene (generally in the form of cDNA) can be the nonmutant (often referred to as "wildtype") or a mutant human gene. Additionally, a nonmutant transgene can also be treated as is known in the art to express mutations.

The offspring of the $F_1$ generation with the modulated phenotype are utilized in animal models as for example testing of treatment modalities in a disease model or for pathogen susceptibility.

Further, one parent strain instead of carrying a direct human transgene may have the homologous endogenous gene modified by gene targeting such that it approximates the transgene. That is, the endogenous gene has been "humanized" and/or mutated [Reaume et al, 1996]. It should be noted that if the animal and human sequence are essentially homologous a "humanized" gene is not required. The transgenic parent can also carry an overexpressed sequence, either the nonmutant or a mutant sequence and humanized or not as required. The term transgene is therefore used to refer to all these possibilities.

Additionally, cells can be isolated from the offspring which carry a transgene from each transgenic parent and that are used to establish primary cell cultures or cell lines as is known in the art.

Where appropriate, a parent strain will be homozygous for the transgene. Additionally, where appropriate, the endogenous nontransgene in the genome that is homologous to the transgene will be nonexpressive. By nonexpressive is meant that the endogenous gene will not be expressed and that this nonexpression is heritable in the offspring. For example, the endogenous homologous gene could be "knocked-out" by methods known in the art. Alternatively, the parental strain that receives one of the transgenes could carry a mutation at the endogenous homologous gene rendering it nonexpressed.

The method of the present invention also provides a screening protocol to determine which combination of transgenes produce modulated phenotypes. These combinations can then be incorporated in a single transgenic animal to produce a modulated phenotype. That is, an engineered transgenic animal may be wanted that has incorporated in its genome two or more transgenes but that is not established by crossing rather is engineered by standard methods for making transgenic animals. For example, a transgenic organsim may be wanted wherein two or more transgenes are on the same vector under the control of the same promoter and which should have the required modulated phenotype. However due to the cost and effort of making the transgenic animal a screening is necessary to determine the most likely candidates to engineer.

In the screening method of the present invention an $F_1$ generation is produced by crossing a first and second transgenic parent each carrying a different expressible transgene at different steps/aspects in the same or interactive biosynthetic pathways for the phenotype or phenotype aspect under consideration. The offspring of the $F_1$ generation are tested and those offspring which carry a transgene from each transgenic parent are selected and observed for the modulated phenotype.

The transgenic parents are produced as is known in the art. The present invention provides for transgenic parental strains containing transgenes as described herein above and including gene targeted or overexpressed mutant or nonmutant transgenes and where appropriate as well as for knockout strains carrying a transgene. Any method can be used which provides for stable, inheritable, expressible incorporation of the transgene within the nuclear DNA of an animal. These transgenic animals are constructed using standard methods known in the art and as set forth in U.S. Pat. Nos. 5,614,396 5,487,992, 5,464,764, 5,387,742, 5,347,075, 5,298,422, 5,288,846, 5,221,778, 5,175,384, 5,175,383, 4,873,191, 4,736,866 as well as Burke and Olson [1991], Capecchi [1989], Davies et al. [1992], Dickinson et al. [1993], Duff and Lincoln [1995], Huxley et al. [1991], Jakobovits et al. [1993], Lamb et al. [1993], Pearson and Choi [1993], Rothstein [1991], Schedl et al. [1993], Strauss et al. [1993]. Further, patent applications WO 94/23049, WO 93/14200, WO 94/06908, WO 94/28123 also provide information.

More specifically, any techniques known in the art may be used to introduce the transgene expressibly into animals to produce the parental lines of animals. Such techniques include, but are not limited to, pronuclear microinjection (U.S. Pat. No. 4,873,191); retrovirus mediated gene transfer

into germ lines [Van der Putten et al., 1985]; gene targeting in embryonic stem cells [Thompson et al., 1989 and U.S. Pat. No. 5,614,396]; electroporation of embryos [Lo, 1983]; and sperm-mediated gene transfer [Lavitrano et al., 1989]. For a review of such techniques see Gordon [1989].

In an exemplar of the present invention as shown in the Example herein below a transgenic animal has been created for Alzheimer's Disease (AD) having a pronounced accelerated phenotype of an Aβ related phenotype of accumulated amyloid using the method of the present invention. The animal is a rodent and in a preferred embodiment, a mouse.

