**No. 2022-2248**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES,**
***Plaintiff-Appellant,***

**v.**

**UNITED STATES,**
***Defendant-Appellee.***

---

**APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS,**
**IN 1:15-CV-01549, JUDGE PATRICIA CAMPBELL-SMITH.**

---

# BRIEF OF THE DEFENDANT-APPELLEE, THE UNITED STATES

---

BRIAN M. BOYNTON
Assistant Attorney General

GARY L. HAUSKEN
Director

WALTER W. BROWN
Senior Litigation Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 353-0517
Walter.brown2@usdoj.gov

*Attorneys for the United States*

Of Counsel:

CARRIE E. ROSATO
KAVYASRI NAGUMOTU
Department of Justice

January 26, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... v

TABLE OF ABBREVIATIONS ..... vii

STATEMENT OF RELATED CASES ..... ix

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF THE CASE ..... 3

I. USF'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE GOVERNMENT DID NOT ENJOY A LICENSE WAS DENIED. ..... 3

II. USF'S MOTION *IN LIMINE* TO PRECLUDE TESTIMONY SUPPORTING A GOVERNMENT LICENSE WAS DENIED. ..... 6

III. USF'S BRIEFING BEFORE AND AFTER TRIAL FAILED TO RAISE ARGUMENTS NOW ASSERTED ON APPEAL. ..... 7

STATEMENT OF FACTS ..... 9

I. THE '094 PATENT WAS CONCEIVED OF AND FIRST REDUCED TO PRACTICE AT THE UNIVERSITY OF SOUTH FLORIDA. ..... 10

II. THE '094 PATENT WAS REDUCED TO PRACTICE AT USF WITH FUNDS FROM NIH GRANT AG14633. ..... 15

A. The AG014633 Grant Was Applied for by Drs. Duff and Hardy While Employed at the University of South Florida ..... 16

B. Project 5 of the AG014633 Grant Evolved to Include Mice with Both Presenilin and APPSwe Mutations. ..... 18

C. The AG014633 Grant Funded Dr. Gordon's Work Under Project 5 Starting in 1996. ..... 19

D. USF Research Funded by the AG014633 Grant Is Described In the '094 Patent. ..... 24

III. MICE COVERED BY THE '094 PATENT WERE SOLD AT MMRC. ..... 26

SUMMARY OF THE ARGUMENT ....................................................................28

ARGUMENT ..............................................................................................31

I. STANDARDS OF REVIEW ....................................................................31

II. THE BAYH-DOLE ACT CLARIFIED PATENT RIGHTS FOR FEDERALLY FUNDED RESEARCH. ..........................................................................31

A. The Statutory Framework of the Bayh-Dole Act Provides for a Paid-Up Nonexclusive License to the Government. ..........................32

B. Contractors Are Required to Reserve a License for the Government. ..........................................................................34

III. THE INVENTIONS OF THE '094 PATENT WERE FIRST REDUCED TO PRACTICE USING NIH GRANT FUNDS. ...................................................35

A. A "Subcontract of Any Type" Includes Implied-in-Fact Contracts. ..........................................................................35

B. An Implied-in-Fact Subcontract Between USF and Mayo Funded the First Actual Reduction to Practice. ..................................38

1. AG14633 Grant Funds Flowed to USF by October 1996. ..........................................................................39

2. The USF Subcontract Funded the First Actual Reduction to Practice. ..........................................................................40

3. The Trial Court Did Not Misconstrue the Testimony of Dr. Morgan and Dr. Gordon. ..................................................42

IV. USF WAIVED ITS ARGUMENTS REGARDING REQUIREMENTS OF IMPLIED-IN-FACT CONTRACTS AND "FUNDING AGREEMENTS." ..........................................................................43

A. The Bayh-Dole License Provision Should Be Implied into the USF Subcontract. ..........................................................................44

B. USF Also Failed to Raise the Four Requirements of An Implied-in-Fact Contract at Trial. ..................................................46

CONCLUSION ..........................................................................................49

CERTIFICATE OF SERVICE ....................................................................52

# TABLE OF AUTHORITIES

## Cases

*American Bankers Association v. United States*,
932 F.3d 1375 (Fed. Cir. 2019) ....................4
*Atlas Corp. v. United States*,
895 F.2d 745 (Fed. Cir. 1990) .................... 8, 36, 47
*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) ....................36
*Campbell Plastics Eng'g & Mfg., Inc. v. Brownlee*,
389 F.3d 1243 (Fed. Cir. 2004) .................... 33, 37
*Cent. Admixture Pharm. Servs. v. Advanced Cardiac Solutions, P.C.*,
482 F.3d 1347 (Fed. Cir. 2007) ....................33
*City of Cincinnati v. United States*,
153 F.3d 1375 (Fed. Cir. 1998) ....................49
*FDA v. Brown & Williamson Tobacco Corp.,*
*529* U.S. 120 (2000) ....................37
*Flynn v. Sandahl*,
58 F.3d 283 (7th Cir. 1995) ....................44
*Icon Health & Fitness, Inc. v. Strava, Inc.,*
*849* F.3d 1034 (Fed. Cir. 2017) ....................44
*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ....................44
*Kersavage v. United States,*
36 Fed. Cl. 441 (Fed. Cl. 1996) ....................32
*Madey v. Duke Univ.*,
413 F. Supp. 2d 601 (M.D.N.C. 2006) .................... 35, 46
*Porter v. United States*,
496 F.2d 583 (1974) ....................8
*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) ....................36
*S. Hosp., Inc. v. Zurich Am. Ins. Co.*,
393 F.3d 1137 (10th Cir. 2004) ....................40
*Singleton v. Wulff*,
428 U.S. 106 (1976) .................... 43, 44
*Tech. Dev. Corp. v. United States*,
597 F.2d 733 (Ct. Cl. 1979) ....................32

*Gaylord v. United States*,
777 F.3d 1363 (Fed. Cir. 2015) .......... 31
*United States v. Ron Pair Enters.*,
489 U.S. 235 (1989) .......... 36
*Univ. of S. Fla., Bd. of Trs. v. United States*,
146 Fed. Cl. 274 (2019) .......... 5, 45
*Univ. of S. Fla., Bd. of Trs. v. United States*,
154 Fed. Cl. 145 (2021) .......... 6, 7
*Univ. of S. Fla., Bd. of Trs. v. United States*,
162 Fed. Cl. 59 (2022) .......... 3, 8

**Statutes**

28 U.S.C. § 1498(a) .......... 3, 27
35 U.S.C. §§ 200–212 .......... 28, 31, 32
35 U.S.C. § 201(b) .......... 5, 33
35 U.S.C. § 202 .......... *passim*

**Regulations**

37 C.F.R. pt. 401 .......... 34, 38
37 C.F.R. § 401.14(g)(1) (1987) .......... 45
37 C.F.R. §§ 401.3 .......... 34
52 Fed. Reg. 8552 (Mar. 18, 1987) .......... 34

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| | *Parties* |
| USF | Plaintiff-Appellant University of South Florida, Board of Trustees |
| Government | Defendant-Appellee United States |
| | *Patent-in-suit* |
| ’094 patent | U.S. Patent No. 5,898,084 |
| | *Other Entities* |
| DHHS | Department of Health and Human Services |
| Jackson | The Jackson Laboratory |
| Mayo | Mayo Clinic |
| MMRRC | Mutant Mouse Resource and Research Center |
| NIA | National Institute on Aging |
| NIH | National Institutes of Health |
| | *Exhibit References* |
| (__:__) | Column and line number of cited patents |
| APPX____ | Citation to Joint Appendix |
| Dkt. No. | Court of Federal Claims Docket |
| PBr. | Plaintiff’s Appellant’s Brief (Blue Brief) |
| | *Other Abbreviations* |
| ’518 application | U.S. Patent Application No. 08/903,518 |
| ’711 application | Provisional Patent Application Serial No. 60/029,711 |

| | |
|---|---|
| ’937 application | Provisional Patent Application Serial No. 60/028,937 |
| Aβ | β-amyloid |
| AG14633 Grant | Grant Number 1P01AG014633 |
| APP | Amyloid Precursor Protein |
| APPSwe | APP695 isoform containing a K670N,M671L mutation |
| CFC | Court of Federal Claims |
| CV | Curriculum Vitae |
| Morgan/Gordan lab | USF research laboratory headed by Drs. Morgan and Gordon |
| NIH RePORTER | NIH online grant database |
| Project 5 | Project 5 of the NIA program project grant AG14633 |
| SPRC | Standard Patent Rights Clause |

## STATEMENT OF RELATED CASES

No other appeal in, or from, the civil action in the lower court was previously before this or any other appellate court. To counsel's knowledge, no other cases pending before this or any other court will directly affect or be affected by the Court's decision in this appeal.

