**2022-2248**

In The
# United States Court of Appeals
For The Federal Circuit

**UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES,**

***Plaintiff – Appellant*,**

**v.**

**UNITED STATES,**

***Defendant – Appellee.***

**APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN NO. 1:15-cv-01549-PEC, JUDGE PATRICIA E. CAMPBELL-SMITH.**

## REPLY BRIEF OF APPELLANT

**Steven B. Kelber**
**THE KELBER LAW GROUP**
**6701 Democracy Boulevard, Suite 300**
**Bethesda, Maryland 20817**
**(240) 506-6702**
**steve@kelberlawgroup.com**

***Counsel for Appellant***

**Jerry Stouck**
**THE LAW OFFICES OF JERRY STOUCK**
**10863 Symphony Park Drive**
**North Bethesda, Maryland 20852**
**(301) 807-5100**
**jerrystouck@verizon.net**

***Counsel for Appellant***

THE LEX GROUP[DC] ♦ 1050 Connecticut Avenue, N.W. ♦ Suite 500, #5190 ♦ Washington, D.C. 20036
(202) 955-0001 ♦ (800) 856-4419 ♦ www.thelexgroup.com

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-2248

**Short Case Caption** University of South Florida Board of Trustees v. United States

**Filing Party/Entity** University of South Florida Board of Trustees

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/27/2022

Signature: /s/ Steven Kelber

Name: Steven Kelber

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| University of South Florida Board of Trustees | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| The Kelber Laws Group, LLC | Steven Kelber | |
| Greenberg & Traurig | Jerry Stouck | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. NO MONEY FROM GRANT AG14633 WENT TO USF BEFORE NOVEMBER 9, 1997 ........ 4

III. THE EXPRESS AGREEMENT BETWEEEN USF AND MAYO UNDER AG 14633 PRECLUDES THE POSSIBILITY OF AN EARLIER "IMPLIED-IN-FACT AGREEMENT" ........ 7

IV. THE ELEMENTS A COURT MUST IDENTIFY BEFORE AN IMPLIED-IN-FACT AGREEMENT MAY BE FOUND WERE NOT PRESENT ........ 9

A. There Was No Waiver – USF Expressly Presented the Arguments the Government Urges Were Waived ........ 10

B. The Elements of an "Implied-in-Fact Agreement" Were Not Found By the CFC ........ 13

C. The Bayh-Dole Act Requires "Each Funding Agreement…With a Non-Profit Organization Shall Contain" Provisions to Satisfy Eight Specific Objectives ........ 20

V. CONCLUSION ........ 24

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Bankers Association v. United States*,
932 F.3d 1375 (Fed. Cir. 2019) ....................10, 11, 12

*Anderson v. United States*,
344 F.3d 1343 (Fed. Cir. 2003) ....................11

*Bank of Guam v. United States*,
578 F.3d 1318 (Fed. Cir. 2009) ....................8

*City of El Centro v. U.S.*,
922 F.2d 816 (Fed. Cir. 1990) ....................9, 18

*Federal Crop Ins. Corp v. Merrill*,
332 U.S.C 380 (1947)....................9, 18

*Fincke v. United States*,
675 F.2d 289 (1982) ....................9

*Flynn v. Sandahl*,
558 F.3d 283 (7th Cir. 1995) ....................12

*Ideal Innovations, Inc. v. United States*,
148 Fed. Cl. 385 (F. Cl. 2020)....................10

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ....................13

*Juda v. United States*,
6 Cl. Ct. 441 (1984) ....................9, 18

*Morgan v. Sundance, Inc.*,
142 S. Ct. 1708 (2022)....................12

*Rekhi v. Wildwood Industries, Inc.*,
56 F.3d 1313 (7th Cir. 1995) ....................................................................11

*Russell Corp. v. United States*,
537 F.2d 474 (Ct. Cl. 1976), *cert denied*,
429 U.S. 1073(1977).......................................................................................9

*Schism v. United States*,
316 F. 3d 1259 (Fed. Cir. 2002) ..................................................................19

*Singleton v. Wulff*,
428 U.S. 106 (1976)......................................................................................13

*SSI Technologies, LLC v. Dongguan Zhengyang Electronic Mechanical Ltd.*,
2021-2345, 2022-1039 (Slip. Op. Feb. 13, 2023) .................................. 11-12

*Tech. Dev. Corp. v. United States*,
597 F.2d 733 (Ct. Cl. 1979)..........................................................................10

*United States v. Olano*,
507 U.S. 725 (1993).......................................................................................12

*University of West Virginia Board of Trustees v. VanVoorhies*,
278 F.3d 1288 (Fed. Cir. 2002) ..................................................................2, 7