As discussed herein above the pathology of AD is related to aberrant amyloid production. Therefore in this transgenic model, genes relating to the biosynthetic pathways for the phenotype of amyloid accumulation have been used.

In a preferred embodiment for a model for AD the first parental animal carries an expressible transgene for a mutant presenilin transgene [Cruts et al., 1996; Duff et al., 1996] and the second parental animal carries an expressible transgene for a mutant amyloid precursor protein [U.S. Pat. Nos. 5,612,486; 5,602,299; 5,525,714; 5,604,131; 5,387,742; 5,151,508; PCT Patent Applications WO 93/14200; WO 96/06927; WO 94/12627; WO 93/02189; WO 92/06187; European Patent Applications EP 0 451 700 A1; EP 0 653 154 A2; Neve et al., 1996; Hsiao et al., 1996; Ali et al., 1996]. The APP gene can be a humanized targeted nonmutant sequence or mutant sequence and these can be overexpressed or not. Further overexpressed animal nonmutant or mutant sequences can also be used. The presenilin genes (PS1 and PS2) in the mouse and human have essentially homologous sequences so that targeted mutations can be used to generate the parent strain without the need to humanize first.

More specifically, the mutant presenilin transgene is M146L and the mutant amyloid precursor protein (APP) transgene is for an APP695 isoform containing a K670N, M671L mutation. However, any mutant presenilin or amyloid precursor protein gene or subsequently discovered homologs can be used that provide complementarity/interactivity for the expressed amyloid-associated AD phenotype of accumulation Aβ. In further embodiments overexpressed C terminal fragments of APP is used, or the PDAPP mouse [Games et al, 1995], and other APP mice [Sommer et al, 1996; Lamb et al, 1993; Reaume et al., 1996] can be used.

Utilizing the method of the present invention, $F_1$ progeny from a cross between a parental mouse carrying the mutant APP transgene for an APP695 isoform containing a K670N, M671L mutation (referred to herein as K670N,M671L) and a parental mouse carrying the mutant PS1 transgene for M146L were bred and examined in relation to histopathology and behavioral phenotype. In these animals, the expression of mutant PS1 in addition to the expression of mutant APP, accelerates the rate at which Aβ is deposited, most likely due to the PS1-mutant driven elevation in Aβ1-42(43). The double transgenic mice had accelerated formation of deposits containing Aβ (Table 1). Sections stained with the antibody 4G8 (which stains both human and mouse Aβ ending at either residue 40 or residue 42) labels numerous deposits in every doubly transgenic mouse killed between 26 and 32 weeks of age, generally at 29 weeks of age. Corresponding areas from littermate age-matched single transgenic K670N,M671L or M146L mice and non-transgenic littermates were negative for Aβ deposits. The positively staining Aβ deposits become apparent by 13 weeks of age and increased in number and size from that time point showing a modulated phenotype which accelerates the process of Aβ accumulation in the doubly transgenic mice.

All mice in these studies were subjected to a behavioral test battery at 12–14 weeks old. All groups of mice performed similarly on test of sensory and motor function. Body weights were similar for all genotypes. However, when mice were tested for spontaneous alternation behavior in the symmetrical "Y" maze, differences were observed in the total number of arm entries. This index of activity was modified by genotype. The doubly transgenic mice had increased activity compared with the K670N,M671L or M146L or non-transgenic littermates. Thus, as early as 12 weeks, there is a synergistic effect of PS1 and APP mutations on this behavioral measure.

These results clearly demonstrate that presenilin mutations accelerate development of the AD phenotype in K670N,M671L mice in a synergistic manner and provides a modulated phenotype. The data indicate that mutant presenilin affects the processing of mutant APP expressed from the K670N,MG71L transgene to enhance Aβ production, fibrillar plaque formation and affect behavior early in the life-spans of mice. The rapid development of the AD phenotype in these mice will be advantageous in addressing mechanistic issues of amyloid toxicity, and testing the efficacy of agents proposed to interact with select aspects of the AD phenotype.

The above discussion provides a factual basis for the method of developing transgenic animals which have a modified phenotype. The methods used with and the utility of the present invention can be shown by the following non-limiting examples and accompanying figures.

## EXAMPLES

General Methods:

General methods in immunohistochemistry: Standard methods known in the art and not specifically described were generally followed as in Stites et al. (eds), Basic and Clinical Immunology (8th Edition), Appleton & Lange, Norwalk, Conn. (1994) and Johnstone & Thorpe, Immunochemistry in Practice, Blackwell Scientific Publications, Oxford, 1982.