## STATEMENT OF THE ISSUES

As defined by the Bayh-Dole Act, a "funding agreement" includes a "subcontract of any type" for "experimental, developmental, or research work" funded in whole or in part by the government. Under section 202(c)(4), even when the contractor elects rights in a patent, the government is nonetheless granted a "nonexclusive, nontransferrable, irrevocable, paid-up license" in any "subject invention" that is conceived or first actually reduced to practice through work performed under a "funding agreement." Here, USF appeals the trial court's factual findings that USF received NIH grant monies from the grantee Mayo that funded the first actual reduction to practice in April 1997. Accordingly, the following issues are presented on appeal:

1. Did the trial court err in construing a "subcontract of any type" as including an implied-in-fact contract?
2. Did the trial court clearly err in finding that USF received funding before and during the time of the first actual reduction to practice based on USF financial records of a Mayo subgrant account and the testimony of two credible, former USF research scientists—including one directly involved in the first reduction to practice?
3. Did USF waive its arguments regarding the trial court's purported failure to specifically address certain requirements for an implied-in-fact contract and

a Bayh-Dole Act license where USF never raised these arguments at trial, although the possibility of such an implied subcontract (and license) was raised in earlier proceedings?

## STATEMENT OF THE CASE

USF filed suit in the Court of Federal Claims on December 18, 2015, alleging patent infringement under 28 U.S.C. § 1498(a). Appx0043–59 (Complaint (Dkt. No. 1)). The government filed an amended answer on June 27, 2016, asserting, *inter alia*, that the "alleged infringing activities are authorized and licensed pursuant to 35 U.S.C. § 202(c)(4) ('the Bayh-Dole Act')." *See* Appx3624–30 (Amended Answer (Dkt. No. 17)). USF sought to preempt the Government's license defense by moving for partial summary judgement (Appx3631–48 (Dkt. No. 118)) and *in limine* (Appx3697–703 (Dkt. 185); both motions were unsuccessful. After trial on the merits, the trial court found that USF used money from NIH's AG14633 grant to fund the first actual reduction to practice, and therefore, the government enjoyed a license to the '094 patent through the Bayh-Dole Act. *Univ. of S. Fla., Bd. of Trs. v. United States*, 162 Fed. Cl. 59, 60 (2022); *see also* Appx0005–16 (initial sealed opinion).

### I. USF's Motion for Partial Summary Judgment that the Government Did Not Enjoy a License was Denied.

USF first sought a partial summary judgment that the government did not enjoy a license under 35 U.S.C. § 202. Appx3631–48 (Dkt. No. 118). USF argued

that there was no evidence of a "funding agreement" as contemplated under the Bayh-Dole Act. *Id.* The government countered that the relevant "funding agreement" was a subgrant agreement between the Mayo Clinic, as the grantee, and USF, as the subgrantee, and that a formal subcontract was not required. Appx3649–83 (Dkt. No. 131). As such, summary judgment was inappropriate because there was evidence that federal grant money flowed from the NIH to Mayo and then to USF, funding the research that led to USF's patent. *Id.*

In reply, USF argued that the government's position that a "funding agreement" under the Bayh-Dole Act could be implied or oral was unsupported by case law. Appx3684–96 (Dkt. No. 136). It also argued that a "'funding agreement' must incorporate the elements of 35 U.S.C. §202(c)(1) – (8)." *Id*. at Appx3687–88. The reply did not address the criteria that must be met for a court to find an implied contract.[1] *See* Appx3684–96.

The trial court denied USF's motion, finding genuine disputes of material fact precluding summary judgment. *Univ. of S. Fla., Bd. of Trs. v. United States*, 146 Fed. Cl. 274 (2019). The court deemed any argument regarding the test for an

---

[1] After submitting its reply, USF filed a "submission of recent authority," Dkt. No. 138, which identified *American Bankers Association v. United States*, 932 F.3d 1375 (Fed. Cir. 2019) and its discussion of "the four requirements to form a contract binding upon the government." USF argued that none of the requirements of this contract formation test were met.

implied-in-fact contract to have been "abandoned" after it was not raised in USF's supplemental briefing. *Id.* Finding "[t]he characteristics of implied in fact contracts and implied in law contracts . . . firmly established," the Court considered the government's evidence in support of its implied contract theories "substantial and survive[d] plaintiff's attempts to establish otherwise." *Id.*

Regarding the requirements of a "funding agreement," the court emphasized that the statute contemplated that a "funding agreement" could be "a 'subcontract of any type.'" *Id.* at 286 (quoting 35 U.S.C. § 201(b)). While noting the lack of case law on this issue, the trial court nonetheless found that there is an "established protocol for the 'Disposition of rights,' 35 U.S.C. § 202, in federally-funded research and the patents arising from that research," which "depends on regulations, standard contract clauses, and agency policies to ensure compliance with the provisions of section 202." *Id.* (citation omitted). Therefore, the court saw "no categorical impediment to the formation of a subcontract between Mayo and USF before April 25, 1997, that would satisfy section 202, perhaps through an implied contract, because the terms essential to such subcontracts appear to the court to have been well-established in the research university setting at that time." *Id*. The motion was denied.

## II. USF's Motion *in Limine* to Preclude Testimony Supporting a Government License was Denied.

USF later moved to preclude the trial testimony of two former USF researchers, Dr. David Morgan and Dr. Marcia Gordon, who would offer evidence relevant to the government's license defense. Appx3697–703 (Dkt. No. 185). USF argued that it had received no federal grant funding that would give rise to a Bayh-Dole license until after the '094 patent was first reduced to practice in April 1997. *Id.* Further, USF asserted that the researchers' testimony could not "alter or expand the paper record," and was therefore irrelevant. *Id.* The government countered that the first actual reduction to practice was performed by USF using NIH funds from Mayo. Appx3752–60 (Dkt. No. 200). And in turn, the researchers' testimony would confirm that USF received federal grant funds from Mayo prior to the first actual reduction to practice of the '094 patent. *Id.*

The trial court denied USF's motion *in limine*. *Univ. of S. Fla., Bd. of Trs. v. United States*, 154 Fed. Cl. 145 (2021). It found that the researchers would have relevant knowledge of the dates of conception and first reduction to practice, as well as "knowledge and involvement with any [National Institutes of Health (NIH)] grants or subgrants that funded the [plaintiff's] research relating to the '094 patent." *Id.* at 146 (internal quotations omitted). The government expected that these witnesses would testify that their USF laboratory was funded by a federal grant to Mayo, who then provided a portion of those funds to USF, and that one of

the researcher's salaries was funded by that same grant money. *Id.* The trial court agreed that the researchers' testimony was relevant and admissible. *Id.* at 147–48.

### III. USF'S BRIEFING BEFORE AND AFTER TRIAL FAILED TO RAISE ARGUMENTS NOW ASSERTED ON APPEAL.

USF submitted its pretrial Memorandum of Contentions of Fact and Law on May 10, 2021. Appx3704–51 (Dkt. No. 192). In arguing that the government did not have a license to the '094 patent, USF failed to raise any issue that an implied-in-fact funding agreement must fulfill the elements of 35 U.S.C. §202(c)(1)–(8). *See id.* Nor did USF argue that the government had to prove that a particular legal framework was met in order to prove an implied contract. *See id.*

On February 12, 2022, USF submitted its post-trial brief. Appx3767–812 (Dkt. No. 274). USF again failed to argue that the government did not prove the necessary legal elements of an implied contract existed between Mayo and USF prior to the reduction to practice. *See id.* Nor did USF argue that the government failed to prove that a "funding agreement" under the Bayh-Dole Act existed prior to the first reduction to practice in April 1997 because the government failed to establish that all requirements of 35 U.S.C. §202(c)(1)–(8) were included in any implied agreement. *See id.*

After post-trial briefing, the trial court found that the government held a license to the '094 patent pursuant to section 202(c)(4) of the Bayh-Dole Act and thus is not liable for infringement of USF's patent. *Univ. of S. Fla., Bd. of Trs.*,

162 Fed. Cl. at 60. Based on documentary evidence as well as testimony from USF researchers, the trial court determined that USF was receiving federal grant money from Mayo beginning October 1, 1996, prior to the invention's first reduction to practice on April 25, 1997. *Id.* at 64–67. The trial court explained that "[a]n implied-in-fact contract is one founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Id.* at 65–66 (quoting *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990)) (quoting *Porter v. United States*, 496 F.2d 583, 590 (1974)). "In the court's view, such a contract existed between plaintiff and the Mayo Clinic." *Id.* at 66. This implied contract was a "funding agreement" and the '094 patent constituted a "subject invention," such that the government met its burden to prove a license. *Id.* at 64–67.

USF now argues that the trial court erred by failing to apply the appropriate "standard for establishing the existence of an implied-fact contract." *Compare* PBr. at 22–32 *with* App3704–51 (USF pretrial memorandum), Appx3767–812 (USF post-trial brief), *and* Appx3813–42 (USF post-trial reply brief). Similarly, USF now argues that the government failed to establish the necessary elements under 35 U.S.C. § 202 (c) (1-8). *Compare* PBr. at 29–38 *with* App3704–51 (USF

pretrial memorandum), Appx3767–812 (USF post-trial brief), *and* Appx3813–42 (USF post-trial reply brief). USF failed to raise either argument at trial.