**STATUTES**

28 U.S.C. § 1498(a) .........................................................................................1

35 U.S.C. §§ 200–212 .......................................................................................3

35 U.S.C. § 201 ..............................................................................................20

35 U.S.C. § 201(e) ............................................................................................4

35 U.S.C. § 202(c) ....................................................................................*passim*

35 U.S.C. § 202(c)(1-8) ...............................................................................3, 23

35 U.S.C. § 202(c)(4)....................................................................................11, 22

35 U.S.C. § 203 ....................................................................................................22

35 U.S.C. § 204 ....................................................................................................22

**OTHER AUTHORITY**

Moore's Federal Practice § 205.05 at 205-55 (3d ed. 1997) ..................................13

## I. INTRODUCTION

Over seven (7) years ago, University of South Florida Board of Trustees (hereinafter "USF") filed suit to recover damages for patent infringement committed with the authorization and consent of the Government of the United States (hereinafter "Government") pursuant to 28 U.S.C. §1498(a). USF presented witnesses and documentary evidence establishing that U.S. Patent No. 5,898,094 (hereinafter "the '094 Patent"), directed to the very first animal models for Alzheimer's disease, had been infringed over its entire lifetime. After a full trial before the Court of Federal Claims (hereinafter "CFC") the CFC did not decide any issues pertaining to patent validity or infringement. Rather, the CFC held the Government was entitled to a license under the '094 Patent due to an "implied-in-fact agreement" between USF and Mayo Foundation (hereinafter "Mayo") to do work under NIH Grant AG14633. This was the first time in the over forty (40) year history of the Bayh-Dole Act a Federal Court had found an "implied-in-fact agreement" sufficient to meet the requirements of the Act specified in 35 U.S.C. §202(c).

For such a license to exist in favor of the Government, funds from NIH Grant AG16433 would have had to have been provided to USF before the first actual reduction to practice of the patented mice, which occurred on April 25, 1997. No such funds were or could have been provided to USF prior to the express

subcontract with Mayo negotiated in November of 1997. Nonetheless, the CFC found an implied-in-fact agreement to exist between USF and Mayo – despite the fact that no testimony by Mayo, about Mayo's conduct or Mayo's desire to enter into such an agreement was ever presented. That finding by the CFC was clearly erroneous.

That express subcontract executed in November 1997 between USF and Mayo was for the precise work the trial court asserted the "implied-in-fact agreement" was for – work under the NIH Grant AG14633. USF argued at trial, and argues here, that given that express subcontract, no similar "implied-in-fact agreement" for the same work could exist. The CFC ignored that argument, but it's finding was contrary to law. *University of West Virginia Board of Trustees v. VanVoorhies*, 278 F.3d 1288, 1302 (Fed. Cir. 2002): "It is a well-rooted principle of contract law that an express contract and an implied contract, relating to the same subject matter, cannot co-exist." Before this Court, the Government offers no argument to the contrary, and no basis for finding an "implied-in-fact contract" given the express contract for the same work. Like the CFC opinion, the Government's Brief is silent on this issue.

USF also argued below that the elements of an "implied-in-fact agreement" that must be identified before such an agreement may be found were nowhere identified by the CFC. There was no basis for the trial court to conclude an

"implied-in-fact agreement" for Mayo to pay USF federal funds existed as early as October 1, 1996. There was no testimony or evidence from Mayo, nor was there evidence of any conduct by Mayo to support the notion of an "implied-in-fact agreement". Having no effective response to that argument, the Government now asserts USF waived this argument, notwithstanding the briefing specifically on this issue advanced by USF on Summary Judgment, the Government's discussion of that issue, and the CFC's opinion discussing it.

USF has maintained, at trial and here, that an "implied-in-fact agreement" is not consistent with the requirements of the Bayh-Dole Act, 35 U.S.C. §§200–212. The license the Government insists it is entitled to arises from a provision that ensures federal "funding agreements" with nonprofit entities like USF recite the extension of that license, together with seven other specific requirements under the Act. 35 U.S.C. §202(c)(1-8). The Government says that argument was also waived by USF, ignoring the fact that USF and the Government briefed it extensively on Summary Judgment decided by the CFC.

USF discusses each of these issues below, recognizing that any one of them, decided in USF's favor, is sufficient to compel reversal of the CFC Decision, which relied exclusively on the theory of an "implied-in-fact agreement" arrived at by October 1, 1996, offering no other basis to avoid damages for patent

infringement. Remand for resolution of the issue of adequate damages for patent infringement is respectfully requested.

## II. NO MONEY FROM GRANT AG14633 WENT TO USF BEFORE NOVEMBER 9, 1997

Whether or not there was an express or implied-in-fact contract, the Government has no license right under the '094 Patent unless it provided financial support to USF, directly or through Mayo, for development of the mice of the '094 Patent before April 25, 1997. Licenses of this type made with federal funding attach only to "subject inventions" – those made with federal funds before the first actual reduction to practice of the invention. 35 U.S.C. §201(e):

> The term "subject invention" means any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement.