General methods in molecular biology: Standard molecular biology techniques known in the art and not specifically described were generally followed as in Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Springs Harbor Laboratory, New York (1989, 1992), and in Ausubel et al., *Current Protocols in Molecular Biology*, John Wiley and Sons, Baltimore, Md. (1989).

Genotyping Litters:

The resulting offspring were genotyped by cutting tail tips from weanlings, extracting DNA using a Promega genomic DNA extraction kit, transferring denatured DNA to nylon membrane and hybridizing duplicate samples with a DNA probe that recognizes either APP or PS1.

Sensory and Motor Function Tests: For all litters, mice were weighed between 12 and 14 weeks. The forelimb placing response of each mouse was checked by holding the mouse by the tail above a flat surface and slowly lowering the mouse to see if the forepaws reached outwards towards the surface. The righting reflex displayed when the mice were held with feet upwards and dropped from a height of 35 cm onto a soft surface of bedding, was used to test vestibular function. A loud metallic click to elicit the Preyer reflex (a backwards flick of the pinna) was used to test hearing. Testing for spontaneous seizures was accomplished by stressing each mouse by holding it by the tail for 30 seconds. Mice were then placed back in a cage and observed

percentage of alternations was significantly lower in both the doubly transgenic and K670N,M671L mice compared to the M146L or non-transgenic littermates (p<0.05; Neman-Keul's post-hoc comparisons). These results indicate that mice expressing an APP mutation have impaired alternation performance at a very early age. This behavioral deficit may be caused by overexpression of mutant APP, or elevated levels of soluble human Aβ. Importantly, this deficit is not caused by formation of visible fibrillar Aβ deposits because these are either absent or rare in 12 weeks old doubly mutant mice and even by 32 weeks, these deposits are not seen in K670N,M671L mice.

A second measurement in the "Y" maze alternation test is the total number of arm entries. This index of activity was also affected by genotype (FIG. 1B; ANOVA: F(3,43)=3.73, p<0.02). The doubly transgenic mice had increased activity compared with the single transgenic K670N,M671L, M14.6L or non-transgenic mice (p<0.05; Newman-Koul's post-hoc comparisons). The K670N,M671L mice were not significantly different from the other two genotypes on this measure. FIG. 1C demonstrates the rightward shift of the frequency distribution for the activity scores of doubly transgenic mice, indicating this is not the result of the a new outlying animals. Thus, as early as 12 weeks, there is a synergistic effect of PS1 and APP mutations on this behavioral measure.

These results clearly demonstrate that presenilin mutations accelerate development of the AD phenotype in K670N,MG71L mice in a synergistic manner. The data indicate that mutant presenilin affects the processing of mutant APP expressed from the K670N,M671L transgene to enhance fibrillar plaque formation and affect behavior early in the life-spans of mice. The rapid development of the AD phenotype in these mice will be advantageous in addressing mechanistic issues of amyloid toxicity, and, potentially, testing the efficacy of agents proposed to interact with select aspects of the AD phenotype.

Throughout this application, various publications, including United States patents, are referenced by author and year and patents by number. Full citations for the publications are listed below. The disclosures of these publications and patents in their entireties are hereby incorporated by reference into this application in order to more fully describe the state of the art to which this invention pertains.

The invention has been described in an illustrative manner, and it is to be understood that the terminology which has been used is intended to be in the nature of words of description rather than of limitation.

Obviously, many modifications and variations of the present invention are possible in light of the above teachings. It is, therefore, to be understood that within the scope of the appended claims, the invention may be practiced otherwise than as specifically described.

TABLE 1

DEPOSIT NUMBER IN DOUBLY TRANSGENIC AND K670N, M671L MICE

| Mouse | Age | TS | CR | Aβ (IHC) |
|---|---|---|---|---|
| | | Doubly Transgenic Mice plaque counts/section | | |
| F2 | 26 | 77 | 34 | 58 |
| F7 | 26 | 61 | 26 | 31 |
| G3 | 26 | 48 | 24 | 34 |

TABLE 1-continued

DEPOSIT NUMBER IN DOUBLY TRANSGENIC AND K670N, M671L MICE

| Mouse | Age | TS | CR | Aβ (IHC) |
|---|---|---|---|---|
| G6 | 26 | 97 | 43 | 53 |
| C7 | 29 | 78 | 42 | 48 |
| A5 | 32 | 101 | 44 | 54 |
| | | K670N, M671L Mice plaque counts/section | | |
| H6 | 24 | 0 | 0 | 0 |
| F5 | 26 | 0 | 0 | 0 |
| E1 | 27 | 0 | 0 | 0 |
| D3 | 28 | 0 | 0 | 0 |
| C1 | 29 | 0 | 0 | 0 |

Mice ages (weeks) with plaque numbers per section counted from thioflavin S (TS), Congo Red (CR) or Aβ immunohistochemistry (IHC).