## STATEMENT OF FACTS

The '094 patent, titled "Transgenic Mice Expressing APPK670N,M671L and a Mutant Presenilin Transgenes," issued on April 27, 1999 (Appx1141) and claims transgenic mice that model the pathology of Alzheimer's disease. The pathology includes the extracellular amyloid deposits (composed mainly of β-amyloid (Aβ)[2]) and intraneural tangles (consisting largely of the cytoskeletal protein tau), which were known to be associated with the neurodegenerative disease. Appx1144 (1:48–53). The claims of the patent cover transgenic mice expressing both a (i) Swedish APP transgene (APPSwe)[3] and a (ii) presenilin transgene[4] as well as methods of making the same. Appx1149–50 (14:27–16:59 (claims 1–14)).

[2] The '094 patent also references Aβ1-42(43), a species of Aβ that is "selectively deposited early" in patients with familial Alzheimer's disease. Appx1144 (2:20-29).

[3] "The Tg2576 mouse . . .expresses the APP695 isoform containing a K670N, M671L mutation . . . which is often referred to as the Swedish mutation." Appx1144–45 (2:66 to 3:3).

[4] Certain mutations to the Presenilin I and II genes were also known to cause Alzheimer's disease in humans. Appx1145 (3:24-27).

The prior-art single-transgenic mice, expressing only one APP transgene (including APPSwe), showed Alzheimer's pathology slowly (after more than a year), or showed no pathology or only weak pathology. Appx1144–45 (2:61–3:17). Therefore, USF (and others in the field) sought to make double transgenic mice by combining the APPSwe transgene with another transgene expressing presenilin in order to produce the pathology in an accelerated fashion. This provides researchers with more time to understand Alzheimer's disease pathology and test potential treatments. Appx1144 (1:45–48).

Accordingly, the claims of the '094 patent are all directed to double transgenic mice exhibiting some type of "accelerated" Alzheimer's disease pathology, including accelerated Aβ deposition. For example, the parties proceeded to trial by stipulating to infringement of claims 7 and 8. Appx3762 at ¶ 15. Both claims recite "a transgenic mouse" with the APPSwe transgene and a "mutant presenilin" transgene, wherein the mouse develops "accelerated deposition of Aβ [Aβ42(43)] in its brain as compared to non-transgenic mice or mice expressing either transgene." Appx1150 (15:12–32). The validity of the claims and their construction are not at issue in this appeal.

## I. THE '094 PATENT WAS CONCEIVED OF AND FIRST REDUCED TO PRACTICE AT THE UNIVERSITY OF SOUTH FLORIDA.

Drs. Karen Duff and John Hardy are the named co-inventors on the '094 patent. Appx1141–50 ('094 patent). Drs. Duff and Hardy first conceived of the

patented invention while conducting Alzheimer's disease research together at USF. *Id.*; Appx3761–66 at ¶ 17 (Stipulation of Facts). The '094 patent issued on April 27, 1999 and was assigned to USF. Appx1141–50; Appx3762 at ¶¶ 13, 16. It expired on July 30, 2017. Appx1141–50.

While at USF, Drs. Duff and Hardy worked with a team of researchers that included Dr. David Morgan and Dr. Marcia Gordon. Appx0133–34 (Duff). Dr. Morgan was a professor in the Department of Pharmacology and Physiology at USF College of Medicine and ran his own research laboratory there. Appx0150–52 (Duff); Appx0491–96 (Morgan); Appx4078–118 (Morgan CV). Dr. Gordon was an Assistant Professor in the same department, focusing on Alzheimer's disease research, and had a longstanding collaboration with Dr. Morgan.[5] Appx0603–08 (Gordon); Appx2004; Appx3859–75 (Gordon CV). Dr. Gordon's research involved the use various immunohistochemistry[6] techniques to visualize proteins. Appx0607–09 (Gordon). Also working in the Morgan/Gordon laboratory at USF was Leigh Holcomb, a graduate student involved in Alzheimer's disease research related to the role of presenilins. Appx2004; Appx0511–13

[5] Drs. Morgan and Gordon are married. Appx0509–11 (Morgan).

[6] Immunohistochemistry is a technique that uses antibodies labeled with a dye to identify proteins such as amyloid plaques in the tissue from a mouse brain. Appx0149–53 (Duff).

(Morgan); Appx0637–39 (Gordon). Ms. Holcomb was supervised, in part, by Dr. Gordon. Appx3761 at ¶ 6 (Stipulation of Facts).

Dr. Gordon's lab notebooks show that the first litter of doubly transgenic mice were born August 21, 1996. Appx0631–33 (Gordon); Appx3890–91 (Gordon's lab notebook excerpt). In the fall of 1996, when the work leading to the '094 patent had already begun, but before the actual reduction to practice, Dr. Hardy moved from USF to the Mayo Clinic, with Dr. Duff following him to Mayo in December 1996. Appx3762–63 at ¶¶ 17, 21; Appx0135–36, Appx0152–54 (Duff); Appx4121–30, Appx4133–36 (Duff 30(b)(6) testimony). The doubly transgenic mouse colony described in the '094 patent remained at USF after Drs. Duff and Hardy moved to Mayo.[7] Appx0528–29 (Morgan); *see also* Appx4244–46 (Duff 30(b)(6) testimony that she "knew for a fact" that mice were at USF). Dr. Duff continued to direct the overall experiments related to the doubly transgenic mice that continued at USF, delegating the immunohistochemistry testing to the Morgan/Gordon laboratory at USF. Appx0152–54 (Duff).

As Dr. Duff conceded, the first actual reduction to practice of the '094 patent was documented in a facsimile on April 25, 1997. Appx0142–51 (Duff);

[7] USF asserts on appeal that "Dr. Morgan testified that Duff had a colony of the double cross mice at Mayo with her." PBr. At 21–22. USF offers no record citation supporting this assertion and it is counter to the evidence at trial. *See* Appx0528–29 (Morgan).

Appx4162–64, Appx4228–32 (Duff 30(b)(6) testimony); Appx1271–74 (Coppola facsimile); *see also* Appx3631–44 (USF stating as undisputed fact that "[a]ll work [related to the '094 patent] was conducted at the University of South Florida"). This facsimile from Dr. Duff to William Coppola at USF's Technology Transfer Office was sent after Drs. Duff and Hardy had moved to Mayo. Appx1271–74; Appx0142–51 (Duff). Dr. Duff marked the facsimile "urgent" because "[t]his was the first time we had seen . . . this pathology developing so rapidly in these mice." Appx0147–51 (Duff); *see also* Appx0616–19, Appx0631–33 (Gordon); Appx3890–91(Gordon's lab notebook excerpt).

As proof of accelerated amyloid deposition, the Coppola facsimile includes copies of immunohistochemistry testing demonstrating that animals were generated that carried two transgenes and showed dramatically accelerated Alzheimer's pathology. Appx1271–74 (Coppola facsimile). A notation on the slides, written by Dr. Duff, says "NB work performed by D. Morgan at USF in collaboration." *Id*. The notation indicated that the testing shown on the slides was performed by the Morgan/Gordon laboratory at USF.[8] Appx0151–53 (Duff). Dr. Duff conceded that the key inventive concept of the '094 patent is that Aß peptides clump together and form an amyloid deposit at an acerated rate, which makes "a

[8] In fact, Dr. Duff "was unable to" perform the testing documented in the facsimile. Appx4236, Appx4243–45 (Duff 30(b)(6) testimony).

structure you can see with the immunohistochemistry," earlier than when deposits are found in mice without both transgenes. Appx0230–33 (Duff). This feature was not documented prior to the Coppola facsimile. Appx0147–51 (Duff); Appx4162–64, Appx4228–32 (Duff 30(b)(6) testimony).

The accelerated pathology was demonstrated by sacrificing the mice and performing immunohistochemistry experiments on their brains that would show amyloid plaques. Appx0148–55 (Duff); Appx1272. These experiments were performed by Dr. Gordon, or someone supervised in the Morgan/Gordon laboratory at USF, such as Ms. Holcomb. Appx0133–35, Appx0150–55 (Duff); Appx0640–46 (Gordon). Shortly after the facsimile was receive by USF's Technology Transfer Office, U.S. Patent Application No. 08/903,518 was filed on July 30, 1997. Appx3762 at ¶ 12. The '518 application ultimately issued as the '094 patent. *Id.* at ¶ 13.

USF provided no evidence that Drs. Duff and Hardy had actually reduced the '094 patent to practice before leaving USF, as evidenced by an Invention Disclosure Form[9] and two Provisional Patent Applications.[10] These documents

---

[9] Dr. Duff submitted an Invention Disclosure Form to USF's Office of Technology Transfer on September 13, 1996. Appx0163–66 (Duff); Appx3562–93 (Invention Disclosure Form).

[10] Provisional Patent Application Serial No. 60/028,937 was filed on October 21, 1996, and Provisional Patent Application Serial No. 60/029,711 was

each disclose mice with a combination of mutant APP and mutant presenilin transgenes, but none disclose any data on accelerated deposition or other Alzheimer's pathology. Appx0157–59, Appx0161–65 (Duff); Appx3761–66 at ¶¶ 10, 11; *see also* Appx3562–93 (Invention Disclosure Form); Appx1151–90 ('937 Application).