No money from Grant AG14633 went to USF before the mice of the '094 were first actually reduced to practice on April 25, 1997. As discussed in USF's opening brief, the Government does not hold a license to practice that invention precisely because no federal grant money went to USF before that date. It is that simple.

There is no evidence that USF received any federal funding from the Grant until after the mice were reduced to practice in April 1997. The CFC's conclusion is clearly erroneous - the Government does not, and cannot, point to any evidence of receipt of funds by USF from Mayo (the Grant recipient) until USF entered the express written subcontract with Mayo of November 1997. Appx1265-1270. The

only funds the Government and the CFC point to as "used by USF" in reducing the invention of the '094 Patent to practice prior to that time are *funds provided by USF to David Morgan as an advance* before federal funding was received. The Government acknowledges, p. 42 of its brief, that the only money received by Morgan at that time came from USF in the form of one or more advances.

The Government's brief dwells at some length on the establishment, *by USF*, of an account where advances paid *by USF* were deposited to fund certain aspects of a project distinct from the one that led to the '094 Patent – described as Project V under Grant AG14633. Appx0008. There is no dispute - all those funds provided prior to the written subcontract between Mayo and USF were deposited *by USF* as advances that had been requested by David Morgan to pay, in part, for his wife Marcia Gordon. Both were at USF. Appx0010:

> Dr. Morgan explained further that… 'rets' that were prepared to retroactively charge for salary that was paid from another source for that, meaning that "the department may have essentially subsidized her for some period of time, and then the grant was charged once . . . the subcontract was finalized for that purpose."

Morgan testified that not only was the use of advances to defray expenses conventional – it is what he would assume he had done as he had no proof or any certain memory.

> "[W]hat I would have assumed I would have done, is that once I learned from the Mayo Clinic that they had received the notice of award from the NIH . . .. I would have gone to USF and requested that they provide an advance on that award. Appx0010.

Morgan confirmed on cross-examination that the money received by Gordon was money advanced by, and provided by, USF – not NIH or Mayo. The money in the fund set up for this purpose, USF Account 6113-120-LO, was in fact funded by "USF dollars". Appx0566-0567:

> Q. And those funds that you would be asking for in advance, those would be, in a sense, USF dollars, correct?
>
> A. They would be USF dollars that would be reimbursed once the subcontract was finalized.
>
> Q. And you would have to finalize the subcontract between, in this case, USF and Mayo before money would flow to USF. Is that right?
>
> A. Yes.

Morgan was not the only witness to testify that funds under AG14633 could not and did not flow to USF until the express subcontract between Mayo and USF was arrived at, which occurred on November 9, 1997 well after the patented mice were reduced to practice. All four fact witnesses, Morgan, Marcia Gordon (Appx0653-0655), Karen Duff (Appx0136) and the Government's witness Stephen Snyder (Appx2605-2608) testified identically – no money went to USF under the NIH grant until the subcontract with Mayo was signed in November 1997. Marcia Gordon – the individual who was the beneficiary of the advances secured by David Morgan, testified clearly on this point. (Appx0653-0656).

USF, the Government, and the court below all agreed – the first actual reduction to practice of the subject matter of the '094 Patent occurred on April 25, 1997. Whether there was an "implied-in-fact agreement" or not (there wasn't), whether there was evidence of desire by Mayo for such an agreement before November 1997 or not (there wasn't), the testimony is clear, consistent and *uncontroverted* that USF's receipt of funds under the imaginary "funding agreement" on which the Government relies could not begin until that express subcontract was executed – USF did not and could not receive any federal funding under Grant AG14633 before November 9, 1997. The hopes and expectations of Morgan and Gordon do not alter the situation in any way. The simple and determining truth is that no money flowed to USF from the Federal Grant until well after the first actual reduction to practice of the '094 Patent. The CFC's finding to the contrary was clear error.

## III. THE EXPRESS AGREEMENT BETWEEEN USF AND MAYO UNDER AG 14633 PRECLUDES THE POSSIBILITY OF AN EARLIER "IMPLIED-IN-FACT AGREEMENT"

In its Post-Trial Briefs, USF argued that, according to well established precedent, including this Court's Decision in *University of West Virginia Board of Trustees v. Van Voorhies*, 278 F.3d 1288, 1302 (Fed. Cir. 2002), no "implied-in-fact agreement" between USF and Mayo for work under Grant AG14633 could exist given the express written subcontract between them for that work – which

was entered into *months after* the first actual reduction to practice of the invention of the '094 Patent. Appx3798, Appx3821-3823. The CFC did not deal with this argument either, ignoring it and finding the "implied-in-fact agreement" on which the Government relies here.