## REFERENCES

Ali et al., 1996. Artificial Strain-Specific Signs of Incipient Brain Amyloidosis in APP Transgenic Mice. *Neur. of Aging,* 17(2):223–234.

Andra et al., 1996, "Expression of APP in Transgenic Mice: A Comparison of Neuron-Specific Promoters", *Neur. of Aging,* 17(2)P183–190

Borchelt et al., 1996, "Familial Alzheimer's Disease-Linked Presenilin 1 Variants Elevate A-β-1-42/1-40 Ratio in Vitro and in Vivo", *Neuron,* 17:1005–1013

Burke and Olson, 1991. "Preparation of Clone Libraries in Yeast Artificial-Chromosome Vectors" in *Methods in Enzymology,* Vol. 194, Academic Press, Inc., Chap. 17, pp. 251–270.

Cai et al., 1993, "Release of Excess Amyloid β Protein from a Mutant Amyloid β Protein Precursor", *Science,* 259:514–516

Capecchi, 1989, "Altering the genome by homologous recombination" *Science,* 244:1288–1292.

Citron et al., 1992, "Mutation of the β-amyloid precursor protein in familial Alzheimer's disease increases β-protein production", *Nature* 360:672

Cruts et al., 1996, "The Presenilin Genes—A New Gene Family Involved in Alzheimer Disease Pathology", *Human Molecular Genetics,* 5 (Review):1449–1455.

Davies et al., 1992, "Targeted alterations in yeast artificial chromosomes for inter-species gene transfer", *Nucleic Acids Research,* 20(11):2693–2698.

Dickinson et al., 1993, "High frequency gene targeting using insertional vectors", *Human Molecular Genetics,* Vol. 2, No. 8, pp. 1299–1302.

Duff et al., 1996, "Increased amyloid-β42(43) in brains of mice expressing mutant presenilin 1", *Nature,* 383:710–713

Duff and Lincoln, 1995. "Insertion of pathogenic mutation into yeast artificial chromosome containing human APP gene and expression in ES cells", *Res. Adv. in Alzheimer's Disease*

Games et al., 1995, "Alzheimer-type neuropathology in transgenic mice overexpressing V717F β-amyloid precursor protein", *Nature,* 373:523–527

Goate et al., 1991, "Segregation of a missense mutation in the amyloid precursor protein gene with familial Alzheimer's disease", *Nature* 349:704–706

Gordon, 1989, "Transgenic Animals", *Intl. Rev. Cytol,* 115:171–229.

Greenberg, 1996, "APP Transgenesis: Approaches Toward the Development of Animal Models for Alzheimer Neuropathology", pg. 153–171

Hsiao et al., 1996, "Correlative Memory Deficits, A-β Elevation and Amyloid Plaques in Transgenic Mice", *Science,* 274:99–102

Hsiao et al., 1995, "Age-Related CNS Disorder and Early Death in Transgenic FVB/N Mice Overexpressing Alzheimer Amyloid Precursor Proteins", *Neuron,* 15:1203–1218

Huxley et al., 1991, "The human HPRT gene on a yeast artificial chromosome is functional when transferred to mouse cells by cell fusion", *Genomics,* 9:742–750.

Jakobovits et al., 1993, "Germ-line transmission and expression of a human-derived yeast artificial chromosome", *Nature,* 362:255–261

Jarrett et al., 1993, "Carboxy Terminus of β-Amyloid Protein is Critical for Seeding of Amyuloid Formation: Implications for Pathogenesis of Alzheimer's Disease", *Biochemistry,* 32:4693–4697

Lalonde and Thifault, 1994, "Absence of an Association Between Motor Coordination and Spatial Orientation in Lurcher Mutant Mice", *Behavior,* 24:497–501

Lamb et al., 1993. "Introduction and expression of the 400 kilobase precursor amyloid protein gene in transgenic mice", *Nature Genetics,* 5:22–29