## II. THE '094 PATENT WAS REDUCED TO PRACTICE AT USF WITH FUNDS FROM NIH GRANT AG14633.

While at USF, Dr. Hardy applied for a federal grant titled "The Role of the Presenilins in Alzheimer's Disease." By the time grant number 1P01AG014633 (the AG14633 grant[11]) was awarded, Drs. Duff and Hardy had left their employment at USF, so the grant was awarded to their employer, Mayo. Project 5 of the AG014633 grant was to study the effects of presenilin and APP mutations related to Alzheimer's dementia in transgenic mice. Mayo entered into a subcontract with USF to perform research related to Project 5. The subcontract began funding research described in the '094 patent as early as October 1, 1996, well before the first reduction to practice of the patented inventions.

filed on November 12, 1996. Appx3761–66 at ¶¶ 10, 11 (Stipulation of Facts); Appx1151–90 ('937 Application).

[11] The AG14633 grant is also sometimes referenced as the AG014633 grant.

### A. The AG014633 Grant Was Applied for by Drs. Duff and Hardy While Employed at the University of South Florida

On September 29, 1995, Dr. Hardy, on behalf of USF, submitted a program project grant application to the NIA, one of the institutes of the NIH. Appx3761 at ¶ 1; Appx1793–2044 (grant application). A program project grant assembles multiple principal investigators who are working in a coordinated fashion on the same general type of project. Appx0501–04 (Morgan). The application, titled "The Role of the Presenilins in Alzheimer's Disease," sought funding for "five, mutually interlinking projects aimed at elucidating the role of the presenilins in Alzheimer's disease." Appx1793–95. The proposed period of support went from July 1, 1996 through June 30, 1997 with a request for four additional years of funding. Appx1804–06.

Grant applications include "Specific Aims" for each project, which describe the primary goals sought to be accomplished with the series of experiments described in the grant application. Appx0512–14 (Morgan). The titles of the aims describe what the researchers "wish to accomplish in that series of experiments." Appx0513 (Morgan). Project 5 of the AG014633 grant was titled "Regulation and Function of the Presenilins in Rodent Brain." Appx1803, Appx2000–35 (grant application); Appx3761 at ¶ 3 (Stipulation of Facts). The fifth aim of Project 5 was to study the "[e]ffects of [presenilin] mutations related to Alzheimer's dementia in transgenic mice." Appx2009 (grant application).

The grant proposal listed the research team that would work on Project 5. Appx2001–02 (grant application). Dr. Morgan, the Project Leader, would "perform many of the surgical procedures," and "closely direct all experiments using molecular biological approaches." Appx2002–04 (grant application); Appx3762 at ¶ 9; Appx 0503–10, Appx0517–19 (Morgan); *see also* Appx4078–81 (Morgan CV listing "Regulation and Function of the Presenilins in Brain" from "9-96 to 9-99" as past grant support). Listed as a co-Principal Investigator, Dr. Gordon's role included "perform[ing] many of the histochemical procedures," and "play[ing] the major role in analyzing the histochemical data." Appx2002–04 (grant application); Appx3859–61 (Gordon CV); Appx0506–13 (Morgan). Leigh Holcomb, a USF graduate student, was listed as a research assistant who would "work closely with Dr. Morgan on the surgical components of this project, and with Dr. Gorodon [sic] on the histology." Appx2002–04 (grant application); Appx0506–13 (Morgan).

The AG014633 grant was awarded on September 30, 1996 to Mayo. Appx3235–44 (NIH RePORTER materials); Appx0135–36 (Duff); Appx4135–37 (Duff 30(b)(6) testimony); *see also* Appx2089 (AG014633 Notice of Award). Money from the AG014633 grant was available to Mayo as of October 1, 1996. Appx2602–05, Appx2661–66 (Snyder); Appx0519–21 (Morgan).

### B. Project 5 of the AG014633 Grant Evolved to Include Mice with Both Presenilin and APPSwe Mutations.

The aims and experiments described in an original grant can change over the period of grant funding. Appx0186–89 (Duff); Appx0512–15 (Morgan); Appx2580–84, Appx2621–24, Appx2653–59 (Snyder). As Dr. Morgan explained, grants are different from contracts in that a contract binds you to conduct work in the manner originally proposed, even though there may be discoveries made over time, while a grant has flexibility as long as the research fits within the overall project aims. Appx0513–15. Thus, grant aims are research goals rather than hard and fast rules. *Id*.

Dr. Stephen Snyder was the NIA program officer for the AG014633 grant. Appx2616–18, Appx2626–29 (Snyder). In that role, Dr. Snyder was involved in "all aspects of program development" throughout the grant process, from NIA's receipt of the grant application through administration of the grant. Appx2565–68 (Snyder). While the AG014633 grant application did not discuss a mouse model crossing an AppSwe transgene with a presenilin transgene, Dr. Snyder explained that the double transgenic mouse became "part and parcel of the program project grant." Appx2645–48; *see also* Appx2632–37, Appx2646–49; Appx2600–02.

After a grant application is submitted, it is reviewed by a committee. Appx2627–33 (Snyder). The AG014633 review committee proposed that instead of researching the rodent brain under Project 5, Dr. Morgan's group should use a

mouse model, which "just made more sense" since the other grant projects all studied mice. Appx2651–59 (Snyder). The grant application did not require a modification to reflect such a shift. *Id.*

Although the APPSwe mutation was not specifically mentioned in the grant application, Dr. Duff testified that it was the grant applicants' intent that the grant application "cover any APP mutation." Appx0162–64 (Duff). A double transgenic mouse model using the APPSwe mutation became possible when the APPSwe mouse was made available to the Project 5 research team, which occurred after the AG014633 grant application was submitted.[12] Appx0179–86 (Duff); Appx2644–50 (Snyder); Appx0514–17 (Morgan); Appx0631–33 (Gordon). Ultimately, though double transgenic mice were not part of the grant proposal, there were double transgenic mice funded by the AG014633 grant. Appx0505–07, Appx0513–15 (Morgan); Appx3843–58 (progress report).

### C. The AG014633 Grant Funded Dr. Gordon's Work Under Project 5 Starting in 1996.

The AG014633 grant was awarded to Mayo, but grant funds flowed from Mayo to the Morgan/Gordon laboratory at USF to pay for research under Project 5.

[12] The APPSwe mouse was proprietary to Dr. Karen Hsiao Ashe, who first published her research about the mutation after the grant application was submitted, and only made the mouse available to people she knew. Appx0184–86 (Duff); Appx4147–49, Appx4213–15, Appx4205–06, Appx4213–15 (Duff 30(b)(6) testimony).

Appx0521–23 (Morgan); Appx2585–92, Appx2600–06, Appx2651–89 (Snyder). The Project 5 funds paid the salaries of Dr. Morgan, Dr. Gordon, and Leigh Holcomb as well as paying for lab work including surgical procedures, animal behavior studies, and histochemical procedures associated with Project 5. Appx0508–11 (Morgan); Appx2000–08 (grant application). This work is detailed in the '094 patent and a follow-on 1998 Nature Medicine article. Appx1141–50; Appx3231–34.

As the grantee, Mayo entered into a consortium agreement to transfer funds for Project 5 to USF as a subgrantee, which was "a common practice with NIH grants." Appx0652–54 (Gordon); Appx0521–23 (Morgan). A subcontract between a grantee and subgrantee may "not occur immediately upon the award of the grant itself; . . . once the contract is agreed to, the funds that are allocated to the subcontract are essentially post-dated to the start date of the original project itself." Appx0522–24 (Morgan); *see also* Appx0135–40 (Duff explaining why "subcontracts are very often delayed"). If a Mayo-USF subcontract were not agreed to immediately after the initial award, "the funds that were sent to USF can be used to pay back . . . the . . . months of effort that occurred prior to the subcontract being signed or accepted." Appx0522–25 (Morgan).

The earliest written subcontract the parties were able to locate was executed in November 1997.[13] Appx1265–70. This agreement had an effective period from September 1, 1997, to August 31, 1998. Appx1266. Nonetheless, Dr. Morgan "was certain" that USF received funds from Mayo during the first year of the AG014633 grant based on USF's financial records and the period for the second year of the grant. Appx524–25, Appx0546–50, 0574–76 (Morgan); Appx2086–89 (notice of award).

For accounting purposes, USF creates unique account numbers that are "specific to an individual grant." Appx0541–43 (Morgan); *see also* Appx0540. USF Grant Account Number 6113-120-LO was associated with the Mayo subcontract that provided funding for Project 5 of the AG014633 grant. Appx3761 at ¶ 4; Appx0538–43, Appx0629–31 (Morgan); Appx2080–119 (USF grant documents); Appx2050–54, Appx2092–95 (USF financial records). The project period for the Mayo-USF research agreement tied to the 6113-120-LO account ran from September 1, 1996 through August 30, 1999. Appx0541–51 (Morgan); Appx2054, Appx2056, Appx2058 (USF employment documents); *see also* Appx2091–95 (USF financial records); Appx2000–02 (grant application); Appx3860 (Gordon CV listing her as Co-Investigator for the AG14633 grant from

[13] Mayo signed the subcontract on November 5, 1997 and USF signed on November 8, 1997. Appx1270.