USF appeals, arguing, *inter alia,* as it did below, that the very existence of the express written subcontract between USF and Mayo for the exact same work the CFC identified as the subject of the "implied-in-fact agreement" precluded finding any such "implied-in-fact agreement." Opening Brief, pp. 29 – 30. The Government, in responding to USF's Opening Brief, offers *absolutely no argument or opposition* with respect to this position at all. The Government's Brief does not argue USF waived this issue, misapplied this issue, or otherwise erred in any respect with regard to USF's reliance on the express written subcontract between USF and Mayo. Since the Government has surrendered its position on the question of an "implied-in-fact agreement" in the face of the express written contract between USF and Mayo, this case needs to be remanded to the CFC for resolution of the issues of patent infringement originally presented.

Any argument that an "implied-in-fact contract" existed for the exact same work – work pursuant to NIH Grant AG14633 - is foreclosed as a matter of law. *Bank of Guam v. United States*, 578 F.3d 1318, 1330 (Fed. Cir. 2009). Given that the Government concedes, by silence, that no "implied-in-fact agreement" for

work under the federal grant in question could exist in the face of a written subcontract between Mayo and USF for that same work, reversal of the decision of the CFC's Decision, and remand to resolve damages is respectfully requested.

## IV. THE ELEMENTS A COURT MUST IDENTIFY BEFORE AN IMPLIED-IN-FACT AGREEMENT MAY BE FOUND WERE NOT PRESENT

USF argues here, as it did below, that before the CFC could conclude an "implied-in-fact agreement" between USF and Mayo existed prior to April 25, 1997, it needed to identify four elements in the record – pursuant to this Court's precedent. *City of El Centro v. U.S.*, 922 F.2d 816, 820 (Fed. Cir. 1990):

> An implied-in-fact contract requires findings of: 1) mutuality of intent to contract; 2) consideration; and, 3) lack of ambiguity in offer and acceptance. *Russell Corp. v. United States* 537 F.2d 474, 482 (Ct. Cl. 1976), cert. denied, 429 U.S. 1073 (1977); *Fincke v. United States*, 675 F.2d 289, 295 (1982). When the United States is a party, a fourth requirement is added: the Government representative "whose conduct is relied upon must have actual authority to bind the government in contract." *Juda v. United States*, 6 Cl. Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947).

None of these elements was identified or found by the trial court in its decision. Having no adequate response to this argument, the Government insists USF waived the argument. In fact, USF presented the argument precisely as recited here in its briefing on Summary Judgment, that motion having been denied by the trial court on December 20, 2019, Appx0070-0076.

USF first responds briefly to the Government's argument that USF somehow waived the very issues presented to, and decided by, the court below, and then turns to the merits of the issues asserted to be waived – the requirements that must be met before an "implied-in-fact agreement" may be found, and the statutory requirements of "funding agreements" under the Bayh-Dole Act.

### A. There Was No Waiver – USF Expressly Presented the Arguments the Government Urges Were Waived

The burden of proof to demonstrate that it is entitled to a license as the benefit of an "implied-in-fact agreement" to practice the subject matter of the '094 Patent, on which the Government relies, rests on the Government. *Ideal Innovations, Inc. v. United States*, 148 Fed. Cl. 385, 395 (F. Cl. 2020) citing *Tech. Dev. Corp. v. United States*, 597 F.2d 733, 746 (Ct. Cl. 1979). The United States never shouldered that burden. Accordingly, USF moved for Summary Judgment that the Government was not entitled to such a license. In the course of preparing that Summary Judgment Motion, this Court issued its decision in *American Bankers Association v. United States*, 932 F. 3d 1375 (Fed. Cir. 2019) which USF expressly relied upon Appx4300-4319, to demonstrate that to support the existence of the "implied-in-fact agreement" the Government asserted, the Government needed to show "mutuality of intent to contract, lack of ambiguity in offer and acceptance, consideration and a government representative having actual authority to bind the United States in contract.". See this Court's Decision in *American*

*Bankers Association* citing *Anderson v. United States*, 344 F. 3d 1343, 1353 (Fed. Cir. 2003).

USF's Summary Judgment submission is at Appx4300. It presents the very argument the Government now says USF waived, by never advancing! The Government filed a specific response below, Appx4320, arguing that unlike an "implied-in-fact agreement" as considered in *American Bankers Association*, the "relevant law relates to the definition of a "funding agreement" under the Bayh-Dole Act, arguing that properly structured, a "funding agreement" under 35 U.S.C. §202(c)(4), the Bayh-Dole Act guarantees the government a license. This is a precise statement of the second issue the Government insists USF waived! Government's Brief, pp. 43 – 49.