Lavitrano et al, 1989, "Sperm Cells as Vectors for Introducing Foreign DNA into Eggs: Genetic Transformation of Mice" *Cell* 57:717–723

Levy-Lahad et al., 1995, "Candidate Gene for Chromosome 1 Familial Alzheimer's Disease Locus", *Science,* 269:973–977

L'Hernault and Arduengo, 1992, "Mutation of Putative Sperm Membrane Protein in *Caenorhabditis elegans* Prevents Sperm Differentiation", *J. Cell Biology,* 119(1):55–68

Lo, 1983, "Transformation by Iontophoretic Microinjection of DNA Multiple Integrations Without Tandem Insertions", *Mol. Cell. Biol* 3(10):1803–1814

Loring et al., 1996, "Rational Design of Animal Model for Alzheimer's Disease: Introd. of Mult. Human Genomic Transgenes to Reproduce AD Pathology in Rodent", *Neur. of Aging,* 17(2):173–182

Mann et al., 1996, "Amyloid a Protein Deposition in Chrom. 14-linked Alzheimer's Disease", *Annals Neurol,* 40:149–156

Malherbe et al., 1996, "Lack of β-Amyloidosis in Transgenic Mice Expressing Low Levels of Aamilial Alzheimer's Disease Missence Mutations", 17(2): 205–214

Mucke et al., 1994, "Synaptotrophic effects of human amyloid β protein precursors in cortex of transgenic mice", *Brain Res.,* 666:151–167

Neve et al., 1996, "Transgenic Mice expressing APP-C100 in the Brain", *Neuro. of Aging,* 17(2):191–203

Pearson and Choi, 1993, "Expression of the human β-amyloid precursor protein gene from a yeast artificial chromosome in transgenic mice". *Proc. Natl. Scad. Sci.* USA, 90:10578–10582

Reaume et al., 1996, Enhanced amyuloidogenic processing of the β-amyloid precursor protein in gene-targeted mice bearing the Swedish familial Alzheimer's disease mutations and a "humanized" Aβ sequence. *J. Biol. Chem.* 271(38):23380–23388.

Rothstein, 1991, "Targeting, disruption, replacement, and allele rescue: integrative DNA transformation in yeast" in *Methods in Enzymology,* (Academic Press) Chap. 19, 194:281–301.

Schedl et al., 1993, "A yeast artificial chromosome covering the tyrosinase gene confers copy number-dependent expression in transgenic mice", *Nature,* Vol. 362, pp. 258–261.

Scheuner et al., 1996, "Secreted amyloid β-protein similar to that in the senile plaques of Alzheimer's Disease is increased in vivo by the presenilin 1 and 2 and APP mutations linked to familial Alzheimer's Disease", *Nature Medicine,* 2(8):864–870.

Sherrington et al., 1996, "Cloning of a gene bearing missense mutations in early-onset familial Alzheimer's disease", *Nature,* 375:754–760

Strauss et al., 1993, "Germ line transmission of a yeast artificial chromosome spanning the murine $\alpha_1$ (I) collagen locus", *Science,* 259:1904–1907.

Suzuki et al., 1994, "Increased Percentage of Long Amyloid β Protein Secreted by Familial Amyloid β Protein Precursor ($\beta APP_{717}$) Mutants", *Science,* 264:1336–1340

Thompson et al, 1989, "Germ Line Transmission and Expression of a Corrected HPRT Gene Produced by Gene Targeting in Embryonic Stem Cells", *Cell* 56:313–321

Van der Putten et al, 1985, "Efficient insertion of genes into the mouse germ line via retroviral vectors", PNAS USA 82:6148–6152.

What is claimed is:

1. A transgenic mouse with enhanced Alzheimer's Disease related amyloid accumulation in its brain produced by:

producing an $F_1$ generation mouse by crossing a first transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter with a second transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the first transgenic mouse expresses the DNA sequence encoding the mutant presenilin and wherein the second transgenic mouse expresses the DNA sequence encoding the APP; and

selecting from the offspring of the cross, those transgenic mice whose genome comprises at least one DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, and identifying an $F_1$ mouse which express both transgenes such that the $F_1$ mouse develops accelerated deposition of Aβ in its brain as compared to non-transgenic mice or either parental mouse.

2. The mouse as set forth in claim 1, wherein the first transgenic mouse is homozygous for the mutant presenilin transgene.