"October 1, 1996-September 30, 1999"); Appx4080 (Morgan CV showing past NIH support for "Regulation and Function of the Presenilins in Brain" from "9-96 to 9-99"); Appx2675–77 (Snyder confirming the second year of grant ran "from 1 September 1997 to 31 August 1998").

Dr. Morgan, as the leader of Project 5 project, was responsible for administering the Project 5 grant funds. Appx0507–09 (Morgan). Although the written consortium agreement was not effective until September 1, 1997, he testified there may have been an earlier written agreement that could not be found "20 years after the fact." Appx0584–96 (Morgan). Dr. Morgan nonetheless recalled that funds from the AG014633 grant were available to USF by December 1996 and USF would have charged expenses and salaries to the subcontract by that time. Appx0523–26, Appx0548–52, Appx0567–69, Appx0592–94 (Morgan).

Dr. Morgan's laboratory was "very dependent financially upon [the AG14633 grant] project" for the histology and behavior testing conducted on the doubly transgenic mice. Appx0594–98 (Morgan). Even if there was an initial delay in receiving money from the AG14633 grant, underwriting or "rets" could be prepared to retroactively charge for researchers' salaries that would be ultimately reimbursed by the Mayo-USF subcontract. Appx0552–54, Appx0564–66, Appx0593–95 (Morgan); Appx0628–31 (Gordon). Dr. Gordon's salary had to be supported by grant funding and she did not work on any other grants tied to Mayo

while working on the doubly transgenic mice at USF.[14] Appx0610–12, Appx0630–32. Nor did she work with any other grants that supported the doubly transgenic mice project. Appx0628–30.

Drs. Morgan and Gordon both confirmed that, as early as October 1, 1996, at least part of Dr. Gordon's salary was paid from the 6113-120-LO account associated with the Mayo subcontract. Appx0510–13, Appx0551–55, Appx0559–61, Appx0575–79 (Morgan); Appx0619–28 (Gordon); *see also* Appx2050–54, Appx2058 (USF employment documents). Dr. Gordon's employment contract states that the length of that particular appointment was October 1, 1996 through June 12, 1997 and was "funded through contract/grant Mayo Clinic, account # 6113120LO."[15] Appx2058. A USF Appointment Change form also listed Dr. Gordon's appointment date as October 1, 1996, with her salary tied to the Mayo grant account number 6113120LO. Appx2056. This form lists the same Mayo account number and appointment date of October 1, 1996. Appx2054.

---

[14] Dr. Gordon did not work with the doubly transgenic mice colony prior to the AG14633 grant award because Dr. Duff (who was still at USF) had the colony at that time. Appx0575–78 (Morgan).

[15] Dr. Gordon did not sign the employment agreement tied to the 6113-120-LO Mayo account until May 1997 because USF contract executions were often very behind schedule, but the employees would still get their salary from the start of the appointment period. Appx0571–74 (Morgan); Appx0623–25 (Gordon); Appx2058 (employment agreement).

### D. USF Research Funded by the AG014633 Grant Is Described In the ’094 Patent.

Dr. Morgan’s laboratory was “certainly involved in the development of the mice” described in the ’094 patent and “had the overall responsibility for doing all of the behavioral testing and all of the histopathological analysis of the double transgenic mice.” Appx0527–29, Appx0563–65 (Morgan); *see also* Appx4148–51, Appx4224–25 (Duff 30(b)(6) testimony that she knew the mutations covered by the ’094 patent would work based on Gordon’s immunohistochemistry data). The Coppola facsimile, which included immunohistochemistry testing demonstrating reduction to practice of the ’094 patent, was sent April 25, 1997 while the USF laboratory was receiving funding from the AG014633 grant. Appx0554–59 (Morgan); Appx1271 (Coppola facsimile).

Dr. Gordon confirmed that the experiments using congo red stain with GFAP immunostain slides and depicted in the slides, designated as Figures 1 and 2 in the facsimile, (Appx1273–74) were documented in her lab notebook (Appx3893–94) as performed on April 16 and 17, 1997, just a few days before the facsimile. Appx0645–47; *see also* Appx4244– 26 (Duff 30(b)(6) testimony). Additionally, the behavioral studies depicted in Figures 1-A, 1-B, and 1-C of the ’094 patent were done at USF by the Morgan/Gordon lab. Appx0199–202 (Duff); Appx0535–37 (Morgan). The immunohistochemistry results shown in Table 1 of the ’094 patent were also performed at the Morgan/Gordon laboratory on April 19,

1997 when USF was receiving AG014633 grant funding for Project 5. *Compare* Appx1148 *with* Appx3893; *see also* Appx0633–41 (Dr. Gordon confirming the doubly transgenic mouse numbers in the '094 patent correspond to those in her lab notebook).

That USF's work was performed under Project 5 of the AG014633 grant is further established by the Nature Medicine article first publishing that research. Appx3231–34; Appx0524–27 (Morgan); Appx2590–92 (Snyder); *see also* Appx0192–94 (Dr. Duff confirming "the immunohistologic portions of the work [in the article] were completed at USF"). The Nature Medicine article was published in January 1998 and titled "Accelerated Alzheimer-type phenotype in transgenic mice carrying both mutant amyloid precursor protein and presenilin 1 transgenes." Appx3231. Leigh Holcomb and Dr. Gordon were co-lead authors of the article and "contributed equally." *Id.*; Appx0525–29 (Morgan).

The article also acknowledges that the work described in the article was supported by the "Mayo/USF Program Project on the presenilins (AG146133)." Appx3234; *see also* Appx4175–77 (Duff 30(b)(6) testimony). AG146<u>1</u>33 is a typo and both Dr. Duff and Dr. Morgan confirmed the grant number should be listed as AG14633. Appx0530–32 (Morgan); Appx0191–93 (Duff); Appx4289–90 (Duff 30(b)(6) testimony).

When requesting funding from NIA for year three of the AG14633 grant, which "would run from September of '98 to 31 August of '99," the Nature Medicine article was submitted to NIA as part of a progress report documenting the work done in year two of the grant. Appx2667–78, (Snyder); Appx3843–58 (progress report). Dr. Snyder relied on papers like the Nature Medicine article because they demonstrate the work done with the grant funding and what advances were made with that funding. Appx2669–71 (Snyder).

USF performed the behavior tests and immunohistochemistry and other stains on the "mice that ended up in the Nature Medicine paper." Appx0567–70 (Morgan). Dr. Morgan testified that he was "sure" that Figures 1-A, 1-B, and 1-C in the '094 patent and the figures in the Nature Medicine article "are both from a single experiment that was conducted by [the USF] research group on these mice prior to collecting the tissue." Appx0531–36 (Morgan).

## III. Mice Covered by the '094 Patent Were Sold at MMRC.

USF accused the Jackson Laboratory of the unlicensed use, manufacture, and infringement, by or on behalf of the United States, of the '094 patent. Appx0043–47 at ¶14. Jackson "is a nonprofit biomedical research facility located in Bar Harbor, Maine. Appx0889–91 (Bannerman). Part of the Jackson research facility includes "a mouse and services business" with "a little over 13,000 strains . . . of mice that [Jackson] makes available to the biomedical community." *Id.*

Jackson also participates in the Mutant Mouse Resource and Research Center MMRRC) established by the NIH in 1999. Appx3763 at ¶ 22 (Stipulation of Facts). The MMRRC is a consortium of nonprofit entities that banded together to create an infrastructure with the goal of making their mice available to the entire nonprofit, research community. Appx0926–28 (Bannerman). A researcher interested in purchasing a mouse will place an order through the MMRRC portal and that order is fulfilled by facilities like Jackson. Appx0927–29, Appx0948–52 (Bannerman).

Jackson entered into an agreement with the MMRRC on December 21, 2009. Appx3763 at ¶23. On June 17, 2011, the NIH expressly granted Jackson "authorization and consent" as provided in 28 U.S.C. § 1498(a),[16] retroactively for its activities in breeding and distributing certain strains of mice useful in Alzheimer's research through the MMRRC. Appx3763 at ¶¶ 22, 23; *see also* PBr. at 1 (agreeing "NIH granted retroactive 'authorization and consent'").

[16] "[T]he use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States." 28 U.S.C. § 1498(a) ¶ 2 (emphasis added).

## SUMMARY OF THE ARGUMENT

USF brought this action under section 1498, alleging infringement of its ’094 patent. The trial court, however, ruled that the government held a license to the patent under the Bayh-Dole Act, 35 U.S.C. §§ 200–212, based on USF’s use of NIH grant funds through a subcontract with Mayo, the grantee. While no written agreement could be located for the relevant time period, the trial court found that grant funds nonetheless flowed to USF through an implied-in-fact contract.

In its appeal, USF first challenges the legal conclusion that an implied-in-fact contract can qualify as a “funding agreement” under section 201(b), thereby granting the government an automatic paid-up license under section 202(c)(4). While USF notes the lack of precedent on this issue, it completely ignores that the statute defines “funding agreement” as including a “subcontract of ***any type***.” This clear statutory language undoubtedly excludes USF’s proposed reading (which limits subcontracts to express, written contracts) and is consistent with the Act’s overall directive to protect the government’s, and public’s, interests in patented research that has been federally funded.