The trial court discussed the requirements of "implied-in-fact contracts" and the requirements of a "funding agreement" under the Bayh-Dole Act in denying USF's Motion for Summary Judgment. Appx0070-0076. There could not have been a waiver – both parties and the CFC discussed the precise arguments, in Summary Judgment Motion papers, expressly considered before trial. *Rekhi v. Wildwood Industries, Inc.*, 561 F.3d 1313, 1318 (7th Cir. 1995). (Defenses are not extinguished or waived merely because they are presented and denied at Summary Judgment. "The defendant can reassert the defense on appeal.") See, *SSI*

*Technologies, LLC v. Dongguan Zhengyang Electronic Mechanical Ltd.*, 2021-2345, 2022-1039, Slip. Op. 2-13-2023 at p. 14.

What is particularly disturbing is that counsel for the Government was well-aware of the briefing submitted by USF, see the Government's Brief, fn. 1, page 4 referencing the submission by USF on *American Bankers Asoc.* but counsel declined to cite or consider these filings or even make them part of the record on appeal. It is possible that Government counsel discounted their impact on waiver due to its mischaracterization of an unrelated decision, *Flynn v. Sandahl*, 558 F. 3d 283 (7th Cir. 1995), which the Government argues stands for the unlikely proposition that "a summary judgment motion does not (sic) to 'preserve legal arguments for appeal'." Appellee's Brief, fn. 21, p. 44. That is clearly not a correct characterization of the decision in *Flynn*. *Flynn* simply stands for the proposition that:

> "[T]he only effect of a non-movant's failure to respond to a motion for summary judgment is that it constitutes an admission by the non-movant that there are no disputed issues of genuine fact warranting a trial; it does not constitute a waiver by the non-moving party of all legal arguments based upon those undisputed. 558 F.3d at 288.

Neither *Flynn*, nor any other authority undersigned counsel could find, remotely suggests that an issue raised by the parties and decided by the trial court on Summary Judgment can be considered waived by the non-moving party.

"Waiver refers to the intentional relinquishment or abandonment of a known right." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) citing *United States v. Olano*, 507 U.S. 725, 733 (1993). Nowhere, in any argument, motion or brief filed in the seven-year pendency before the CFC in this matter, did the Government suggest or identify any set of facts or conduct that might support the notion that USF intentionally relinquished the arguments it expressly advanced on Summary Judgment. The standard for waiver is a simple one. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1345 (Fed. Cir. 2001) citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) and Moore's Federal Practice §205.05, at 205–55 (3d ed. 1997):

> It is a long-standing rule that, in order to be reviewable on appeal, a claim or issue must have been 'pressed or passed upon below.'

The legal arguments the Government now argues were waived (the failure to find the elements required of an "implied-in-fact agreement" and the requirement to provide a "Funding Agreement" of the Bayh-Dole Act) were both pressed in briefing a Motion for Summary Judgment, and passed upon below by the CFC's Decision, Appx0070-0076, denying that motion. Pure and simple, the Government has no adequate answer to the substance of these arguments, so it now claims they were somehow waived, in the absence of any indication USF intended "to relinquish or abandon them."

### B. The Elements of an "Implied-in-Fact Agreement" Were Not Found By the CFC

The law requires that specific elements must be identified before an "implied-in-fact agreement" – such as that found by the CFC – may be demonstrated. Not one of the four specific elements required by this Court's precedent before an "implied-in-fact agreement" may be found to exist was identified by the trial court in its September 2, 2022 Decision. The Government's Brief does not argue that the four elements required were found – instead, it tries to suggest they are not required or were otherwise present, despite the trial court's failure to identify them. While the Government's Brief suggests that some of these elements were present in the facts surrounding the case, and attempts to supply them, Government's Brief, 47 – 49, that analysis is flawed. Each of the four elements that must be found before an agreement will be implied-in-fact by a court is discussed below.

1. The first element that must be shown to establish an "implied-in fact agreement" was arrived at is "mutuality of intent." Bearing in mind that these elements must be demonstrated by the conduct of the parties – USF and Mayo - there is absolutely no evidence, and the Government cites none, of any conduct by Mayo reflecting its intention to enter into the "implied-in-fact agreement" theorized to have existed. The Government points to the "funding of Dr. Gordon's appointment" and Dr. Morgan's observation that USF was dependent on the grant

funds, although Dr. Morgan did not indicate that USF was dependent on them, but rather only that the funding for his laboratory was. Appx0010. Respectfully, the USF actions the Government cites are evidence of conduct only between USF, Dr. Gordon and Dr. Morgan – not Mayo.

The Government insists that there was mutuality of intent to enter this "implied-in-fact contract" between USF and Mayo. Neither USF's support for Dr. Gordon, who had been funded by a variety of grants and contracts, Appx0611-0612, nor USF's provision of monetary advances of USF funds to USF researcher David Morgan, demonstrates ANY evidence of intent on Mayo's part to enter an implied-in-fact contract. Insisting that there was a "tacit agreement" (CFC Decision, Appx0014) is not a substitute for evidence of Mayo's intent. Since no evidence of the conduct of Mayo, or its intentions, was ever presented, there is simply no evidence that Mayo intended to enter a subcontract with USF at any time prior to April 25, 1997. The very earliest such evidence is dated is in November of that year, when Mayo demonstrated its intent by entering an express, written contract for the exact same work under Grant AG14633.