3. A transgenic mouse with accelerated Alzheimer's Disease related pathology whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that the mouse develops accelerated deposition of Aβ in their brains as compared to non-transgenic mice or transgenic mice expressing either transgene.

4. The mouse as set forth in claim 3, wherein the first transgenic mouse is homozygous for the mutant presenilin transgene.

5. A transgenic mouse with accelerated Alzheimer's Disease related pathology whose genome comprises at least one

least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that the mouse develops accelerated deposition of Aβ in its brain within six months of birth as compared to non-transgenic mice or transgenic mice expressing either transgene.

6. The mouse as set forth in claim 5, wherein the first transgenic mouse is homozygous for the mutant presenilin transgene.

7. A transgenic mouse with accelerated Alzheimer's Disease related pathology whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that the accelerated pathology develop accelerated deposition of Aβ in its brain as compared to non-transgenic mice or mice expressing either transgene.

8. A transgenic mouse with elevated levels of amyloidogenic Aβ (Aβ42(43)) as a pathology for Alzheimer's Disease whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that the mouse develops accelerated deposition of Aβ (Aβ42(43)) in its brain as compared to non-transgenic mice or transgenic mice expressing either transgene.

9. A transgenic mouse with elevated levels of amyloidogenic Aβ (Aβ42(43)) as a pathology for Alzheimer's Disease whose genome comprises at least one least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the mouse expresses the transgenes such that an elevated level of Aβ (Aβ42(43)) protein deposits in it's brain as compared to non-transgenic mice or transgenic mice expressing either transgene.

10. A method of screening for two expressible transgenes, the method comprising:

producing an $F_1$ generation mouse by crossing a first transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding mutant presenilin operably linked to a promoter with a second transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the first transgenic mouse expresses the DNA sequence encoding the mutant presenilin and wherein the second transgenic mouse expresses the DNA sequence encoding the APP; and

selecting from the offspring of the cross, those transgenic mice whose genome comprises at least one DNA sequence encoding mutant presenilin operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, and identifying an $F_1$ mouse which express both transgenes such that the $F_1$ mouse develops accelerated deposition of Aβ in its brain as compared to non-transgenic mice or either parental mouse.



11. A method for preparing a transgenic mouse with elevated levels of amyloidogenic Aβ (Aβ42(43)) as a pathology for Alzheimer's Disease the method comprising:

producing an $F_1$ generation mouse by crossing a first transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding mutant presenilin operably linked to a promoter with a second transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the first transgenic mouse expresses the DNA sequence encoding the mutant presenilin and wherein the second transgenic mouse expresses the DNA sequence encoding the APP; and

selecting from the offspring of the cross, those transgenic mice whose genome comprises at least one DNA sequence encoding mutant presenilin operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, and identifying an $F_1$ mouse which express both transgenes such that the $F_1$ mouse develops accelerated deposition of Aβ (Aβ42(43)) in their brains as compared to non-transgenic mice or either parental mouse.

12. The method as set forth in claim 11, wherein the mutant presenilin is M146L.

13. A method of preparing a transgenic mouse with enhanced Alzheimer's Disease related amyloid pathology, the method comprising:

producing an $F_1$ generation mouse by crossing a first transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding mutant presenilin M146L operably linked to a promoter with a second transgenic mouse whose genome comprises at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, wherein the first transgenic mouse expresses the DNA sequence encoding the mutant presenilin and wherein the second transgenic mouse expresses the DNA sequence encoding the APP; and

selecting from the offspring of the cross, those transgenic mice whose genome comprises at least one DNA sequence encoding mutant presenilin M146L operably linked to a promoter and at least one transgene comprising a DNA sequence encoding APP K670N,M671L operably linked to a promoter, and identifying an $F_1$ mouse which express both transgenes such that the $F_1$ mouse develops accelerated deposition of AD in its brain as compared to non-transgenic mice or either parental mouse.

14. The method as set forth in claim 13, wherein the first transgenic mouse is homozygous for the mutant presenilin transgene.

* * * * *

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 16th day of November, 2022, I caused this Non-Confidential Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Walter W. Brown
Gary L. Hausken
U.S. DEPARTMENT OF JUSTICE
walter.brown2@usdoj.gov
gary.hausken@usdoj.gov

*Counsel for Appellee*

/s/ Steven B. Kelber
*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [*9,592*] words.

   [ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

   [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: November 16, 2022

/s/ Steven B. Kelber
*Counsel for Appellant*