Second, USF challenges the trial court’s factual findings (i) that an implied-in-fact contract existed between subgrantee USF and Mayo, the grantee of the AG14633 grant from NIH, at the time of the admitted first actual reduction to practice in April 1997, and (ii) that the reduction to practice occurred at USF

(rather than Mayo). But these findings are clearly supported by the overwhelming weight of the evidence, as the trial court found, and are not clearly erroneous. While USF contends that no grant monies flowed to USF until November 1997, when the earliest known written subcontract was executed, this is belied by the credible testimony of two former USF employees, Drs. Morgan and Gordon, and USF's own internal accounting documents.

The evidence shows that, when the claim invention was first reduced to practice in April 1997 (as documented in the Coppola facsimile), USF had already established accounts associated with the subgrant from Mayo and those accounts were distributing grant monies well before April 1997. In particular, Dr. Morgan testified that his USF laboratory was financially dependent on the grant at that time and that monies were being received by late 1996. And Dr. Gordon's employment contract for that time period was paid from a USF account associated with the grant.

Dr. Gordon, in turn, was heavily involved with the immunohistology experiments at USF that demonstrated the "accelerated" Alzheimer's pathology that is central to the claimed inventions of the '094 patent. While USF now contends that the work occurred under a different project at Mayo, this is contradicted by its own admissions, the testimony of its chief witness, Dr. Duff,

and even the Coppola facsimile itself, which contains a contemporaneous handwritten notation from Dr. Duff indicating the work was conducted at USF.

Lastly, USF makes two arguments on appeal that were not made at trial and therefore waived: that the trial court failed to address (1) eight alleged contractual provisions necessary to trigger the Bayh-Dole license under section 202(c) and (2) four requirements necessary to establish an implied-in-fact contract. Nonetheless, in both cases, USF's arguments lack merit and there is no compelling reason to consider them further on appeal.

Regarding the Bayh-Dole provisions, the trial court indicated in its summary judgment ruling that provisions effectuating a government license would likely be implied in any subcontract, as a later written subcontract included such a provision. The implementing regulations of the Act also require such a provision.

Regarding the requirements of an implied-in-fact contract, USF's arguments fail to acknowledge the trial court's finding that the conduct of the parties indicated their "tacit understanding" that grant funds would flow to USF through Mayo—the hallmark of an implied-in-fact contract. Additionally, USF claims a lack of "actual authority," which is misplaced, as the government is not alleged to be a party to the subcontract between Mayo and USF.

For these reasons, the court should affirm the trial court's ruling of a paid-up license under section 202(c)(4) and dismiss USF's claims of infringement.

# ARGUMENT

## I. STANDARDS OF REVIEW

The Federal Circuit reviews legal conclusions by the Court of Federal Claims *de novo* and reviews its factual findings for clear error. *Gaylord v. United States*, 777 F.3d 1363, 1367 (Fed. Cir. 2015) (citations omitted). While USF correctly acknowledges both standards, it neglects to delineate which issues it raises are factual and which are legal. PBr. 18. When properly viewed, the only issue of law is whether a "subcontract of any type," as set forth in the Bayh-Dole Act's definition of a "funding agreement" includes implied-in-fact contracts, as the trial court found. All other issues, including the nature and date of the implied-in-fact contract, are clearly issues of fact carefully considered by the trial court.

## II. THE BAYH-DOLE ACT CLARIFIED PATENT RIGHTS FOR FEDERALLY FUNDED RESEARCH.

The government has long supported scientific and technological research by providing monetary grants to colleges and universities, nonprofit organizations, and small businesses. Since 1980, the ownership of inventions resulting from that research has been governed by the University and Small Business Patent Procedures Act of 1980, 35 U.S.C. §§ 200–212, also known as the Bayh-Dole Act. The Act establishes a comprehensive framework for the disposition of rights in federally funded inventions between the research institutions, individual researchers, and the government. *Id.* The Act permits a university or small

business to accept government funding and then own any invention resulting from that funding, while providing the government a royalty-free license in return. *See* 35 U.S.C. § 200.

The Bayh-Dole Act "use[s] the patent system to promote the utilization of inventions arising from federally supported research or development" while also "ensur[ing] that the Government obtains sufficient rights in federally supported inventions to meet the needs of the Government and protect the public against nonuse or unreasonable use of inventions." *Id.* Regarding the latter, this license protects the government and public from paying royalties for patented research it funded. *Tech. Dev. Corp. v. United States*, 597 F.2d 733, 745 (Ct. Cl. 1979); *Kersavage v. United States*, 36 Fed. Cl. 441, 448 (Fed. Cl. 1996).

### A. The Statutory Framework of the Bayh-Dole Act Provides for a Paid-Up Nonexclusive License to the Government.

To these ends, the Act created a uniform framework by which government contractors and grantees can retain ownership of an invention under a federal contract or grant if it is timely disclosed and the contractor/grantee elects to retain ownership. *See* 35 U.S.C. § 202(c)(1).[17] The Bayh-Dole Act also requires that a

[17] There is no evidence that USF timely disclosed that the claimed inventions of the '094 patent were first actually reduced to practice using NIH grant funds, as required by section 202(c)(1), but the government did not seek ownership of the '094 patent for nondislosure as permitted by section 202(c)(2).

"funding agreement" with the government have provisions providing that, *inter alia*: "[w]ith respect to any invention in which the contractor elects rights, the Federal agency shall have a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States any subject invention throughout the world," § 202 (c)(4).

A "funding agreement" is statutorily defined as "any contract, grant, or cooperative agreement entered into between any Federal agency . . . and any contractor for the performance of experimental, developmental, or research work funded in whole or in part by the Federal Government." *Id.* § 201(b). This includes "any assignment, substitution of parties, or subcontract of any type." *Id*. (emphasis added). And "subject invention" includes any contractor invention that was either "conceived" or "first actually reduced to practice in the performance of work under a funding agreement." *Id*. § 201(e). As the trial court recognized, the Act "'vests in the government the right to a paid-up license to practice the invention when the contractor elects to retain title.'" Appx0011 (quoting *Campbell Plastics Eng'g & Mfg., Inc. v. Brownlee*, 389 F.3d 1243, 1247 (Fed. Cir. 2004)); *see also Cent. Admixture Pharm. Servs. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1351 (Fed. Cir. 2007) (holding that government has irrevocable rights to a paid-up license for NIH-sponsored research).

### B. Contractors Are Required to Reserve a License for the Government.

The implementing regulations of the Bayh-Dole Act, 37 C.F.R. pt. 401, further support this reservation of a paid-up, nonexclusive license. The regulations require federal agencies, like NIH, to use a standard patent rights clause (SPRC) in all funding agreements for research or development work unless an agency can justify an exception. *See* 37 C.F.R. §§ 401.3, 401.14 (1987) (SPRC effective for the first year of AG14633 grant). Like the Bayh-Dole Act, the SPRC specifies that "[w]ith respect to any subject invention in which the Contractor retains title, the Federal government shall have a nonexclusive, nontransferable, irrevocable, paid-up license . . . .[w]ith respect to any subject invention in which the Contractor retains title, the Federal government shall have a nonexclusive, nontransferable, irrevocable, paid-up license . . . ." *Id*. at § 401.14(b). The regulations also required, at the time of the AG14633 grant, that contractors "include this clause, suitably modified to identify the parties, in all subcontracts, regardless of tier, for experimental, developmental or research work to be performed by a small business firm or domestic nonprofit organization. *Id.* at § 401.14(g)(1); *see also* Rights to Inventions Made by Nonprofit Organizations and Small Business Firms, 52 Fed. Reg. 8552 (Mar. 18, 1987) (codified at 37 C.F.R. pt. 401).

## III. THE INVENTIONS OF THE '094 PATENT WERE FIRST REDUCED TO PRACTICE USING NIH GRANT FUNDS.

To establish a Bayh-Dole license, the government must prove (1) that there is a "funding agreement," and (2) that the patented invention(s) was conceived or first actually reduced to practice under that funding agreement—in other words, that the government funded the "subject inventions." *See* 35 U.S.C. § 202(c); *Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 613 (M.D.N.C. 2006). USF's challenges the trial court's ruling under both prongs.

Regarding the existence of a "funding agreement," USF asserts (1) that any USF subcontract between Mayo and USF must be an express, written contract, PBr. 32–38, and (2) that, regardless, the NIH AG14633 grant did not fund the "subject invention," *e.g.*, *id*. at 8–11, 30–31. These positions are legally flawed and unsupported by the evidence of record.

### A. A "Subcontract of Any Type" Includes Implied-in-Fact Contracts.

USF challenges whether anything other than an express, written contract can qualify as a "funding agreement" under the Bayh-Dole Act. PBr. 32–38. In USF's view, the trial court improperly "dismissed the entire case based on . . . an implied-in-fact license that no court had ever found in connection with the Bayh-Dole Act." *Id.* at 37–38. Without the certainty of a written agreement, it contends, the trial court's understanding of a "funding agreement" will "give rise to endless litigation" over the terms of such agreements. *Id.* at 37.