2. The second element that must be shown to establish the existence of an "implied-in-fact agreement" is lack of ambiguity in "offer and acceptance" of the terms of the "implied-in-fact agreement." The trial court's analysis relied upon by the Government does not reflect any "offer or acceptance" of any contract or

agreement by Mayo, ambiguous or otherwise. The Government's brief instead insists that it was not conduct, but a "tacit understanding" it relied upon. From the Government's Brief, p. 42:

> [T]he conduct of the parties (USF and Mayo) indicated their "'tacit understanding' that grant funds would flow from the NIH to the Mayo Clinic and ultimately to plaintiff [USF]" by October 1, 1996, the date of Dr. Gordon's appointment funded by the USF account for Mayo grant funds. Appx0014

Respectfully, there was NO conduct exhibited by Mayo– at all! The record is devoid of ANY evidence reflecting conduct by Mayo. It was the Government's burden to advance this evidence – in its absence, no "implied-in-fact agreement" can be found.

Even if there had been evidence pertaining to Mayo (there was none) – it would have to reflect not a "tacit agreement" but some sort of conduct that was clear and non-ambiguous, conduct evincing Mayo' intent to enter into a subcontract with USF. There is no such evidence – there is only evidence that David Morgan wanted to secure advance money from USF to support his laboratory. That does not support the notion that Mayo supported that, or even knew about it.

3. The Government's Brief, at page 43, acknowledges that the third element that must be demonstrated to establish the existence of an "implied-in-fact

agreement" – consideration – was not demonstrated. Instead, the Government advances a peculiar form of circular reasoning:

> For example, the trial court cited Dr. Morgan's testimony that he would have requested advanced funds from USF only after he "learned from the Mayo Clinic that they had received notice of award." …
>
> Dr. Duff's receipt and use of the USF immunohistology results (and maintenance of the mouse colony) provides consideration from USF to Mayo. Government's Brief, p. 48.

The work funded by USF in doing histology, and maintaining a mouse vivarium did not somehow benefit Mayo – those were activities engaged in by USF (not Mayo) years before AG16433 was ever applied for. Dr. Duff's actual reduction to practice of the invention of the mice of the '094 Patent on April 25, 1997 was similarly of no benefit to Mayo – Duff had assigned the '094 Patent rights to USF months earlier. Appx1175-1176.

There is simply no evidence of any conduct engaged in by Mayo that would reflect any sort of consideration flowing to either USF or Mayo, a prerequisite for an "implied-in-fact agreement" to exist. Contrast this with the later express contract, which specifically recites that USF will receive compensation (up to $145,152.00) in consideration for work under the Grant by USF if fully reported to Mayo. Appx1266-1267.

4. There was no government authority of any type sufficient to approve the agreement the Government insists Mayo exchanged with USF, which the

government insists gave the U.S. a license. This fourth element that must be demonstrated to establish the existence of an "implied-in-fact agreement" that grants rights to the United States government is nowhere identified by the Government here – rather the Government insists that for THIS agreement, it need not be shown, as the Government is not a party to the purported subcontract with USF. That is simply not the law. *El Centro*, 922 F. 2d at 820. Whenever an "implied-in-fact agreement" is asserted as the basis for a right in favor of the United States government, there must be "a government representative having actual authority to bind the United States in contract." *Juda v. United States*, 6 Cl. Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947). The Government and CFC insist that the Government did receive a benefit – a license to use the invention of the '094 Patent – from the asserted "implied-in-fact agreement." To receive such a benefit – there must have been the approval by someone having actual authority.

Such approval was eventually provided, but not by October 1, 1996 as the decision below insists must have been the case. Appx0012. Instead, no authority was provided by the United States Government to Mayo to engage in and negotiate subcontracts under the Grant until the necessary paperwork was completed later. Dr. Duff spoke to the process, and the delays often encountered. Appx0136-0139:

> [T]he grant was awarded to Mayo Clinic. The portion of the work to be done by Marcia Gordon was a subcontract, and subcontracts are

> very often delayed, as the host institution has to process the paperwork with NIH to allow the subcontractor to receive its money. So the grant would have gone first of all to Mayo and subsequently to USF…
> Q. You indicated that it sometimes takes some time to award subcontracts under an NIH grant. Could you explain that in a little more detail? Why does it take time?
>
> A. The NIH wheels move slowly, and the first award is usually worked out with the host institution, which in this case was Mayo Clinic, and then the arrangement is made with the subcontractor for the transfer of money, and final details are, you know, approved, and so it takes some time for that process.