But this argument ignores the express language of the statute and the explicit policies behind it. Under section 201(b), a "funding agreement" explicitly includes subcontracts "of any type," language that USF's opening brief completely fails to acknowledge. To limit that language to include only express, written agreements improperly rewrites a clear statutory directive.

The first step of statutory interpretation "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). The "inquiry ceases 'if the statutory language is unambiguous and the statutory scheme is coherent and consistent.'" *Id.* at 450 (quoting *Robinson*, 519 U.S. at 340); *see also United States v. Ron Pair Enters.*, 489 U.S. 235, 240–41 (1989) (Where "the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.").

That is clearly the case regarding the meaning of "subcontract of any type." Such language unequivocally includes types of contracts other than express contracts, which leads directly to inclusion of implied-in-fact contracts, where the conduct of the parties indicates a "meeting of the minds"—even though no formal written agreement exists. *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed.

Cir. 1990); *see also* Appx0014 (citing same). While USF cites the lack of any case law on this issue, *e.g.*, PBr. 33–34, the statute itself provides sufficient clarity.

Under USF's view, subcontracts would be limited to one type. This position runs counter the express language of the statute as well as the overall statutory scheme. *See FDA v. Brown & Williamson Tobacco Corp., 52*9 U.S. 120, 133 (2000) (holding that words of a statute must be read "in their context and with a view to their place in the overall statutory scheme"). As noted above, the Act was intended to reserve certain rights to the government for federally funded inventions, which as this court has acknowledged in *Campbell Plastics*, includes a paid-up license when the contractor elects to take title to a "subject invention." 389 F.3d at 1247. That decision specifically noted that provisions of section 202(c)(1) requiring the contractor to disclose its federally funded inventions in order to "provide the government adequate means with which to protect these rights." *Id*.

By not limiting subcontracts to express contracts, the statute similarly protects the government's right to a license by broadly including any type of subcontract as a "funding agreement." Similarly, the surrounding statutory language also accounts for any "assignment" or "substitution of parties" in a funding agreement. *See* 35 U.S.C. § 202(c).

Rather than leading to "endless litigation," as USF alleges, this interpretation of "any type of subcontract" protects one of the Act's chief aims by prohibiting a contractor from subcontracting federal funds without a written agreement, and thereby circumventing the grant of a government license. As the government is not a party to such subcontract,[18] it relies upon the statute and relevant regulations to ensure that its rights are nonetheless protected.[19]

### B. An Implied-in-Fact Subcontract Between USF and Mayo Funded the First Actual Reduction to Practice.

Apart from whether an implied-in-fact contract can legally qualify as a "funding agreement," USF also questions the CFC's factual finding that the weight of the evidence "establishes that plaintiff's work on the mice in the '094 patent was

---

[18] USF argues—for the first time on appeal—that there is no evidence of any official with actual authority to bind the government in the Mayo-USF subcontract. *See* PBr. 27–28. This argument is misplaced, as the government is not a party to that agreement. Likewise, Mayo is obligated to include the license provision on the government's behalf under 37 C.F.R. pt. 401.

[19] USF misrepresents the testimony of Dr. Snyder (the former NIA program officer who evaluated and supervised the AG14633 grant, Appx2554–67) when it argues that NIH would possess a copy of any Mayo-USF subcontract. PBr. 10, 28 (citing Appx2607). As USF acknowledges, Dr. Snyder testified that the subcontract to USF under the AG14633 grant was "'strictly a hands-off situation'" for NIH. PBr. 28 (quoting Appx2610). He explained that subcontracting matters were "sort of a curtain through which [he] did not have a line of sight." Appx2606–09. And he "could not answer" as to whether the subcontract would be included in NIH records. Appx2610.

performed using funds from NIH grant AG014633 as early as October 1996," Appx0013, under an implied-in-fact contract with Mayo, Appx0013–14. USF argues that the trial court erred because: (1) USF's subcontracted work was not funded by the AG14633 grant until November 1997, the start date of the only written subcontract; (2) the AG14633 only funded work on Project 5, which was unrelated to the claimed inventions of the '094 patent (and the first actual reduction to practice); and (3) the testimony of former USF employees Drs. Morgan and Gordon and former USF/Mayo employee Dr. Duff was misconstrued. *See, e.g.*, PBr. at 9–10. But these arguments are belied by the overwhelming weight of the evidence, as the trial court's analysis makes clear.

***1. AG14633 Grant Funds Flowed to USF by October 1996.***

USF claims that "no money or benefit" flowed to it from the AG14633 grant until the written "Consortium Agreement" between USF and Mayo was signed in November 1997. PBr. 10. That agreement, Appx1265–70, was for a period of performance from September 1, 1997 to August 31, 1998. Appx1265, Appx1266 (Article 6). But USF's internal forms indicate that this was the second year of the grant and that it was paid out of a USF account numbered 6113-120-LO. Appx2094; *see also* Appx0009.

In turn, Dr. Gordon's employment contract for the period of October 1, 1996 to June 12, 1997 specifically states that it was "funded through contract/grant

Mayo Clinic, account #6113120LO." Appx2058. Her appointment change form provides the same information. Appx2056; *see also* Appx0009. Though supported by the credible testimony of Drs. Morgan and Gordon, as discussed herein, these documents alone support the trial court's finding that grant funds flowed to USF "as early as October 1996." Appx0013.

#### *2. The USF Subcontract Funded the First Actual Reduction to Practice.*

USF also asserts that the trial court's finding that the work in Dr. Morgan's and Dr. Gordon's USF laboratory was conducted under Project 5 of the AG14633 grant indicates that it was unrelated to the claimed mice of the '094 patent. PBr. 29 (citing Appx0008). According to USF, there could have been no first actual reduction to practice at USF because this work occurred under Project 4 and was conducted by the inventors Dr. Duff and Dr. Hardy. *Id.* at 4–6, 29–30.

But USF's position runs counter to its earlier admissions, the testimony of its chief witness, Dr. Duff, and the clear USF documentation of the first reduction to practice. USF admitted in its summary judgment motion that that the facts "demonstrate all work on the invention from its conception through to the first actual reduction to practice was conducted at USF."[20] Appx3636–39 (USF motion

[20] Parties are not permitted to use one version of an argument and then, when that fails, try a different version on appeal. *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1142 (10th Cir. 2004).

for partial summary judgment (Dkt. No. 118)); *see also* Appx3638 at ¶ 5. And in its opening brief, USF specifically admits that the actual reduction to practice took place at USF on April 25, 1997, the date of the Coppola facsmile. PBr. 6–7. These admissions, as discussed above, align with all of the relevant evidence.

Moreover, as the trial court noted, Appx0007, Dr. Duff testified that the Coppola facsimile was the first documented evidence that the double transgenic mice of the ’094 patent "develop[ed] pathology . . . at an age which was far accelerated." Appx0143–44. As the trial court properly recognized, this testing was "integral to the project," and indeed the claimed inventions of the ’094 patent. Appx0014 (n.5).

Dr. Duff further explained that the work indicated in the immunohistology slides included with the facsimile were performed at Dr. Morgan's USF laboratory, as Dr. Duff's handwritten note on Figure 1 indicates: "work performed by D. Morgan of USF in collaboration. . . ." *Id*. at Appx4232–38 (Duff 30(b)(6) testimony) (discussing Appx1273); Appx0150–53 (Duff) (same). She further admitted that immunohistology was likely performed by Dr. Gordon, who headed such work in the USF laboratory. Appx0151–53

Dr. Duff also confirmed, in her testimony (in her Rule 30(b)(6) testimony) that Project 4, indeed, was not the relevant project for this work. According to Dr. Duff, the mouse crosses cited by USF, PBr. 4, were speculative and never performed under that project. Appx4281–86 (Duff 30(b)(6) testimony). Therefore, Dr. Duff, a USF inventor and witness, confirms that the actual reduction to practice occurred at USF, not Mayo.

***3. The Trial Court Did Not Misconstrue the Testimony of Dr. Morgan and Dr. Gordon.***

These conclusions are also supported by the testimony of Drs. Morgan and Gordon—both deemed by the trial court to be credible. Appx0013. USF argues that neither testified that subcontract money was provided by Mayo before the actual reduction to practice in April 1997, PBr. 18, and the trial misconstrued their testimony, *id*. at 10.

But it is USF that is misconstruing their testimony. First, USF notes Dr. Morgan's testimony that he requested money advances from USF, not Mayo. *Id.* at 19. But as the trial court noted, Dr. Morgan testified that the advances were based on an understanding that Mayo had received a notice of award from NIH and he requested an advance against that award. Appx0014 (citations omitted). Given USF's financial dependence on the Mayo grant, this action was indicative of "tacit understanding" between the parties—and thus indicative of an implied-in-fact contract. Appx0014. Second, Dr. Morgan specifically recalled that funds from the

AG14633 grant were available to USF by December 1996—several months before the reduction to practice. Appx0523–26, Appx0548–52, Appx0567–69, Appx 0592–94 (Morgan).