Indeed, Marcia Gordon, the individual most clearly funded by the subcontract, offered her own testimony on cross-examination remarking at the long delay between the Grant award and the subcontract date. Appx0656:

> That's a very good point. That's very interesting. I didn't realize there was a year difference there.

There can be no question – until the authority to enter into subcontracts was transferred from NIH to Mayo much later than October 1, 1996, no "implied-in-fact agreement" could be arrived at – Mayo could not provide the necessary authority to support the license the Government insists was part of that "implied-in-fact agreement." *Schism v. United States*, 316 F. 3d 1259, 1263 (Fed. Cir. 2002).

Not one of the elements required to establish the existence of an "implied-in-fact agreement" was made out by the Court of Federal Claims' Decision. Not one of the elements required to establish the existence of an "implied-in-fact agreement" was reflected by the evidence, evidence which reflects no conduct by

Mayo at all, or even awareness by Mayo, of any conduct by USF. Not one of the elements required to establish an "implied-in-fact agreement" that benefits the Government was made out by the decision of the trial court. And yet, this "implied-in-fact agreement" whose elements were not and cannot be shown is all that was found to shield the Government from liability for infringement of the '094 Patent. The "implied-in-fact agreement" was a chimera – something the Government hoped for but is in fact illusory and does not exist.

The Decision below should be reversed, with a remand to resolve the Government's patent liability.

### C. The Bayh-Dole Act Requires "Each Funding Agreement… With a Non-Profit Organization Shall Contain" Provisions to Satisfy Eight Specific Objectives

The Government urges this Court conclude that the "implied-in-fact agreement" found below satisfies the requirements of a "funding agreement" as defined and characterized by the Bayh-Dole Act, 35 U.S.C. §202(c). It identifies no case law support for this notion, and acknowledges that no Federal Court has ever reached such a conclusion in the 43-year existence of the Act. It instead insists that because 35 U.S.C. §201 recites that a funding agreement can be "any contract, grant or cooperative agreement… or subcontract of any type" such "Funding Agreements" under the Bayh-Dole Act can be implied-in-fact agreements without the provisions expressly required by statute. Respectfully – the Government did

not read that statute, 35 U.S.C. §202(c), which spells out the requirements for such a "Funding Agreement" with a nonprofit entity like USF.

The Bayh-Dole Act defines the nature of a "funding agreement" by reliance on the elements required of such an agreement as recited in 35 U.S.C. §202(c). Pursuant to statute, to qualify as a "funding agreement" with a nonprofit entity, each and every "funding agreement" must expressly advance different provisions to "effectuate" eight goals before the statute is satisfied. The language of the statute is not permissive, but mandatory. Each "funding agreement" "shall contain appropriate provisions" to meet certain requirements. Those requirements are spelled out in the eight subsections of 35 U.S.C. §202(c), statutory provisions nowhere discussed in the Government's Brief. *Pursuant to statute* – if an agreement or contract is to satisfy the requirements of the Bayh-Dole Act, that contract must contain provisions establishing:

1. All contractors (receiving money under a funding agreement) disclose any inventions conceived or first actually reduced to practice with federal funding within a reasonable time after it becomes known;

2. All contractors must make a written election within two years after disclosure as to whether the contractor will retain title to the invention;

3. A contractor electing to retain title to a subject invention must file a patent application directed to that subject invention;

4. The contract, to satisfy the Bayh-Dole Act, must provide for a license to practice the subject invention on behalf of the United States;

5. The Federal Government can require periodic reporting on the utilization of the subject invention.
6. All contractors must include a written statement in all patents and applications specifying that the subject invention as made with Government funding;

7. A prohibition on the rights of non-profit contractors preventing them from assigning the rights in subject inventions without Government approval;

8. A contractor must honor the March in Rights and Preference For Domestic Industry set forth in 35 U.S.C. §§203 and 204.

Respectfully, these are not the elements of an "implied-in-fact agreement" – they are precise, complex, and must be worded to effectuate specific action called for in each of the subsections of 35 U.S.C. §202(c).

In point of fact the Government 'implicitly' recognizes the criticality of satisfaction of at least one of the requirements of the statute. Of the eight distinct provisions of 35 U.S.C. §202(c) that must be present before a "funding agreement" satisfies the requirements of the Bayh-Dole Act, the longest and most complex is the one the Government relies on in this case – calling for a specific provision in any "funding agreement" under the Bayh-Dole Act to include a license in favor of the Government to use a "subject invention." This provision must, *like all the others*, be present in any contract before the "funding agreement" meets statutory requirements. 35 U.S.C. §202(c)(4) – it does not simply arise because federal funds

are involved. Recognizing the criticality of this statutory provision, the Government insists that this provision of the Bayh-Dole Act, and ONLY this provision, must be "implied into any implied-in-fact agreement" – even in the absence of a mutual understanding by the contractor, the subcontractor, and the federal agency. See the Government's Brief, pp. 45 – 46.