USF contends that Dr. Gordon's testimony "established she did not receive any funds from Mayo under the grant until November 1997" and that USF used "a variety of grants other than the Mayo grant for her work on the mice of the '094 Patent . . . prior to Duff's departure for Mayo." PBr. 19. But Dr. Gordon confirmed that her salary at the time of the April 1997 reduction to practice was paid from a USF account associated with the AG14633 grant, which was the only Mayo-associated grant she worked under. Appx0619–28 Again, that reduction to practice, as the Coppola facsimile itself indicates, occurred after (not before) Dr. Duff left USF in December 1996.

## IV. USF WAIVED ITS ARGUMENTS REGARDING REQUIREMENTS OF IMPLIED-IN-FACT CONTRACTS AND "FUNDING AGREEMENTS."

USF argues—for the first time—that the trial court: (1) ignored the four requirements of an implied-in-fact contract, PBr. 22–29, and (2) made no findings regarding the alleged "eight elements" of a "funding agreement" under the Bayh-Dole Act, *id*. at 35–37. Under the doctrine of waiver, this court should not consider these arguments because they were not addressed during the trial court proceedings. As the Supreme Court has stated, the "general rule" is "that a federal appellate court does not consider an issue not passed upon below." *Singleton v.*

*Wulff*, 428 U.S. 106, 120 (1976). While this court can, in its discretion, deviate from this general rule of waiver, *id.* at 121, there is no reason to do so here as USF had ample opportunity to address both arguments with the trial court.[21] Moreover, as described herein, USF's arguments do not raise issues of general unfairness or manifest injustice that weigh in favor of their consideration on appeal. *See Icon Health & Fitness, Inc. v. Strava, Inc., 84*9 F.3d 1034, 1040 (Fed. Cir. 2017); *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1344 (Fed. Cir. 2001).

### A. The Bayh-Dole License Provision Should Be Implied into the USF Subcontract.

USF argues that section 202(c) of the Bayh-Dole Act requires that each "funding agreement" "contain appropriate provisions to effectuate" its eight subparts, including the license provision, as a "prerequisite" to establishing a government license. PBr. 36. USF, however, did not address this argument at trial or in either its pre- or post-trial briefs. *See supra* Statement of the Case (Part III).

[21] USF raised some of these arguments in its summary judgment motion, but that is of no consequence because a summary judgment motion does not to "preserve legal arguments for appeal." *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995) (citing 6 Moore's Federal Practice ¶ 56.04[1] at 56–60 to 56–61 (2d ed. 1994)).

This failure is particularly noteworthy given that the trial court addressed this issue in a summary judgment ruling more than a year before trial. *Univ. of S. Fla. v. United States*, 146 Fed. Cl. 274 (2019). The court noted that "the consortium agreement between Mayo and USF dated November 8, 1997 . . . shows that any subcontract between Mayo and USF for the previous year would likely have included the same provisions required by section 202." *Id*. at 289. The court concluded that there was:

> [N]o categorical impediment to the formation of a subcontract between Mayo and USF before April 25, 1997, that would satisfy section 202, perhaps through an implied contract, because the terms essential to such subcontracts appear . . . to have been well-established in the research university setting at that time.

*Id.* Indeed, as USF concedes (PBr. 37 n.4), the Consortium Agreement includes an Article 17, which states that "[p]atents and inventions shall be treated in accordance with" the Bayh-Dole Act (referenced as "P.L. 96-517") and the "DHHS implementing regulations." Appx1268. And as discussed, the relevant implementing regulations (under Title 37[22]), as they existed at the time of the implied agreement at issue, specify that contractors must include a SPRC, which provides a government license. 37 C.F.R. § 401.14(g)(1) (1987). For these

---

[22] Article 17 references DHHS regulations under Title 45, Appx1268, but the implementing Bayh-Dole regulations are found under Title 37.

reasons, it is proper to presume that the implied-in-fact subcontract the trial court found would include a government license provision.

Moreover, no specific provision providing for a government license is required under the Bayh-Dole Act for funding agreements with nonprofit organizations (like USF). The statute automatically retains a paid-up nonexclusive license under section 202(c)(4). Additionally, "all funding agreements, including those with other than small business firms and nonprofit organizations," must include the requirements established in sections 202(c)(4) and 203 for establishment of an irrevocable, paid-up government license. *See* 35 U.S.C. § 202(c). Therefore, the Act creates both a statutory-based and a contractually based license for the government. *Madey*, 413 F. Supp. 2d at 611.

### B. USF Also Failed to Raise the Four Requirements of An Implied-in-Fact Contract at Trial.

For similar reasons, USF waived its arguments that the trial court failed to properly apply the four requirements of an implied-in-fact contract: (1) mutuality of intent to contract, (2) consideration, (3) an unambiguous offer and acceptance, and (4) where the government is a party, a representative with "actual authority" to bind the government. PBr. 22–23 (citations omitted). USF did not raise these arguments at trial or in either its pre- or post-trial briefs. *See supra* Statement of the Case (Part III).

Nonetheless, these arguments lack merit. The fourth requirement of "actual authority" is irrelevant here as the government is not a party to the implied-in-fact subcontract. And USF's arguments on the first three requirements essentially are a repackaged version of its continued assertions that no USF subcontract existed prior to November 1997—arguments that were fully addressed by the trial court.

Regarding mutuality of intent, USF argues that "[t]here is no evidence, of any kind, that Mayo wanted or intended to enter into a subcontract [] with USF until November 1997," noting a lack of evidence of a "meeting of the minds." PBr. 23–24. But the trial court explicitly addressed this question, finding that the conduct of the parties (USF and Mayo) indicated their "'tacit understanding' that grant funds would flow from the NIH to the Mayo Clinic and ultimately to plaintiff [USF]" by October 1, 1996, the date of Dr. Gordon's appointment funded by the USF account for Mayo grant funds. Appx0014 (quoting *Atlas Corp.*, 895 F.2d at 754). Apart from the evidence surrounding the funding of Dr. Gordon's appointment, the court also cited Dr. Morgan's testimony that USF was "very dependent financially" on the grant funds at the time of the notice of award to Mayo in September 1996. *Id.* (quoting Appx0594–98).

Similarly, USF asserts that "the court's analysis did not include identification of any sort of consideration, a fundamental error of law." PBr. 25. USF acknowledges that the trial court found a "tacit understanding" that funding

would flow by October 1, 1996, but views its underwriting of funds expected from Mayo to be a "unilateral anticipation," not a "mutual understanding." *Id*. at 26. But the trial court's finding of a contract (and therefore consideration) is supported by substantial evidence. For example, the trial court cited Dr. Morgan's testimony that he would have requested advanced funds from USF only after he "learned from the Mayo Clinic that they had received notice of award." Appx0014 (quoting Appx0594). Therefore, there was consideration from Mayo to USF; and Dr. Duff's receipt and use of the USF immunohistology results (and maintenance of the mouse colony) provides consideration from USF to Mayo. Accordingly mutual consideration between Mayo and USF existed by October 1996. *See* Appx0152–54 (Duff testifying that she directed work to USF).

Finally, regarding offer and acceptance, USF asserts that "[t]he record is devoid of any evidence concerning the conduct of Mayo until November, 1997 when Mayo and USF agreed to their first (and only) express subcontract." PBr. 27. But again, this is specifically refuted by the trial court, which found that the collective evidence demonstrated a "tacit understanding" between the parties based on the testimony of Dr. Morgan, Appx0014, who was involved in the administration of the grant funds for USF. *See* Appx0507–09**.** Indeed, there is legal no requirement that specific evidence of an express offer and acceptance come from Mayo (or any other source) as USF asserts. PBr. 27. "In short, an

implied-in-fact contract arises when an express offer and acceptance are missing but the parties' conduct indicates mutual assent." *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998). Such conduct was specifically found by the trial court.

## CONCLUSION

For the reasons set forth herein, the government respectfully requests that this Court affirm the trial court's final judgment, finding that the government held an irrevocable, paid-up license to the '094 patent, and in turn, dismissing all of USF's infringement claims.

January 26, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

/s/Walter W. Brown
WALTER W. BROWN
Senior Litigation Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0341
Facsimile: (202) 307-0345
walter.brown2@usdoj.gov

*Attorneys for the United States*

Of Counsel:
CARRIE E. ROSATO
KAVYASRI NAGUMOTU
Department of Justice

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(5)–(7) of the Federal Rules of Appellate Procedure, I hereby certify that the Brief of the Defendant-Appellee contains no more than 13,000 words, proportionally spaced, as recorded in the document statistics for this document in Microsoft Word 365, Version No. 2208, which provides the following information:

- Typeface: Times New Roman, proportionally spaced, 14 point
- Word Count: 10,973 (excluding the parts of the Brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Federal Circuit Rule 32(b))

/s/Walter W. Brown___
WALTER W. BROWN
Senior Litigation Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 307-0341

January 26, 2023

*Attorney for the United States*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing BRIEF OF THE DEFENDANT-APPELLEE, THE UNITED STATES was filed electronically using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/Walter W. Brown______
WALTER W. BROWN
Department of Justice
Telephone: (202) 307-0341