With respect – this is not how "implied-in-fact agreements" are characterized. There can be no provision to "imply" yet another agreement – a license - into an "implied-in-fact subcontract." It is non-sensical to suggest such a structure. The statute specifically states that the "funding agreement" must recite that license – if it is not recited, the agreement in question does not satisfy the statutory requirements of the law. This is why many parties incorporate previously approved language into their agreements involving Federal Funding – precisely as recited in Article 17 of the actual subcontract that eventually came to exist between Mayo and USF. Appx1268. In the absence of that kind of provision – any such subcontract would not satisfy the statutory requirements of the Bayh-Dole Act

This is why no Federal Court, anywhere, has ever found an "implied-in-fact agreement" to satisfy the requirements of the Bayh-Dole Act. It makes no sense at all to imply a license into an "implied-in-fact agreement." The statute requires that provision, along with the other provisions of 35 U.S.C. §202(c)(1-8) be specifically

recited in the "funding agreement." The Statute is not open to the inclusion of "funding agreements" that do not recite those requirements.

The decision of the Court of Federal Claims, relying exclusively on an imagined "implied-in-fact agreement" that does not satisfy the requirements of the Bayh-Dole Act, should be reversed, and the case remanded for resolution of all outstanding matters.

## V. CONCLUSION

The Court of Federal Claims created an "implied-in-fact agreement" where none was supported by the evidence or permitted under law. It did so to shield the Government from the obligation to pay damages for patent infringement – an issue the trial court refused to entertain. That decision, to protect the Government, perforce had to find an "implied-in-fact agreement" arose prior to April 25, 1997 – the day the mice of the '094 Patent were first actually reduced to practice. No such "implied-in-fact agreement" was intended by the parties, reflected by their conduct or compliant with the law.

Moreover, no money ever flowed to USF from Mayo prior to their written, express contract arrived at in November 1997. The "tacit understanding" the Government references repeatedly was nothing other than the hope and desire of David Morgan, who was supported by money advanced his laboratory by USF, prior to the subcontract of November, 1997. A "tacit understanding" requires the

understanding of two parties – Mayo and USF. No evidence suggests any sort of understanding by Mayo with respect to a subcontract existed before November 1997. Morgan *hoped* the advances provided to him by USF would be reflected in a subcontract with Mayo to be arrived at later on. Those unilateral hopes of David Morgan do not reflect an understanding between USF and Mayo– tacit or otherwise, or somehow support the existence of an "implied-in-fact agreement" between Mayo and USF.

The Government offers no argument or opposition to the position taken years ago by USF, and renewed at trial and here, that no reliance on an "implied-in-fact agreement" between USF and Mayo to do work under Grant AG14633 may be had, given the existence of the express subcontract to do exactly that. Appx1265-1270. The improper "implied-in-fact agreement" conjured by the trial court would not provide the Government with a license under the '094 Patent. The subcontract actually entered into, which IS of record, was executed months after the first actual reduction to practice of the invention of that patent, and so conveys no license to the patented mice.

There is no decision out of any Federal Court that finds an "implied-in-fact agreement" to be sufficient to provide the Government a license under the Bayh-Dole Act. The statute requires a "funding agreement" with a nonprofit entity to have specific, express provisions, including the provision of a license for use.

Without satisfaction of the statute, there is no “funding agreement” under the law, and no license in favor of the Government.

The trial court’s decision was contrary to the facts, the law and statute. Even the Government does not appear to disagree - that decision is contrary to law which prohibits an “implied-in-fact agreement in the face of a written one.” USF respectfully requests the decision of the CFC in this matter be reversed, and the case remanded for resolution of all issues outstanding.

Respectfully submitted,

/s/ Steven B. Kelber

Steven B. Kelber
THE KELBER LAW GROUP
6701 Democracy Blvd., Suite 300
Bethesda, MD 20817
Tel: (240) 506-6702
E-Mail: steve@kelberlawgroup.com

Jerry Stouck
JERRY STOUCK AND MINDY BUREN
10863 Symphony Park Dr
North Bethesda, MD 20852
Tel: (301) 807-5100
E-Mail: jerrystouck@verizon.net

*Counsel for Appellant*
UNIVERSITY OF SOUTH
FLORIDA BOARD OF TRUSTEES

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 16th day of February, 2023, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Walter W. Brown
Gary L. Hausken
U.S. DEPARTMENT OF JUSTICE
walter.brown2@usdoj.gov
gary.hausken@usdoj.gov

*Counsel for Appellee*

/s/ Steven B. Kelber
*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*6,092*] words.

[ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: February 16, 2023

/s/ Steven B. Kelber
*Counsel for Appellant*